**The PEOPLE of the State of Colorado, Plaintiff–Appellee/Cross–Appellant,**

v.

**Frank D. RODRIGUEZ, Defendant–Appellant/Cross–Appellee.**

No. 91SA112.

Supreme Court of Colorado,
En Banc.

March 11, 1996.

As Modified on Denial of Rehearing
April 15, 1996.

Gale A. Norton, Attorney General, Stephen K. ErkenBrack, Chief Deputy Attorney General, Timothy M. Tymkovich, Solicitor General, John Daniel Dailey, Deputy Attorney General, Robert Mark Russel, First Assistant Attorney General, Robert M. Petrusak, Senior Assistant Attorney General, Criminal Enforcement Section, Denver, for Plaintiff–Appellee/Cross–Appellant.

David F. Vela, State Public Defender, Michael J. Heher, Deputy State Public Defender, Nora V. Kelly, Denver, for Defendant–Appellant/Cross–Appellee.

Justice ERICKSON delivered the Opinion of the Court.

In 1986, the trial court[1] sentenced Frank Rodriguez to death for his participation in the kidnapping, robbery, rape, and murder of Lorraine Martelli. We affirmed the imposition of the death sentence, *People v. Rodriguez*, 794 P.2d 965 (Colo.1990) (*Rodriguez IV*), and the United States Supreme Court denied certiorari. *Rodriguez v. Colorado*, 498 U.S. 1055, 111 S.Ct. 770, 112 L.Ed.2d 789 (1991). Pursuant to Crim.P. 35, Rodriguez sought postconviction review of his death sentence. The district court granted relief in part, denied relief in part, and refused to vacate the death sentence. Both Rodriguez and the prosecution appealed. We affirm in part, reverse in part, and remand in part with directions.

I

*Facts and Procedural History*

On November 14, 1984, Rodriguez;[2] his brother, Chris Rodriguez; David Martinez; and Patricia Thomas participated in events which culminated in the brutal murder of Lorraine Martelli. The facts of the murder are set forth in *People v. Rodriguez*, 794 P.2d 965, 969–971 (Colo.1990) (*Rodriguez IV*), *cert. denied*, 498 U.S. 1055, 111 S.Ct. 770, 112 L.Ed.2d 789 (1991).[3] A jury convicted Rodriguez of first-degree murder, first-degree felony murder, first-degree sexual assault, first-degree aggravated motor vehicle theft, second-degree kidnapping, aggravated robbery, conspiracy to commit first-degree murder, conspiracy to commit second-degree kidnapping, conspiracy to commit first-degree aggravated motor vehicle theft, and five counts of using a deadly weapon during the commis-

sion of the above offenses. R., v. 3 at 545–558.

In a separate proceeding, Rodriguez' brother, Chris Rodriguez, was convicted of the following crimes: first-degree murder, first-degree sexual assault, aggravated motor vehicle theft, second-degree kidnapping, robbery, conspiracy to commit first-degree murder, conspiracy to commit second-degree kidnapping, and conspiracy to commit aggravated motor vehicle theft. *People v. Rodriguez*, 786 P.2d 472, 473 (Colo.App.1989), *cert. denied*, No. 89SC600 (Colo. Jan. 29, 1990). David Martinez was convicted of second-degree kidnapping and sentenced to twenty years. R., v. 67 at 105. The prosecution granted Patricia Thomas immunity in exchange for her testimony and did not charge her for her participation in the criminal episode. *See* R., v. 2 at 8.

Prior to the penalty phase of Rodriguez' prosecution, the trial court conducted a habitual criminal proceeding pursuant to section 16–13–103, 8 C.R.S. (1984 Supp.), and the jury found beyond a reasonable doubt that Rodriguez had been convicted of three prior felonies. R., v. 33 at 63–65.

At the penalty phase of Rodriguez' trial, the jury found that six statutory aggravating factors existed beyond a reasonable doubt: (1) committing murder while under a felony sentence of imprisonment; (2) intentionally killing a person kidnapped by him or by anyone associated with him; (3) intentionally killing a person in furtherance of an agreement to kill; (4) intentionally causing the death of a person in the course of or in furtherance of a felony or in his immediate flight therefrom; (5) killing in an especially heinous, cruel or depraved manner;[4] and (6)

1. Throughout this opinion, we use the term "trial court" to refer to the court which presided over the guilt and penalty phases of Rodriguez' trial. We use the term "district court" to refer to the court which presided over Rodriguez' postconviction motions.

2. In this opinion, we use "Rodriguez" to refer to Frank Rodriguez and refer to Frank Rodriguez' brother, Chris Rodriguez, by both first and last name.

3. During the trial, Rodriguez filed an original proceeding challenging the trial court's orders denying his motion for recusal of the trial judge and granting the prosecution's motion to disqual-

ify the public defender from representing Rodriguez because of a conflict of interest. In *Rodriguez v. District Court*, 719 P.2d 699 (Colo.1986) (*Rodriguez I*), this court held that Rodriguez failed to prove bias, prejudice, or other grounds that warranted disqualification of the trial judge and remanded for a determination of whether Rodriguez voluntarily, knowingly, and intelligently waived his right to conflict-free representation. *Id.* at 702–08.

4. In *Rodriguez IV*, we held that, in the absence of a limiting instruction, the aggravating factor that "the defendant committed the offense in an especially heinous, cruel or depraved manner" violated the Eighth Amendment because that factor

committing murder for the purpose of avoiding or preventing a lawful arrest or prosecution. R., v. 4 at 746–52; *see* § 16–11–103(6), 8A C.R.S. (1986). The jury further found that the mitigating factors did not outweigh the aggravating factors and sentenced Rodriguez to death. R., v. 4 at 753.

The trial court stayed the death sentence pending an automatic direct appeal, pursuant to section 16–11–103(7), 8A C.R.S. (1986), and C.A.R. 4(d).[5] The Colorado State Public Defender's Office represented Rodriguez on direct appeal. After four extensions of time to file an opening brief and nearly two years after the case had been docketed in this court, defense counsel filed a 138–page document entitled "Partial Opening Brief," with a protest that a complete brief could not be filed without an additional extension of time.[6] Am.R., v. 18 at 1–151. Rodriguez attached an appendix to the "Partial Opening Brief" which listed 102 additional issues which he claims he wanted to raise, but could not because of unreasonable time limitations and an inadequate record on appeal.[7] Am.R., v. 5 at 1219–1231.

On direct appeal, we affirmed the death sentence. *Rodriguez IV,* 794 P.2d 965. On February 11, 1991, Rodriguez filed a Crim.P. 35(b) motion for reduction of sentence, and, on February 21, 1991, the district court denied relief. Am.R., v. 4 at 823. On March 13, 1991, Rodriguez filed a notice of appeal in the court of appeals seeking review of the district court's denial of his Crim.P. 35(b) motion. *Id.* at 889–91. On March 28, 1991, we accepted jurisdiction over the appeal and granted Rodriguez' motion for a stay of execution. *Id.*

On March 25, 1991, Rodriguez filed a Crim.P. 35(a) and (c) motion in the district court and a motion to obtain the appointment of private counsel to investigate and litigate claims of ineffective assistance of counsel. *Id.* On April 12, 1991, the prosecution filed a motion to dismiss Rodriguez' motions on the ground that the district court lacked jurisdiction over the case due to the pendency of the Crim.P. 35(b) appeal in this court. *Id.* at 881. On April 19, 1991, Rodriguez filed a motion to withdraw the previously filed Crim.P. 35(a) and (c) motion. *Id.* at 888. On May 30, 1991, we ordered that the case be remanded to the district court for the limited purpose of setting a time frame to permit Rodriguez to file any and all postconviction claims relating to his conviction and sentence. *Id.* at 889–91. We further ordered that the district court conduct a hearing on all such claims that it deemed appropriate and issue a final ruling without unnecessary delay. *Id.* On July 8, 1991, the district court ordered that Rodriguez submit all post-trial motions by August 1, 1991. *Id.* at 897.

On August 1, 1991, Rodriguez filed a Crim.P. 35(c) motion for postconviction review of his death sentence which was over 700 pages and raised 319 claims for relief relating to the guilt and penalty phases of the trial and the direct appeal. *See* Am.R., vv. 11–13, 68. Rodriguez' postconviction motion also contained claims relating to ineffective assistance of counsel and newly discovered evidence.

On December 11, 1991, the district court appointed Richard Hostetler as independent counsel to investigate and litigate Rodriguez' claims of ineffective assistance of counsel.

---

failed to provide sufficient guidance to the capital sentencer. 794 P.2d at 982–83. We concluded that the inclusion of that invalid aggravating factor was harmless beyond a reasonable doubt and did not require that Rodriguez' death sentence be vacated. *Id.*

5. After submission of the appeal, we granted the prosecution's request for a limited remand to the trial court to determine whether the prosecution should be required to disclose possibly exculpatory evidence to the defense. *People v. Rodriguez,* 786 P.2d 1079 (Colo.1989) (*Rodriguez II* ). Following the limited remand, we held that the state must disclose such evidence to Rodriguez. *Peo-*

*ple v. Rodriguez,* 794 P.2d 964 (Colo.1990) (*Rodriguez III* ).

6. Under C.A.R. 28(g), the principal briefs of both parties shall not exceed thirty pages and a reply brief shall not exceed eighteen pages without permission of the appellate court. We permitted both the defense and the prosecution to exceed the page limits imposed by the rule.

7. The "Partial Opening Brief" raised errors relating solely to the penalty phase of trial. The appendix to the "Partial Opening Brief" listed errors relating to both the guilt and penalty phases.

Am.R., v. 6 at 1486. On January 19, 1993, Hostetler filed a separate Crim.P. 35(c) motion claiming that Rodriguez received ineffective assistance of counsel during the guilt and penalty phases of his trial and on direct appeal. Am.R., v. 7 at 1631–1647. The district court held a hearing on Rodriguez' claims of ineffective assistance of counsel and, on October 7, 1993, denied relief. *Id.* at 1762–88.

On February 14, 1994, the district court ruled on Rodriguez' Crim.P. 35(c) motion that had been filed on August 1, 1991. The district court vacated Rodriguez' convictions for felony murder, conspiracy to commit second-degree kidnapping, and conspiracy to commit aggravated motor vehicle theft, but denied Rodriguez' motion to vacate the death sentence. R., v. 1 at 216–219. The district court denied all of Rodriguez' remaining postconviction claims, *see id.* at 152–222, but reserved ruling on the allegations of newly discovered evidence. *Id.* at 221–222. On March 17, 1994, the district court held a hearing on Rodriguez' claims of newly discovered evidence and denied relief. *See* R., v. 67 at 182–83.

Rodriguez now appeals the district court's denial of his Crim.P. 35(c) postconviction claims and its refusal to vacate his death sentence. Rodriguez' Opening Brief on this appeal is 419 pages and raises 151 issues. A list of these issues is attached as Appendix A.[8] Rodriguez also appeals the district court's denial of his claims alleging ineffective assistance of counsel. This issue was separately briefed on this appeal.

The prosecution cross-appeals, arguing that the district court erroneously vacated Rodriguez' convictions for felony murder, conspiracy to commit second-degree kidnapping, and conspiracy to commit aggravated motor vehicle theft.

The primary question on appeal is whether the district court erred in determining that Rodriguez' Crim.P. 35 motion did not warrant reversal and vacation of his death sentence. We conclude that the district court's vacation of Rodriguez' duplicative sentences and our remand to the district court of Rodriguez' conviction for first-degree sexual assault as a class 2 felony, *see infra* parts IX(A) and XIV, provide the only relief available to Rodriguez on the arguments presented in his Crim.P. 35 motions. Accordingly, we affirm in part, reverse in part, and remand in part with directions.

## II

### *Issues Previously Litigated*

#### A

■ The district court denied 110 of the 319 postconviction claims Rodriguez raised in his Crim.P. 35(c) motion,[9] holding that Rodriguez could not raise claims that he previously raised on direct appeal and which this court previously resolved in *People v. Rodriguez*, 794 P.2d 965 (Colo.1990) (*Rodriguez IV* ), and *Rodriguez v. Dist. Ct., City & Cty. of Denver*, 719 P.2d 699 (Colo.1986) (*Rodriguez I* ). On this appeal, Rodriguez specifically asserts the following issues, which are comprised of or contain claims which the district court disposed of as previously litigated: 5, 6, 9, 10, 66, 79, 90, 91, 92, 96, 106, 115, 135, 136, 137,

---

8. Rodriguez' Opening Brief demonstrates that page limitations do indeed serve a useful purpose in the prevention of abuse of process. *See* C.A.R. 28(g). Future requests for additional pages shall set forth good cause for the extension of limitations and specify the number of additional pages requested.

9. In part I of the district court order, the court listed 111 of Rodriguez' claims under the heading *"DEFENDANT CANNOT RELITIGATE HEREIN CLAIMS RESOLVED ON APPEAL."*

R., v. 1 at 155–77. In doing so, the district court listed Claims 20 and 289 twice. Therefore, part I of the district court order disposed of only 109 of Rodriguez' claims.

In part III(A) of the order, the district court concluded that three claims regarding recusal of judges had been "previously resolved." R., v. 1 at 213–14. However, two of these three claims were also included in the claims resolved in part I of the order. Thus, in parts I and III(A) of its order collectively, the district court denied 110 of the 319 claims as previously litigated.

138, 150, and Rodriguez' argument that the inadequacy of the record on appeal denied him effective assistance of counsel.[10] In Issue 1 of this appeal, Rodriguez attempts to salvage the remaining claims which the district court disposed of as previously litigated, asserting that "the district court's ruling that Mr. Rodriguez had already had appellate review of many claims in his postconviction motions was erroneous." Rodriguez' Opening Brief at 32–37. We conclude that Rodriguez' failure to specifically reassert on this appeal all of the claims which the district court disposed of as previously litigated on direct appeal constitutes a conscious relinquishment of those claims which he does not reassert. Accordingly, we address only those postconviction claims that Rodriguez specifically reasserts on this appeal.

## B

■ Rodriguez has no constitutional right to postconviction review; rather, any right he has is statutory. *People v. Wiedemer*, 852 P.2d 424, 438 (Colo.1993). We presume the validity of the judgment of conviction and place upon Rodriguez the burden to establish his right to relief by a preponderance of the evidence. *See People v. Naranjo*, 840 P.2d 319, 325 (Colo.1992).

■ Rule 35 proceedings are intended to prevent injustices after conviction and sentencing, not to provide perpetual review. *People v. Hampton*, 187 Colo. 131, 133, 528 P.2d 1311, 1312 (1974). Accordingly, Rodriguez cannot use a proceeding under Rule 35 to relitigate matters fully and finally resolved in an earlier appeal. *See People v. Johnson*, 638 P.2d 61, 63 (Colo.1981); *People v. Trujillo*, 190 Colo. 497, 500, 549 P.2d 1312, 1314 (1976); *Morse v. People*, 180 Colo. 49, 52, 501 P.2d 1328, 1329 (1972); *People v. Bradley*, 169 Colo. 262, 265, 455 P.2d 199, 200 (1969); ABA Standards for Criminal Justice, Postconviction Remedies § 22–6.1(a) at 22–62 (2d ed. 1986).[11] An issue is "fully and finally litigated when the highest court of the state

to which a defendant could appeal as of right has ruled on the merits of the question." ABA Standards § 22–6.1(a) at 22–62. Moreover, an argument raised under Rule 35 which does not precisely duplicate an issue raised on appeal will be precluded if its review "would be nothing more than a second appeal addressing the same issues on some recently contrived constitutional theory." *People v. Bastardo*, 646 P.2d 382, 383 (Colo. 1982).

■ The United States Supreme Court has defined the concept of "same grounds" for the purposes of successive applications for postconviction relief by federal prisoners:

> By "ground," we mean simply a sufficient legal basis for granting the relief sought by the applicant. For example, the contention that an involuntary confession was admitted in evidence against him is a distinct ground for federal collateral relief. But a claim of involuntary confession predicated on alleged psychological coercion does not raise a different "ground" than does one predicated on alleged physical coercion. In other words, identical grounds may often be proved by different factual allegations. So also, identical grounds may often be supported by different legal arguments, or be couched in different language, or vary in immaterial respects.

*Sanders v. United States*, 373 U.S. 1, 16, 83 S.Ct. 1068, 1077, 10 L.Ed.2d 148 (1963) (citations omitted); *see also People v. Scheer*, 184 Colo. 15, 19, 518 P.2d 833 (1974) (holding that previous Crim.P. 35 attacks on the voluntariness, coercion, and adequacy of advisement of defendant's guilty plea precluded raising a similar attack alleging that defendant did not understand the nature of the charge). We use this standard to assist our review of those claims which the district court disposed of as having been previously litigated.

---

**10.** We discuss these issues in parts II(C), II(D), III, VII(D), IX(C), IX(G), XIII, and XVIII(F).

**11.** *See People v. Muniz*, 667 P.2d 1377, 1381 (Colo.1983) (stating that "we have generally re-

lied on the American Bar Association Standards Relating to Postconviction Remedies" and applying the Standard relating to timeliness of postconviction claims).

## C

In his Crim.P. 35(c) motion, Rodriguez raised numerous claims challenging the constitutionality of the capital sentencing statute, § 16–11–103, 8A C.R.S. (1986), under which he was sentenced. The district court held that our decisions in *People v. Tenneson*, 788 P.2d 786 (Colo.1990), and *People v. Davis*, 794 P.2d 159 (Colo.1990), *cert. denied*, 498 U.S. 1018, 111 S.Ct. 662, 112 L.Ed.2d 656 (1991), disposed of Rodriguez' claims. R., v. 1 at 209–10. In Issue 3, Rodriguez challenges the propriety of the district court's ruling, and, in Issues 5, 6, 7, 8, 9, and 87, he collectively reasserts his attack on the death statute.

■■■ Our decisions in *Tenneson*, 788 P.2d at 789–92, and *Davis*, 794 P.2d at 170–74, upheld the constitutionality of section 16–11–103 and rejected the argument that the death penalty violates the Cruel and Unusual Punishment and Due Process Clauses of the United States and the Colorado Constitutions. We see no reason to overrule that precedent. Accordingly, we reject the arguments raised in Issues 3, 6, 7, 8, and 87.[12]

■■■ In *Davis*, we held that a court is not constitutionally required to provide proportionality review of a death sentence or to inquire as to whether the punishment imposed on the defendant is disproportionate to the punishment imposed on others convicted of the same offense. 794 P.2d at 173–74. We see no reason to set this precedent aside. Accordingly, we reject Issues 5 and 9.

**12.** In Issue 87, Rodriguez asserts that the trial court's refusal to put a burden of proof on the prosecution to prove that mitigating factors did *not* exist constituted prejudicial error. In *Tenneson*, we scrutinized the death statute's process of weighing aggravating factors against mitigating factors and held that "[a]n instruction to the jury that they must be convinced beyond a reasonable doubt that any mitigating factors do not outweigh the proven statutory aggravating factors before a sentence of death can be imposed adequately and appropriately communicates the degree of reliability that must inhere in the balancing process." 788 P.2d at 792. In Rodriguez' case, the death statute imposed no burden of

## III

### *Issues Inadequately Raised*

■■■ A postconviction motion "may be summarily denied where, as here, it does not specify the facts which constitute the basis for the unconstitutional charge." *Hooker v. People*, 173 Colo. 226, 228, 477 P.2d 376, 377 (1970). In his postconviction motion, Rodriguez raised many claims which did little more than allege that his conviction and sentence were illegal and unconstitutional. These claims did not set forth facts from which the court could discern any basis for unconstitutional action or inaction. *See id.*[13]

Rodriguez reasserts many of these issues on this appeal. On appeal, Rodriguez must inform this court "both as to the specific errors relied upon and as to the grounds, supporting facts and authorities therefor." *See People v. Diefenderfer*, 784 P.2d 741, 752 (Colo.1989). Many of the reasserted issues appear as they appeared in the motion and are likewise inadequately supported in this proceeding. Accordingly, we affirm the district court's dismissal of the following issues: Issue 21 (alleging cumulative error); Issue 25 (challenging the plea bargain given to David Martinez); Issue 34 (alleging that this court gave preferential treatment to the prosecution); Issue 37 (alleging prosecutorial misconduct surrounding Patricia Thomas' testimony); Issue 42 (challenging the admissibility of "probability" and "reliability" evidence concerning hairs and fibers); Issue 43

proof on the prosecution to prove that mitigating factors did not exist. *See* § 16–11–103(1)(d). The trial court properly instructed the jury that "a mitigating factor does not have to be proved by any burden of proof. You must find that a mitigating factor exists if there is any evidence to support it." R., v. 4 at 767. Accordingly, we find no error.

**13.** Rodriguez was represented by counsel at all critical stages of the guilt and penalty phases, *see Hooker*, 173 Colo. at 228, 477 P.2d at 377 (noting as significant the presence of counsel), and we confine our holding here to such a situation.

(challenging the admissibility of the prosecution's evidence concerning the cuts on David Martinez' hands); Issue 45 (challenging the admissibility of certain exhibits); Issue 47 (alleging prosecution's discriminatory use of peremptory strikes); Issue 60 (alleging ex parte communication between the trial court and jurors); Issue 63 (alleging defective jury summoning and selection); Issue 66 (alleging limitations on voir dire concerning the commutation of death row inmates in New Mexico);[14] Issue 94 (alleging error in the trial court's refusal to require David Martinez to cooperate with Rodriguez' investigation); Issue 97 (alleging that Rodriguez' letters and statements to Margie Marquez were involuntary statements); Issue 98 (alleging inadequate representation on the first day of jury selection); Issue 102 (alleging the trial court's failure to comply with a Supreme Court order regarding the first day of jury selection); Issue 105 (alleging prosecutorial misconduct regarding Margie Marquez); and Issue 119 (alleging that the charges and convictions were "circular").

■ Rodriguez also attempts to use his brief on this appeal to fortify a number of issues inadequately raised or supported by his motion. Because the district court can summarily dismiss claims inadequately presented to it, see *Hooker,* 173 Colo. at 228, 477 P.2d at 377, our consideration of such issues on appeal of the district court's order would effectively grant Rodriguez a successive 35(c) motion without also burdening him with the harsher standard of review appropriate to a successive motion. See *infra* at part IV. We decline to grant Rodriguez this deference and, instead, uphold the district court's dismissal of these claims, regardless of the adequacy of their presentation upon this appeal. We refuse to review the following issues because of Rodriguez' failure to adequately

specify the errors and legal grounds for relief at the district court level: Issue 4 (challenging the trial court's refusal to death qualify the judge); Issue 10 (alleging bias on the part of Judge Phillips); portions of Issue 11 (those portions alleging unauthorized communication between judges regarding Rodriguez' case and error in the trial court's refusal to have a judge from another district hear the case);[15] Issue 24 (alleging discovery violations); Issue 26 (alleging police failure to obtain exculpatory evidence from David Martinez and Patricia Thomas); Issue 29 (alleging that Rodriguez was not provided with oral statements of prosecution witnesses); Issue 32 (alleging discovery violations); Issue 33 (alleging that Rodriguez was not afforded adequate opportunity to prepare or file an adequate brief on direct appeal); Issue 40 (alleging error in the trial court's refusal to allow Rodriguez to impeach Patricia Thomas with videotaped testimony); Issue 44 (alleging improper admission of testimony); portions of Issue 46 (alleging that Rodriguez was denied his right to make motions, objections, and record regarding bench conferences and penalty phase jury instructions);[16] Issue 48 (alleging unreasonable restrictions on voir dire); Issues 52 and 78 (alleging trial court error in refusing to excuse for cause prospective jurors who knew of Chris Rodriguez' conviction and sentence); Issue 53 (alleging error in the trial court's failure to appropriately swear prospective jurors); Issue 56 (alleging error in the trial court's refusal to allow individual sequestered voir dire); Issue 58 (realleging defects in procedure on the first day of jury selection);[17] Issue 59 (alleging inadequate voir dire of one panel due to defense counsel's inexperience); Issue 64 (alleging undue limitations on voir dire); Issue 76 (alleging error in the trial court's refusal to excuse potential juror G.P. for cause); Issue 77 (alleging im-

---

14. In reality, the court did *not* refuse voir dire on the subject of commutation. Counsel discussed the matter with the court, R., v. 20 at 2–6, and, where appropriate during the voir dire on media coverage, the court questioned the jurors on that subject. *See, e.g., id.* at 16, 22–23.

15. We address that portion of Issue 11 relating to Judge Peterson's involvement in Rodriguez' case in part XIII of this opinion.

16. We address the portion of Issue 46 which alleges an inability to make contemporaneous objections or a record on the jury selection process in part VI(B) of this opinion.

17. Also in Issue 58, Rodriguez asserts that the trial court prevented Rodriguez from making contemporaneous objections or a record on that day and during jury selection as a whole. We have addressed that issue on its merits in part VI(B) of this opinion.

proper excusal of potential jurors for cause due to their death penalty views); Issue 79 (alleging error in the trial court's failure to instruct jurors who were aware of Chris Rodriguez' conviction not to consider that fact); Issue 82 (alleging error in the trial court's refusal to strike the panel of prospective jurors to whom the prosecutor stated that "defendants want to get sentenced right before Christmas," R., v. 20 at 133); Issue 85 (alleging trial court error in refusing to preclude the prosecution from arguing theories inconsistent with that argued in the trials of the other participants); Issue 86 (alleging error in the exclusion of evidence of David Martinez' physical condition after arrest); Issue 88 (alleging error in allowing testimony regarding photographs not admitted into evidence); Issue 89 (alleging inadequate waiver of Rodriguez' right to testify); Issue 90 (alleging erroneous admission of photographs); Issue 91 (alleging erroneous prosecutorial examination of Margie Marquez as to Rodriguez' letters); Issue 92 (alleging erroneous allowance of the prosecution's cross-examination of the jail chaplain); Issue 93 (alleging that the trial court erroneously concluded that Rodriguez' statements to police after his arrest were voluntary); Issue 99(B) (alleging judicial bias); [18] Issue 100 (alleging error in the trial court's refusal to allow the jail chaplain to wear his collar while sitting with the Rodriguez family); Issue 103 (alleging error in the scheduling of trial); Issue 104 (alleging prosecutorial violations of due process); and Issue 151 (alleging that Rodriguez was not competent to stand trial).

In Issue 41, Rodriguez alleges error in the district court's dismissal of postconviction claims which he now reasserts in Issues 42, 43, 44, 45, and 88. Because we hold these underlying issues to be inadequately presented, we reject Issue 41.

## IV

### Waiver

The district court disallowed 191 claims which were "available for appeal, but which

counsel nevertheless eliminated based on priority." [19] R., v. 1 at 178. Rodriguez now generally contends that his decision not to pursue these claims on direct appeal does not constitute waiver and then specifically reasserts many of these issues on this appeal of the denial of postconviction relief. Of the remaining issues, we conclude that many are waived.

Although the standard for waiver is essential to the proper determination of many postconviction claims, we have had little occasion to address it. See McCleskey v. Zant, 499 U.S. 467, 477, 111 S.Ct. 1454, 1461, 113 L.Ed.2d 517 (1991). For the most part, we have addressed the standard only obliquely, through dicta and dismissals of claims. See id. The case law and dicta which do address the standard are not easily synthesized, but indicate that the state of the law at the time of Rodriguez' direct appeal precludes waiver of the limited number of constitutional issues which Rodriguez reasserts on this appeal.

The criminal justice system is intended to ensure "that guilt shall not escape or innocence suffer." Berger v. United States, 295 U.S. 78, 88, 55 S.Ct. 629, 633, 79 L.Ed. 1314 (1935). Within that system, postconviction proceedings have a dual purpose: to prevent constitutional injustice and to bring finality to judgment. See People v. Hampton, 187 Colo. 131, 133, 528 P.2d 1311, 1312 (1974).

> "Let it be emphasized at this point, however, that it by no means follows that a bare allegation such as that made in the case at bar automatically entitles a prisoner who has not appealed to what is in effect an appeal with the possibility of a new trial perhaps resulting in acquittal. Prison gates do not swing open so easily. The path to appellate relief by this route is steep and narrow." (Emphasis added.)

Haines v. People, 169 Colo. 136, 142, 454 P.2d 595, 597 (1969) (quoting Desmond v.

---

18. Issue 99(C) alleges that the court unduly restricted Rodriguez' ability to make contemporaneous objection during voir dire. We have addressed that issue in part VI(B) of this opinion. The remainder of Issue 99 does not raise constitutional error. See infra part IV.

19. These 191 claims included some claims which Rodriguez listed in an appendix to his "Partial Opening Brief" on direct appeal as issues which he would have raised but for time limitations.

*United States,* 333 F.2d 378, 380–81 (1st Cir. 1964) and addressing a postconviction claim that an indigent defendant was denied his right to appellate review of his conviction).

■ Although postconviction proceedings are intended to correct constitutional error, the right to bring such a proceeding is statutory, not constitutional. *People v. Wiedemer,* 852 P.2d 424, 438 (Colo.1993). Rodriguez exploits this statutory right through his exceedingly long and disjointed presentation of his case to both this court and the district court and thereby inhibits the goal of finality. *See People v. Hubbard,* 184 Colo. 243, 247, 519 P.2d 945, 947–48 (1974) (holding same in context of successive postconviction motions). However, because a sentence of death is qualitatively unlike any other punishment, *Lockett v. Ohio,* 438 U.S. 586, 604, 98 S.Ct. 2954, 2964–65, 57 L.Ed.2d 973 (1978); *People v. Rodriguez,* 794 P.2d 965, 972 (Colo.1990) (*Rodriguez IV*), *cert. denied,* 498 U.S. 1055, 111 S.Ct. 770, 112 L.Ed.2d 789 (1991), and because a corresponding need exists for reliability in the death sentencing procedure, *Rodriguez IV,* 794 P.2d at 972, we will address the motion.

■ We have held that a petitioner may raise issues of constitutional error in a postconviction proceeding "although the same issues could have been effectively raised on [appeal]." *People v. Bradley,* 169 Colo. 262, 265, 455 P.2d 199, 200 (1969).[20] *See Sackett v. People,* 176 Colo. 18, 20, 488 P.2d 885, 886 (1971). The prosecution argues that, for Rodriguez to bring claims which he could have raised on direct appeal but did not, he must show special circumstances or justifiable excuse for his failure. However, the prosecution supports this argument with cases and standards relating to successive postconviction motions, as opposed to cases and standards relating to the initial postconviction motion following prosecution proceedings and, where taken, direct appeal. *See, e.g., Turman v. Buckallew,* 784 P.2d 774, 780 (Colo.1989) (affirming dismissal of claims raised in second habeas corpus petition because defendant failed to raise those claims in the first petition); *People v. Billips,* 652 P.2d 1060, 1063 (Colo.1982) (allowing defendant to bring a constitutional claim on a successive postconviction motion because the claim had not been fully and finally litigated in the previous postconviction proceeding); *Hubbard,* 184 Colo. at 249, 519 P.2d at 948 (holding that, on successive postconviction motions, the court may summarily dismiss newly-asserted grounds absent sufficient excuse); ABA Standards for Criminal Justice: Postconviction Remedies § 22–6.2 at 22–67

20. We have followed many sections of the American Bar Association Standards for Criminal Justice: Postconviction Remedies, *see, e.g., People v. Muniz,* 667 P.2d 1377, 1381 (Colo.1983), and now express our approval of Standard 22–6.1 as the rule in Colorado regarding finality of a conviction and sentence. American Bar Association Standards for Criminal Justice: Postconviction Remedies, § 22–6.1 at 22–62 (2d ed. 1986). Sections (b) and (c) of that Standard provide:

(b) Unless barred because of abuse of process, claims advanced in postconviction applications should be decided on their merits, even though they might have been, but were not, fully and finally litigated in the proceedings leading to judgments of conviction.

(c) Where an applicant raises in a postconviction proceeding a factual or legal contention which the defendant deliberately or inexcusably

(i) failed to raise in the proceeding to judgment of conviction, or,

(ii) having raised the contention in the court, failed to pursue the matter on appeal, a court may deny relief on the ground of an abuse of process. Abuse of process should be an affirmative defense to be pleaded by the

respondent. Where a rule or procedure governing conduct of criminal prosecutions requires that specified defenses or objections be presented at a certain time, and an applicant raises in a postconviction proceeding an issue that might have been but was not presented in a timely manner in the proceeding leading to judgment of conviction, the applicant should be required to show cause for the failure to comply with the rule of procedure. In other instances, the burden of proof of abuse of process should be borne by the respondent. ABA Standard § 22–6.1(b), (c) at 22–62. The application of this Standard would neither violate due process by depriving the defendant of all "ability to challenge the constitutional validity of a conviction," *see People v. Thomas,* 867 P.2d 880, 886 (Colo.1994), nor conflict with Crim.P. 35. Rather, our approval of this Standard indicates our agreement with the American Bar Association that criminal procedural rules "can be undermined if a defendant, without explanation, is permitted to raise the same matters for the first time in a postconviction proceeding." ABA Standard § 22–6.1, History of Standard at 22–62 to –63 (2d ed. 1986). However, we decline to apply the Standard retroactively to this case.

(2d ed. 1986) (regarding "[f]inality of a judgment in a postconviction proceeding; repetitive applications").

The prosecution contends that this court in *People v. Bastardo*, 646 P.2d 382 (Colo.1982), held that claims available on direct appeal may not be brought in a postconviction proceeding. This contention mischaracterizes the holding in *Bastardo*. In *Bastardo*, we affirmed the trial court's denial of postconviction relief on two grounds: (1) "the issues raised were available for review when the case was reviewed on the appeal" *and* postconviction review would have been "nothing more than a second appeal addressing the same issues on some recently contrived constitutional theory;" and (2) defendant's "claim of unconstitutionality was not well-founded." *Id.* at 383. The prosecution focuses on the availability of the issues on appeal and fails to consider whether postconviction review would be "more than a second appeal" or whether Rodriguez' constitutional claims are well-founded.

Likewise, Rodriguez cites inapposite authority. *See People v. Coyle*, 654 P.2d 815, 818 (Colo.1982) (stating that "the convicted criminal defendant is assured not only of all of the avenues of direct appeal which the State provides as of right, but also of a means of post-conviction collateral review notwithstanding his failure to pursue a direct appeal," but holding that a criminal defendant charged with violation of a child custody judgment cannot collaterally attack the underlying adjudication or order).

█ In Issue 2, Rodriguez attempts to salvage the postconviction claims which he has not specifically reasserted on this appeal by placing them under the umbrella claim that he "did not forfeit his right to postconviction review by not raising the same claims on direct appeal."[21] Rodriguez' Opening Brief at 37. However, his reassertion of two-thirds of the "waived" claims and his abandonment of the rest indicates a conscious relinquishment of those claims not reasserted. Moreover, these claims will be unavailable for review on a subsequent application for postconviction relief. *See Hubbard*, 184 Colo. at 249–52, 519 P.2d at 949–50 (interpreting Rule 35 in conformance with ABA Standard § 6.2 as it then existed); ABA Standard § 22–6.2(b) at 22–67;[22] *see also McCleskey*, 499 U.S. at 489–96, 111 S.Ct. at 1467–71.

We hold that Rodriguez has waived all alleged errors: (1) that do not rise to the level of constitutional error; or (2) which Rodriguez does not reassert on this appeal.[23]

█ Rodriguez claims numerous instructional errors which he did not pursue on direct appeal. "As a general rule, errors in jury instructions do not constitute fundamental error" sufficient to merit postconviction review. *People v. Shearer*, 181 Colo. 237, 244, 508 P.2d 1249, 1253 (1973). *But see* part IX of this opinion (addressing constitutional issues relating to penalty phase jury instructions). On direct appeal, Rodriguez could have raised the following instructional claims which do not raise constitutional error. Instead, Rodriguez has attempted to evade the appellate process by bringing these claims through the use of Crim.P. 35: Issue 107 (alleging error in that the jury had to find Rodriguez not guilty of first-degree murder before considering the charge of second-degree murder); Issue 133 (alleging defects in the aggravated motor vehicle theft instructions); Issue 146 (alleging error in that the trial court instructed the guilt-phase jury not to consider the possible resulting penalties);

---

**21.** Rodriguez also claims that he was denied effective assistance of counsel because his counsel on direct appeal did not pursue all potential claims. We find this argument meritless. *See infra* part XVIII(H).

**22.** Standard 22–6.2(b) states:

Where an applicant raises in a subsequent application a factual or legal contention which the applicant did not use due diligence in
 (i) raising in an earlier application, or,

(ii) having raised the contention in the trial court, failed to pursue the matter on appeal, a court may deny relief on the ground of an abuse of process. Abuse of process should be an affirmative defense to be pleaded and proved by the state.

**23.** In determining which issues presented by Rodriguez are constitutional, we do not consider those issues which we conclude were insufficiently raised in his postconviction motion. *See supra* part III.

and Issue 147 (alleging error in court's refusal to orally give the anti-sympathy instruction). As such, Rodriguez has waived those issues of instructional error. Issues 120–122 and 125–128 allege instructional error in Rodriguez' convictions for felony murder, conspiracy to commit second-degree kidnapping, and conspiracy to commit aggravated motor vehicle theft. These issues are rendered moot by the trial court's vacation of those convictions and our affirmance of that vacation as discussed in part XIV of this opinion.

 In Issues 57, 65, 80, and portions of Issue 99, Rodriguez claims that the trial court erred in limiting voir dire. Defense counsel does not have a *constitutional* right to voir dire, so long as the court's "examination allowed counsel to determine whether any potential jurors possessed any beliefs that would bias them such as to prevent [the defendant] from receiving a fair trial." *People v. O'Neill*, 803 P.2d 164, 169 (Colo.1990). Likewise, defense counsel does not have a constitutional or statutory right to unlimited voir dire. *Id.* We hold that the following issues do not raise constitutional error and do not require postconviction review: Issue 57 (alleging error in the trial court's refusal to videotape voir dire, although the court allowed stenographic transcription); Issue 65 (alleging preclusion of counsel from voir dire on hardships and publicity);[24] Issue 80 (alleging undue limitations on defense counsel's voir dire);[25] and Issue 99(A), (D), and (E) (alleging prejudicial limitations on defense counsel's voir dire).

 Should Rodriguez attempt to bring a successive motion under Crim.P.

35(c) and reassert those issues which we hold that he either waived or insufficiently presented to the trial court, such reassertion will be subject to the affirmative defense of abuse of process. *See Hubbard*, 184 Colo. at 249–52, 519 P.2d at 949–50; ABA Standard § 22–6.2(b) at 22–67. *See also McCleskey*, 499 U.S. at 489–496, 111 S.Ct. at 1467–71. Those claims which we hold to be of constitutional dimension, we address on their merits below, although the district court deemed them waived and did not address them substantively.[26]

 We recognize that a party seeking postconviction relief pursuant to Crim.P. 35 is entitled to a prompt evidentiary hearing unless the motion, the files, and the record " 'clearly establish that the allegations presented in the defendant's motion are without merit and do not warrant postconviction relief.' " *People v. Trujillo*, 190 Colo. 497, 499, 549 P.2d 1312, 1313 (1976) (quoting *People v. Hutton*, 183 Colo. 388, 391, 517 P.2d 392, 394 (1973)); *see White v. Denver Dist. Court*, 766 P.2d 632, 634 (Colo.1988). However, we also recognize that a hearing is not required under Crim.P. 35 where the motion and the record present only issues of law, *People v. Velarde*, 200 Colo. 374, 616 P.2d 104, 105 (1980); *People v. Triggs*, 200 Colo. 107, 109, 613 P.2d 317, 318 (Colo.1980); ABA Standards for Criminal Justice: Postconviction Remedies § 22–4.6, or where the motion fails to assert facts that, if true, would support a constitutional claim. *White*, 766 P.2d at 635; *People v. Muniz*, 667 P.2d 1377 (Colo.1983); *Trujillo*, 190 Colo. at 499, 549 P.2d at 1314. Furthermore, a defendant is not entitled to a hearing when the ground relied upon for

---

**24.** A portion of Issue 65 alleges inadequacy of the trial court's voir dire on these topics. However, this portion is unsupported with facts, record cites, or case law. Therefore, we affirm the summary dismissal of that portion. *See People v. Diefenderfer*, 784 P.2d 741, 752 (Colo.1989); *Hooker v. People*, 173 Colo. 226, 228, 477 P.2d 376, 377 (1970).

**25.** A portion of Issue 80 alleges Rodriguez' inability to make a record on the effects of the limitations on voir dire. This argument is addressed in part VI(B) of this opinion.

**26.** We disagree, in part, with the district court's holding that Rodriguez waived all claims which

he "deliberately screened out from prior appeal." R., v. 1 at 177. As stated above, we conclude that Rodriguez has not waived those constitutional issues which he reasserts on this appeal. However, we agree with the district court's conclusion that Rodriguez' motion did not warrant reversal and vacation of his death sentence. We will affirm the district court even when it reaches the "correct judgment for the wrong reason." *See State v. Franc*, 165 Colo. 69, 76, 437 P.2d 48, 51, *cert. denied*, 392 U.S. 928, 88 S.Ct. 2284, 20 L.Ed.2d 1385 (1968); *see also Zigan Sand & Gravel v. Cache La Poudre*, 758 P.2d 175, 181 (Colo.1988). Thus, we will substantively review the constitutional postconviction issues which Rodriguez realleges here.

postconviction relief has been fully and finally resolved in a prior judicial proceeding. *White*, 766 P.2d at 635; *Muniz*, 667 P.2d at 1380.

After reviewing both the issues on this appeal and the entire record of Rodriguez' case, we conclude that the issues presented are either: (1) issues which we may decide on the record without the benefit of a hearing at the district court level, *see Velarde*, 616 P.2d at 105; or (2) issues presented by Rodriguez' claims of newly discovered evidence and ineffective assistance of counsel upon which the district court conducted hearings. With regard to either class of issue, we conclude that the record is sufficient to allow us to address these issues here.

We address these issues in the interests of justice and of finality and in recognition that, upon review of a postconviction motion, "[a]n appellate court should exercise a broad scope of review so that all pertinent legal issues are considered on their merits insofar as possible, toward the end of a final determination of the entire case concerning the applicant." ABA Standards for Criminal Justice: Postconviction Remedies § 22–5.3(b) at 22–60 (2d ed. 1986).

## V

### Adequacy of the Information

In Issue 140, Rodriguez argues that the information inadequately charged seven of the offenses of which he was convicted. In Issue 108, Rodriguez alleges unconstitutional variance between the sexual assault charged in the information and the sexual assault upon which the jury was instructed. We perceive no merit to Rodriguez' arguments.

In Issue 140, Rodriguez contends that the information insufficiently charged the following offenses: first-degree aggravated motor vehicle theft, second-degree kidnapping, aggravated robbery, and conspiracy to commit first-degree murder. Rodriguez makes similar arguments regarding first-degree felony murder, conspiracy to commit second-degree kidnapping, and conspiracy to commit first-

degree aggravated motor vehicle theft. These latter arguments are rendered moot by our decision in part XIV of this opinion, upholding the vacation of those offenses.

In Issue 140, Rodriguez argues that the information was inadequate to charge first-degree aggravated motor vehicle theft, second-degree kidnapping, and conspiracy to commit first-degree murder because those counts did not allege the elements of their various predicate offenses. Rodriguez cites *Martinez v. People*, 163 Colo. 503, 506–07, 431 P.2d 765, 766–67 (1967), in support of this proposition. The holding of *Martinez* cannot support Rodriguez' argument. In *Martinez*, we held that one count of an information can incorporate by reference another count by specifying that count or the offense charged therein by name. *Id.* That is, each count of an information need not enumerate the elements of a predicate offense, but must specifically and clearly incorporate by reference another count which does enumerate the essential elements of the predicate offense. *Id.* Each challenged count in the information specifically refers to the predicate offense or offenses by name; the elements of each predicate offense are set forth in other counts of the information; and the information adequately advised Rodriguez of the charges against which he must defend. *See* R., v. 1 at 3–4.

Rodriguez also contends, without elaboration, that the charge for aggravated robbery "fails to adequately allege a crime under that statute and further fails to provide adequate notice." Rodriguez' Opening Brief at 385. Our review of the information charging aggravated robbery reveals that the information tracked the appropriate statutory language, *see* §§ 18–4–301 to –302, 8 C.R.S. (1978), and reveals no error.

In Issue 108, Rodriguez contends that Instruction No. 25 unconstitutionally expanded upon the sexual assault charged in the information. We disagree.

In Colorado, a defendant may be charged by complaint, information, or indictment. § 16–5–101(1), 8 C.R.S. (1978).[27] "An

---

27. The Fifth Amendment of the United States Constitution guarantees a grand jury indictment for certain federal crimes. This guarantee has not, however, been selectively incorporated by

information is sufficient if it advises the defendant of the charges he is facing so that he can adequately defend himself and be protected from further prosecution for the same offense." *Cervantes v. People*, 715 P.2d 783, 785 (Colo.1986) (citation and internal quotation marks omitted). The prosecution cannot constitutionally require a defendant to answer a charge not contained in the charging instrument. *See Schmuck v. United States*, 489 U.S. 705, 717, 109 S.Ct. 1443, 1451, 103 L.Ed.2d 734 (1989).

▆▆▆ Case law recognizes two types of variances between the charge contained in the charging instrument and the charge of which a defendant is convicted: (1) simple variance, which "occurs when the charging terms are unchanged, but the evidence at trial proves facts materially different from those alleged" in the charging instrument, *United States v. Williamson*, 53 F.3d 1500, 1512 (10th Cir.) (citation and internal quotation marks omitted), *cert. denied*, —— U.S. ——, 116 S.Ct. 218, 133 L.Ed.2d 149 (1995); and (2) constructive amendment, which changes an essential element of the charged offense and thereby alters the substance of the charging instrument. *See id.* With respect to a simple variance, "[c]onvictions generally have been sustained as long as the proof upon which they were based corresponds to *an offense* that was clearly set out in the indictment." *United States v. Miller*, 471 U.S. 130, 136, 105 S.Ct. 1811, 1815, 85 L.Ed.2d 99 (1985) (emphasis added). The constitution prohibits only amendments that "effectively subject a defendant to the risk of conviction for an offense that was not origi-

nally charged" in the charging instrument. *United States v. Mosley*, 965 F.2d 906, 915 (10th Cir.1992).

> When on the trial of any … information … for any offense there appears to be any variance between the statements in the … information and the evidence offered in proof thereof … in the name or description of any matter or thing whatsoever therein named or described, such variance is not grounds for the acquittal of the defendant, unless the court before which such trial be had finds such variance is material to the merits of the case or may be prejudicial to the defendant. No … information … shall be deemed insufficient, nor shall the trial, judgment, or other proceedings thereon be reversed or affected by any defect which does not tend to prejudice the substantial rights of the defendant on the merits.

§ 16–10–202, 8 C.R.S. (1978).

▆▆▆ Rodriguez contends that Instruction No. 25 unconstitutionally expanded upon the sexual assault charged in the information because, at trial, the instructional definition of "sexual penetration" included cunnilingus, anilingus, and anal intercourse, as well as the acts of sexual intercourse and fellatio, which were specifically charged in the information. *See* R., v. 1 at 2; R., v. 3 at 577.

In Instruction No. 16, the trial court instructed the jury that first-degree sexual assault required the infliction of "sexual penetration on Lorraine Martelli," R., v. 3 at 577, and, in Instruction No. 25, the court recited verbatim the statutory definition of "Sexual Penetration:"

> Until otherwise provided by law, no person shall, for a felony, be proceeded against criminally otherwise than by indictment, except in cases arising in the land or naval forces, or in the militia when in actual service in time of war or public danger. In all other cases, offenses shall be prosecuted criminally by indictment or information.

the Due Process Clause of the Fourteenth Amendment to the United States Constitution and, thus, is inapplicable to the states. *See Beck v. Washington*, 369 U.S. 541, 545, 82 S.Ct. 955, 957–58, 8 L.Ed.2d 98 (1962). However, federal precedent is helpful to our analysis of Claim 108 because, whether prosecuted by the federal or state government, a defendant cannot be required to answer for a crime with which he is not charged. *See Schmuck v. United States*, 489 U.S. 705, 717, 109 S.Ct. 1443, 1451, 103 L.Ed.2d 734 (1989).

The Colorado Constitution does not guarantee a grand jury indictment for a felony charge. *See Losavio v. Robb*, 195 Colo. 533, 536, 579 P.2d 1152, 1154 (1978). Article II, Section 8 of the Colorado Constitution does provide that:

However, this provision serves only to "direct that criminal proceedings must be initiated by indictment and to authorize the legislature to provide alternative methods of proceeding." *Falgout v. People*, 170 Colo. 32, 39, 459 P.2d 572, 576 (1969). The legislature enacted section 16–5–101 to provide for alternative methods of initiating a criminal proceeding.

"Sexual Penetration" means sexual intercourse, cunnilingus, fellatio, anilingus, or anal intercourse. Emission need not be proved as an element of any sexual penetration. Any penetration, however slight, is sufficient to complete the crime.

*Compare* R., v. 3 at 588 *with* § 18–3–401(6), 8 C.R.S. (1978).

We hold that Instruction No. 25 did not impermissibly amend the charges in the information. *See People v. Torres*, 701 P.2d 78, 79 (Colo.App.1984) (affirming conviction for first-degree sexual assault although definitional instruction included one method of committing the crime with which defendant was not charged). Count III of the information alleged the essential elements of first-degree sexual assault with sufficient specificity to "inform the accused of the specific offence, coming under the general description, with which he is charged." *See Russell v. United States*, 369 U.S. 749, 765, 82 S.Ct. 1038, 1048, 8 L.Ed.2d 240 (1962) (citation and internal quotation marks omitted); R., v. 1 at 2. The information also specifically alleged the date of the assault, the perpetrator, the victim, the location, and the accomplices. R., v. 1 at 2. The specification of the particular manner in which Rodriguez committed the element of sexual intrusion or sexual penetration represents further evidentiary details which the information need not state. *See United States v. Martinez–Nava*, 838 F.2d 411, 414–15 (10th Cir.1988).

The case before us differs from that in *People v. Tucker*, 631 P.2d 162 (Colo.1981). In *Tucker*, we held that an indictment for embezzlement was insufficient where the indictment tracked the statutory language, but failed to allege specifically how the embezzlement was accomplished. *Id.* at 164. There, we stated that "[u]nlike other crimes, there are numerous ways in which embezzlement may be committed." *Id.* Unlike embezzlement, sexual assault can be committed in only a limited number of ways, each enumerated in the statute and each of which requires similar preparation for defense. Moreover, Count III of the information referred Rodriguez to the correct statutory citation for the offense of sexual assault which "provide[d] clarification" of the charges which Rodriguez would be required to meet. *Cervantes*, 715 P.2d at 787; *see* R., v. 1 at 1.

These facts also differ from those in *Stirone v. United States*, 361 U.S. 212, 80 S.Ct. 270, 4 L.Ed.2d 252 (1960). In that case, the defendant, Stirone, was indicted by a grand jury for unlawful interference with interstate commerce. *Id.* at 213, 80 S.Ct. at 271. Specifically, the indictment alleged that Stirone unlawfully obstructed importation of goods into the state of Pennsylvania. *Id.* The trial court permitted evidence and instructed the jury on both importation and exportation of goods. *Id.* at 214, 80 S.Ct. at 271–72. The Supreme Court held that this constructive amendment of the indictment was unconstitutional because the amendment struck at the heart of the federal courts' jurisdiction. The Court stated:

> The charge that interstate commerce is affected is critical since the Federal Government's jurisdiction of this crime rests only on that interference. It follows that when only one particular kind of commerce is charged to have been burdened a conviction must rest on that charge and not another, even though it be assumed that under an indictment drawn in general terms a conviction might rest upon a showing that commerce of one kind or another had been burdened.

*Id.* at 218, 80 S.Ct. at 274. The amendment in *Stirone* concerned wholly different acts at different times and different places against which Stirone was required to defend. By contrast, any variance in this case between the facts set forth in the information and those on which the court instructed the jury concerned the same incident of assault, the same defendant, victim, and accomplices.

Rodriguez' case is also distinguishable from *Hunter v. New Mexico*, 916 F.2d 595 (10th Cir.1990), *cert. denied*, 500 U.S. 909, 111 S.Ct. 1693, 114 L.Ed.2d 87 (1991), in which the Tenth Circuit held that the indictment at issue had been constructively amended and reversed Hunter's conviction for criminal sexual penetration (CSP). *Id.* at 599. Count I of the indictment charged that Hunter committed CSP between January 1, 1974, and October 23, 1977, in that he "un-

lawfully and intentionally engaged in sexual intercourse" with his step-daughter. *Id.* at 597. The trial court instructed the jury, however, that the relevant sexual act was *either* sexual intercourse or digital penetration. *Id.* The jury convicted Hunter of CSP, *id.* at 596, but the Tenth Circuit reversed the conviction, holding that the jury instruction constructively amended the indictment by adding another mode of sexual penetration. *Id.* at 599.

The court's holding was premised on legislative history: prior to June 1975, digital penetration supported a conviction only of fourth-degree sexual assault, whereas sexual intercourse supported a conviction for rape of a child. *Id.* at 597. A defendant convicted of fourth-degree sexual assault could be sentenced to five years' imprisonment, whereas a defendant convicted of either rape of a child or first-degree CSP could be imprisoned for life. *Id.* at 597–98. Under the jury instructions given, it was possible that the jury convicted Hunter of CSP based only on conduct which occurred before the statutory change and which was not actionable as a first-degree felony before the statutory change. *Id.* at 599. By contrast, the added modes of sexual penetration in this case do not change the applicable statute, sentence, or level of offense.

■ "Technical defects in an information do not require reversal unless the substantial rights of the defendant are prejudiced. The defendant is entitled to reversal if he was prejudiced, surprised, or hampered in his defense." *People v. Albo*, 195 Colo. 102, 106, 575 P.2d 427, 429 (1978). The record before us indicates no prejudice of Rodriguez' "substantial rights,"[28] nor does Rodriguez point to any. *See* § 16–10–202. Likewise, Rodri-

guez was neither surprised by the evidence at trial nor hampered in his defense. Rodriguez was convicted of first-degree sexual assault as charged in the information. We deny Rodriguez' challenge to that conviction.

## VI

### *Jury Selection*

Rodriguez raises numerous issues relating to the jury selection process, which generally fall within the following categories: (A) the state of the record regarding jury selection; (B) Rodriguez' alleged inability to make contemporaneous objections and preserve issues for appeal; (C) the trial court's cautionary instructions to prospective jurors; (D) hardship excusals; (E) excusals for cause; (F) the standard the trial court used to excuse jurors for cause due to their death penalty opinions; and (G) the death qualification of the jury.

### A

As a preliminary matter, Rodriguez repeatedly complains that the initial jury questionnaires are not part of the record[29] and implies that the trial court has an affirmative duty to preserve those questionnaires.[30] Rodriguez makes this argument as an adjunct to the jury selection arguments he raises in Issues 53, 58, 65, 67–71, 73, 74, 76, and 81. Rodriguez has not demonstrated that the record before us is insufficient for the resolution of these issues or that the absence of the questionnaires from the record has prejudiced him in any way.

In Issue 53, Rodriguez challenges the timing of the oath taken by the potential jurors in relation to their completion of the jury questionnaires and notes that "[a]ll but a

---

**28.** Of course, "[w]hat may be technical for one is substantial for another; what minor and unimportant in one setting crucial in another." *Kotteakos v. United States*, 328 U.S. 750, 761, 66 S.Ct. 1239, 1246, 90 L.Ed. 1557 (1946) (distinguishing between technical and substantial for purposes of the federal "harmless error statute" which governs federal appellate review). Whether rights are "substantial" is "[e]ssentially . . . for experience to work out. For, as with all lines which must be drawn between positive and negative fields of law, the precise border may be indistinct, but case by case determination of par-

ticular points adds up in time to discernible direction." *Id.* at 761–62, 66 S.Ct. at 1246.

**29.** Thirteen of the completed questionnaires are part of the record before us. R., v. 38 at 355–393.

**30.** In 1989, the statute was amended to require the court to retain the completed questionnaires for all prospective jurors. *See* § 13–71–115, 6A C.R.S. (1995 Supp.). However, the statute in effect at the time of Rodriguez' trial did not require retention of the questionnaires.

very few of the questionnaires were apparently destroyed." Rodriguez' Opening Brief at 170–71 n. 44. In the relevant portion of Issue 58, Rodriguez alleges procedural defects on the first day of jury selection. In Issue 76, Rodriguez contends that the trial court erred in failing to excuse juror G.P. for cause and that G.P.'s questionnaire would "fully and independently support[ ] Mr. Rodriguez' claim." Rodriguez' Opening Brief at 212 n. 63. However, Rodriguez did not adequately raise Issues 53, 58, or 76 in his Crim.P. 35(c) motion before the district court, and the arguments presented in those issues are not properly before us. Moreover, G.P.'s questionnaire *is* part of the record before us, *see* R., v. 38 at 385–86, and reveals no basis for Rodriguez' claim of error.

In Issue 65, Rodriguez alleges that the trial court failed "to make adequate inquiry into *the statements of the jurors in the questionnaires,* and the manifest differences between those statements and those given in person." Rodriguez' Opening Brief at 203. In part IV of this opinion, we affirmed the summary dismissal of this portion of Issue 65 as inadequately supported with facts, record cites, or case law. Accordingly, we decline to address the issue here.

As discussed in part VI(E) of this opinion, regardless of the information contained in the jury questionnaires, Rodriguez cannot demonstrate prejudice arising from the errors alleged in Issues 67–71, 73, and 74, because he did not exhaust his peremptory challenges.

In Issue 81, Rodriguez contends only that the missing questionnaires would allow this court to determine the exact number of jurors who claimed hardships on the first day of jury selection. This information is neither crucial nor relevant to our discussion of Issue 81.

▉▉▉ Rodriguez himself bears the responsibility to designate the record on appeal and to ensure its transmission to the appellate court. *See People v. Velarde,* 200 Colo. 374, 375–76, 616 P.2d 104, 105 (1980). Where, as here, "no report of the evidence or proceed-

ings at a hearing or trial was made, or . . . a transcript is unavailable, the appellant may prepare a statement of the evidence or proceedings from the best available means, including his recollection." C.A.R. 10(c). Rodriguez has not prepared such a statement nor provided this court with specific assertions of fact or error. We conclude that the record before us is sufficient to permit our resolution of the jury selection issues which are properly before us.

**B**

▉▉▉▉▉ A criminal defendant has a fundamental right to trial before an impartial jury. *People v. Collins,* 730 P.2d 293, 300 (Colo.1986). Voir dire examination is intended "to enable counsel to determine whether any prospective jurors are possessed of beliefs which would cause them to be biased in such a manner as to prevent the [defendant] from obtaining a fair and impartial trial." *Id.* "The right to an impartial jury does not, however, require that counsel be granted unlimited voir dire examination. Nor is counsel entitled to voir dire the jury as a matter of constitutional law."[31] *People v. O'Neill,* 803 P.2d 164, 169 (Colo.1990).

The right to voir dire is set forth in Rule 24 of the Colorado Rules of Criminal Procedure. Crim.P. 24 provides counsel the right to question jurors, but also endows the trial court with the authority to reasonably limit the scope and extent of that questioning.

▉▉▉▉▉ In Issue 51, Rodriguez argues that the trial court erred in ordering that Rodriguez submit to the court in writing any record of a juror's demeanor. *See* R., v. 3 at 421. The trial court's order did not impermissibly impede Rodriguez' ability to make a record on any objection he might have had to a juror's demeanor. The responsibility of assuring that jurors are fair and impartial is,

> in the first instance, vested in the trial judge: It is the trial court which hears the questions put to the juror and the answers given, observes the juror's demeanor while being questioned, and discerns the truthfulness, the sincerity, and the dedication to

---

**31.** *See supra* part IV of this opinion, in which we upheld the district court's summary disposal of

claims relating to limitations on defense counsel's voir dire questioning.

the high responsibility involved in being a fair and impartial juror.

*People v. Abbott,* 690 P.2d 1263, 1267 (Colo. 1984) (citation and internal quotation marks omitted).

 Absent an abuse of discretion, we will not disturb on appeal the trial court's decision to deny a challenge for cause. *Id.* Rodriguez had an adequate opportunity to make a record on any juror's demeanor which would be sufficiently egregious to satisfy this burden. The trial court did not err by requiring Rodriguez to submit any record of a prospective juror's demeanor in writing.

 In portions of Issues 46, 58, 80, and 99, Rodriguez contends that he "cannot be faulted for any possible lack of a record on the actual effects of the court's time and subject matter restrictions, since he was *ordered* to not attempt to make such a record, and since the trial court unambiguously demonstrated its prejudgment of any such objections." Rodriguez' Opening Brief at 216. However, our review of the record reveals that the court stated that counsel could make contemporaneous objections [32] and that, subsequently, Rodriguez' counsel objected to the voir dire limitations both orally and in writing. R., v. 14 at 2–7, 15–19, 22–30; R., v. 3 at 489–92, 497–505. The trial court did not impermissibly impede Rodriguez' ability to make a record or to preserve the issues for appeal. Rather, Rodriguez' counsel objected

on the record, filed written objections, preserved the alleged errors for appeal, then failed to appeal on those grounds. We perceive no merit to these portions of Issues 46, 58, 80, and 99.

## C

 In Issue 54, Rodriguez argues that the trial court erred in failing to instruct some prospective jurors not to discuss the case or to avoid any publicity concerning the case. Specifically, Rodriguez alleges that, on the first day of jury selection, the court did not appropriately caution the jurors who alleged hardship prior to their dismissal.[33]

However, those jurors did complete their juror questionnaires prior to their dismissal that first day. The cover sheet of the questionnaires instructed the jurors to "not discuss this case with any other prospective juror or anyone else" and to "not listen to or read any news accounts of this case." Am. R., v. 31 at 26.[34]

The jurors claiming hardships were ordered to return the following Monday. R., v. 14 at 11. After hardship voir dire, the court distributed those jurors who did not qualify for hardship excusal among the jury groups already assigned. *See id.* at 72–73, 109–110, 150–51. Each jury group was then asked whether any member had been exposed to publicity regarding the case. Any prospective juror who indicated publicity exposure

---

32. Prior to the commencement of hardship voir dire, defense counsel and the trial court engaged in the following colloquy:

> EISNER: .... My understanding from the court's order, amended order, and comments to counsel ... indicates counsel are not to make contemporaneous objection; objections are to be made in writing.
> THE COURT: You can make contemporaneous objections. If it's going to be lengthy I would want it supplemented by written objection.
> EISNER: The court will give us opportunity to make objections and the court will rule at that time?
> THE COURT: Yes. But what I want to do during the time scheduled for voir dire, and for jury selection is to have our time doing that; in other words, we spent 20 minutes so far this morning, and I am not complaining about that. What I am saying, the time we have set aside for the jurors, I want to use for the jurors, and

> you may make objections, of course, but if you have lengthy reasons to explain those objections, then that's the type I want in writing. R., v. 14 at 29.

33. The court dismissed those jurors who alleged hardship prior to its dismissal of the remaining jurors. R., v. 14 at 11. The court subsequently instructed the remaining jurors not to discuss the case and to avoid publicity concerning the case. *Id.*

34. Rodriguez "does not concede or suggest that prospective jurors received any cover page for the questionnaire." Rodriguez' Opening Brief at 177 n. 48. However, the blank questionnaires contained in the record have cover pages, and counsel discussed the contents of the cover page on the record. *See* R., v. 14 at 9–10. Even if the questionnaires did not have cover pages when given to the jury, the trial court's subsequent voir dire on media coverage and its repeated cautionary instructions would have cured any error.

was questioned in chambers. *See* R., v. 14 at 154–196; R., v. 15 at 8–49, 140–182; R., v. 17 at 190–218; R., v. 18 at 2–54; R., v. 19 at 5–62; R., v. 20 at 6–97; R., v. 21 at 5–75; R., v. 22 at 194–262. After voir dire on pretrial media coverage and death penalty qualification, each panel was dismissed with cautionary instructions similar to the following:

> Please let me instruct you not to discuss this case among yourselves or with any other potential jurors; not to discuss the case with anyone else; do not read any news accounts of the case in the newspaper or anyplace else; do not listen to any news accounts on the T.V. or radio.

R., v. 14 at 293; *see* R., v. 15 at 138; R., v. 16 at 83–84; R., v. 17 at 311; R., v. 18 at 142; R., v. 19 at 153; R., v. 20 at 179; R., v. 22 at 192, 334.

■ Although the trial court is best advised to issue oral cautionary instructions to the entire jury panel prior to their dismissal on the first day of jury selection, we conclude that the trial court adequately instructed the prospective jurors not to discuss the case and to avoid exposure to related publicity. The subsequent voir dire on media coverage would have uncovered any tainting of the jury pool by the failure to caution the jurors who alleged hardships, and the failure to instruct was adequately cured by the court's subsequent and repeated cautionary instructions. Rodriguez has failed to demonstrate any prejudice to his right to an impartial jury, and, accordingly, we deny Issue 54.

### D

In Issues 61 and 81, Rodriguez asserts that the jury commissioner and the trial court "destroyed the randomness of the jury selection process" by dismissing some prospective jurors who claimed hardship without voir dire as to the validity of their hardship. Rodriguez' Opening Brief at 220.

■ In support of Issue 81, Rodriguez cites three United States Supreme Court cases, each of which relates to the systematic exclusion of certain groups from jury service. *See Powers v. Ohio*, 499 U.S. 400, 111 S.Ct. 1364, 113 L.Ed.2d 411 (1991) (systematic exclusion of black jurors); *Duren v. Missouri*, 439 U.S. 357, 99 S.Ct. 664, 58 L.Ed.2d 579 (1979) (systematic exclusion of women); *Peters v. Kiff*, 407 U.S. 493, 92 S.Ct. 2163, 33 L.Ed.2d 83 (1972) (systematic exclusion of black jurors). In this context, a claim of systematic exclusion requires that Rodriguez show purposeful discrimination by the state. *See Cerrone v. People*, 900 P.2d 45, 53 (Colo. 1995) (involving composition of a grand jury). Rodriguez has not even attempted to make such a showing, and we decline to address the issue.

■ Likewise, in Issue 61, Rodriguez has alleged violations of the Uniform Jury Selection and Service Act, §§ 13–71–101 to –122, 6 C.R.S. (1973 & 1986 Supp.). Conduct which violates the requirements of the Jury Selection Act may also violate the Constitution if, for example, a defendant shows systematic exclusion of a particular class of jurors. *See Cerrone*, 900 P.2d at 52 n. 9 and accompanying text, 54. Rodriguez alleges conduct which, if true, would violate the Jury Selection Act, but which does not rise to the level of constitutional error. For example, Rodriguez alleges that the jury commissioner excused jurors who merely stated that they were students, were over sixty with medical problems, or who asserted vacation hardships without requiring a showing that jury service would cause "undue hardship, extreme inconvenience, or public necessity" as set forth in section 13–71–112(2). *See People ex rel. Faulk v. District Court*, 667 P.2d 1384, 1389 (Colo.1983) (stating in dicta that, under the statute, the court should not excuse a qualified juror "for any reason short of the statutory criteria . . . set out in section 13–71–112(2)"). However, the allegations Rodriguez makes, although appropriate for review on direct appeal, do not rise to the level of constitutional error and, thus, do not merit review here.

### E

■ In Issues 55, 62, 67–75, and 83–84, Rodriguez alleges trial court error relating to the excusal or non-excusal of prospective jurors for cause. The Colorado statutes provide for excusal for cause where the court finds:

The existence of a state of mind in the juror evincing enmity or bias toward the defendant or the state; however, no person summoned as a juror shall be disqualified by reason of a previously formed or expressed opinion with reference to the guilt or innocence of the accused, if the court is satisfied, from the examination of the juror or from other evidence, that he will render an impartial verdict according to the law and the evidence submitted to the jury at the trial[.]

§ 16–10–103(1)(j), 8A C.R.S. (1986). A juror is appropriately excluded for cause if that juror would be unable "to set aside any bias or preconceived notion and render an impartial verdict based on the evidence adduced at trial and the instructions given by the court." *People v. Drake*, 748 P.2d 1237, 1244 (Colo. 1988). A prospective juror's indication of concern or of the presence of some preconceived belief as to some facet of the case does not mandate exclusion of that person for cause. *Id.* at 1243. Likewise, the fact that a juror answers voir dire questions in such a way that might indicate prejudice does not require excusal for cause. *Abbott*, 690 P.2d at 1267. Rather, the trial court must consider all available facts, including the challenged juror's assurance of impartiality. *Id.*

 At the time of voir dire, the burden was upon Rodriguez to "demonstrate, through questioning, that the potential juror lack[ed] impartiality." *Wainwright v. Witt*, 469 U.S. 412, 423, 105 S.Ct. 844, 852, 83 L.Ed.2d 841 (1985). We are deferential to the trial court in such matters because "the trial judge is the only judicial officer able to assess fully the attitudes and state of mind of a potential juror by personal observation of the significance of what linguistically may appear to be inconsistent or self-contradictory responses to difficult questions." *People v. Sandoval*, 733 P.2d 319, 321 (Colo.1987); *see People v. Davis*, 794 P.2d 159, 204 (Colo. 1990), *cert. denied*, 498 U.S. 1018, 111 S.Ct. 662, 112 L.Ed.2d 656 (1991). We will set aside the trial court's decisions only if the record affirmatively demonstrates a clear abuse of discretion. *People v. Rhodus*, 870 P.2d 470, 477 (Colo.1994); *see Davis*, 794 P.2d at 204; *Drake*, 748 P.2d at 1243. Rodriguez has not shown that either the procedure or the trial court's decisions were an abuse of discretion, nor does our review of the record reveal abuse.

 In Issues 55, 70, 72, 74, and 75, Rodriguez alleges error in the trial court's refusal to excuse for cause prospective jurors who had been exposed to pretrial publicity and, as a result, either knew of Chris Rodriguez' conviction and sentence for the same charged offenses or had formed an opinion as to Rodriguez' guilt. However, Rodriguez did not exhaust his peremptory challenges, *see* R., v. 24 at 67, and, therefore, has shown no prejudice. *See O'Neill*, 803 P.2d at 173; *People v. Silvola*, 190 Colo. 363, 368, 547 P.2d 1283, 1287–88, *cert. denied*, 429 U.S. 886, 97 S.Ct. 238, 50 L.Ed.2d 167 (1976). Accordingly, we find no merit to these arguments.[35]

During jury selection, Rodriguez challenged jurors J.A., D.L., R.M., and K.G. for cause based on their death penalty views. The district court denied these challenges. In Issues 67, 69, 71, and 73, Rodriguez argues error in those denials. Again, however, Rodriguez failed to exhaust his peremptory challenges and has not demonstrated prejudice. *See O'Neill*, 803 P.2d at 173; *Silvola*, 190 Colo. at 368, 547 P.2d at 1287–88. We hold these arguments meritless.

In Issue 68, Rodriguez alleges error in the trial court's refusal to excuse for cause prospective juror J.B. based on his "clear bias." *See* Rodriguez' Opening Brief at 207. For the reasons discussed above, Rodriguez has shown no prejudice and we hold that Issue 68 does not merit postconviction relief.

F

In Issues 62, 83, and 84, Rodriguez challenges the standard used by the trial court to determine the inclusion or exclusion of prospective jurors based upon their death penalty opinions. Specifically, Rodriguez contends

---

**35.** In Issue 72, Rodriguez also cites to a portion of the voir dire transcript of R.K. in which R.K. discusses his opinion on the death penalty. The analysis does not change. Rodriguez failed to exhaust his peremptory challenges, left R.K. on the jury as an alternate, and has demonstrated no prejudice from the denial of his challenge for cause.

that the trial court applied the wrong legal standard for exclusion which favored the prosecution and the death penalty, *see* Rodriguez' Opening Brief at 221, 228, and that the court applied this standard inconsistently to Rodriguez' detriment. *See id.* at 188.

In Issue 83, Rodriguez argues that the standard set forth in *Wainwright v. Witt,* 469 U.S. 412, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985), does not apply to this case "[b]ecause the standard in Colorado at the time of Mr. Rodriguez' trial was more lenient than the *Witt* standard." Rodriguez' Opening Brief at 221–222.[36] Rodriguez contends that the trial court should have applied the "standard" in *Witherspoon v. Illinois,* 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968). In *Witherspoon,* the Supreme Court noted that jurors may be excluded for cause if they make it

> unmistakably clear (1) that they would *automatically* vote against the imposition of capital punishment without regard to any evidence that might be developed at the trial of the case before them, or (2) that their attitude toward the death penalty would prevent them from making an impartial decision as to the defendant's *guilt.*

*Id.* at 522–23 n. 21, 88 S.Ct. at 1777 n. 21. The *Witherspoon* statement is pure dicta. *Witt,* 469 U.S. at 422, 105 S.Ct. at 851.

Further, in its 1985 decision in *Witt,* the Supreme Court clarified its *Witherspoon* opinion. In *Witt,* the Court held that a juror may be excused for cause because of his views on the death penalty when those views would "prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath." 469 U.S. at 424, 105 S.Ct. at 852 (footnote and internal quotation marks omitted); *see Davis,* 794 P.2d at 159.

Jury selection for Rodriguez' trial began in November of 1986. The trial court appropriately concluded that the *Witt* standard for exclusion governed the jury selection in this trial.

In Issue 84, Rodriguez argues that, if *Witt* applies, *Witt* requires that the jurors be able to " 'consider and decide the facts impartially and conscientiously apply the law as charged by the court.' " 469 U.S. at 420, 105 S.Ct. at 850 (quoting *Adams v. Texas,* 448 U.S. 38, 45, 100 S.Ct. 2521, 2526, 65 L.Ed.2d 581 (1980)). Thus, Rodriguez argues that the court must rule on a challenge for cause while bearing in mind the law applicable to the case. Rodriguez concludes that, because Colorado law does not require that the death penalty be imposed in any particular case, a juror should not be excused for cause although that juror could never impose the death penalty. *See* Rodriguez' Opening Brief at 230. However, under Colorado law at the time of Rodriguez' trial, a capital sentencing jury was asked to determine whether death was the appropriate penalty. Thus, "it does not make sense to require simply that a juror not 'automatically' vote against the death penalty; whether or not a venireman *might* vote for death under certain *personal* standards, the State still may properly challenge that venireman if he refuses to follow the statutory scheme." *Witt,* 469 U.S. at 422, 105 S.Ct. at 851. Rodriguez is not "entitled to a legal presumption or standard that allows jurors to be seated who quite likely will be biased in his favor." *Id.* at 423, 105 S.Ct. at 852. The trial court in this case appropriately applied the *Witt* standard and concluded that, if a juror is unwilling to consider a death sentence where, under the law, such a sentence is appropriate although not required, that juror cannot "conscientiously apply the law" and is appropriately excused for cause. *See Witt,* 469 U.S. at 420, 105 S.Ct. at 850 (citation and internal quotation marks omitted); *O'Neill,* 803 P.2d at 171; *Davis,* 794 P.2d at 207.

In Issue 62, Rodriguez argues that the trial court applied the *Witt* standard inconsistently and that, accordingly, some jurors were dismissed because of their views on the death penalty although they were actually qualified to sit and some jurors were retained who should have been excused for cause. In support of this claim, Rodriguez cites to the voir dire transcript of six potential jurors, none of whom served on Rodri-

---

**36.** We rejected a similar argument in *Davis,* 794 P.2d at 204.

guez' jury: D.G., R.M., Ru.M., W.V., E.B., and B.R.

### 1

Rodriguez argues that jurors D.G., R.M., Ru.M., and B.R.[37] were improperly retained although their "biases in favor of the death penalty left them impaired." Rodriguez' Opening Brief at 188. Although Rodriguez asserts that the trial court's decisions "skewed the jury panel for the state and against Mr. Rodriguez," *id.* at 190, the record does not bear this out. Further, Rodriguez has not "shown how he was prejudiced by the three jurors as they did not serve on the jury and since the defense did not exhaust its peremptory challenges."[38] *O'Neill,* 803 P.2d at 173; *Silvola,* 190 Colo. at 368, 547 P.2d at 1287–88.

### 2

Rodriguez argues that "[t]he court clearly indicated the standard it was applying regarding death-prone jurors when it granted the challenge to prospective juror [W.V.]." Rodriguez' Opening Brief at 189. We find no reversible error in the court's application of the *Witt* standard to this juror.

■■■ During voir dire, W.V. stated that she thought that a "life is worth more than twenty years," R., v. 16 at 39, but that she could impose life imprisonment if required by the court's instructions. *Id.* at 58. The following colloquy occurred:

> EISNER: .... You're in a situation where you're facing the death penalty and the judge tells you that given the circumstances of the case, that the law would basically assure you that the person would die of old age in prison ... then would that make life imprisonment a more palatable choice for you?
>
> W.V.: No.
>
> EISNER: Even then, you wouldn't like it?

> W.V.: I wouldn't like it, no. If you kill somebody, you deserve to lose your life, especially if it's a deliberate thing, you're talking First Degree Murder.
>
> . . . .
>
> EISNER: In your mind, if there's a First Degree Murder conviction after deliberation, then the person should die?
>
> W.V.: Yes, sir.

*Id.* at 59–60. The court granted defense counsel's challenge for cause, stating that "I think that she was very clear in her position that she did not wish to consider anything but the death penalty." *Id.* at 82. After considering the entire transcript of voir dire, we conclude that the court's statement did not imply its adoption of the more stringent *Witherspoon* standard for challenges made by the defense as opposed to the *Witt* "substantial impairment" standard the court applied to the prosecution. Rather, the court's statement upon its dismissal of juror W.V. indicated its assessment of that particular juror. We perceive no error.

### 3

Rodriguez argues that the court erroneously excused juror E.B., "who expressed her belief in the death penalty, but merely expressed hesitancy about 'signing' the verdict." Rodriguez' Opening Brief at 189. Our review of the record discloses more than a mere hesitancy about the death penalty. We conclude that, in excusing E.B. for cause, the trial court neither abused its discretion nor misapplied the *Witt* standard.

■■■ E.B. stated that she had mixed emotions and didn't know whether she could sign a death verdict. R., v. 18 at 77. E.B. stated that she had never been "totally clear" on the issue, but could "possibly" support the death penalty. *Id.* E.B. stated that she would be willing to follow the law in imposing a penalty, *id.* at 80–81, but expressed an unwillingness to impose the death sentence. The following colloquy occurred:

---

**37.** The court later excused B.R. for cause on different grounds. R., v. 23 at 236–37.

**38.** Rodriguez exercised a peremptory challenge and excused D.G. R., v. 23 at 251. However, at the close of jury selection, Rodriguez had used only eight of his twelve peremptory challenges. R., v. 24 at 66–67.

LITTLE: [H]ypothetically, you have found aggravation that clearly outweighs mitigation; there is no question about it in your mind; the law instructs you that you're to weigh these and make a decision on what to do, . . . would you be willing to sign a verdict and put your name down that would sentence Mr. Rodriguez to death?

E.B.: I don't know if I could.

*Id.* at 82.

LITTLE: . . . . Could you in the appropriate case sign a death penalty verdict?

E.B.: In theory, I could but my problem is that I think that if a juror says the death penalty, in fact, they're responsible for the carrying out of the death penalty, even though they wouldn't physically do that, and then I would have to live with that, and I don't know if I could. That's my problem.

*Id.* at 103; *see id.* at 119–20. The prosecution challenged E.B. for cause based on her opinion on the death penalty. *Id.* at 138. The court granted the challenge. *Id.* at 141. Under the totality of the circumstances disclosed by the record, we discern no abuse of discretion in the trial court's excusal of E.B. for cause. *See Sandoval,* 733 P.2d at 322. Given her responses to counsel's questions, the court could fairly have found that E.B. was "substantially impaired" in her ability to consider the potentially applicable penalties in this case. *See Witt,* 469 U.S. at 424, 105 S.Ct. at 852.

G

In Issues 49 and 50, Rodriguez asserts that the death qualification of the jury and the trial court's refusal to allow two juries, one death-qualified and one not death-qualified, violated his Sixth Amendment right to a jury drawn from a fair cross-section of the community and his rights under the Due Process and Cruel and Unusual Punishment Clauses of the federal and Colorado Constitutions. In *Lockhart v. McCree,* 476 U.S. 162, 106 S.Ct. 1758, 90 L.Ed.2d 137 (1986), the United States Supreme Court held that death qualification of a jury does not violate the fair cross-section requirement of the Sixth Amendment because the Constitution does not require that petit juries actually chosen reflect the composition of the community at large. *Id.* at 173–77, 106 S.Ct. at 1764–67. Rodriguez contends that his case presents distinct factual circumstances not addressed in *Lockhart* and urges this court to follow the dissenting opinion in *Lockhart* for the proposition that a court must provide two juries, one death-qualified and one not death-qualified. *See id.* at 204, 106 S.Ct. at 1781. We reject Rodriguez' attempts to circumvent the majority's holding in *Lockhart* and, accordingly, hold that Issues 49 and 50 are meritless.

VII

*Trial Court Rulings Relating to Witnesses*

A

In denying Rodriguez' Crim.P. 35(c) motion, the district court characterized five of Rodriguez' claims as attacks on the credibility of prosecution witnesses and held that, under *Taylor v. People,* 155 Colo. 15, 392 P.2d 294 (1964), such claims did not allege errors of constitutional magnitude. In Issue 35, Rodriguez contends that the district court erroneously applied *Taylor* to dispose of claims which asserted constitutional questions and did not merely attack the credibility of the prosecution witnesses. In Issues 36, 37, 38, 39, and 40 Rodriguez individually reasserts five claims relating to the testimony of Patricia Thomas which the district court disposed of under *Taylor.* Rodriguez' claims allege that the trial court denied him his constitutional right to cross-examine and confront witnesses and assert more than a mere attack on the credibility of the prosecution witnesses. In part III of this opinion, we denied Issues 37 and 40 because Rodriguez failed to adequately specify the errors and grounds for postconviction relief. We address the substantive arguments contained in Issues 36, 38, and 39.

1

In Issue 36, Rodriguez contends that the prosecution and the trial court illegally granted Patricia Thomas absolute immunity

from prosecution.[39] A defendant lacks standing to contest the propriety of a grant of immunity to a witness. *United States v. Trammel*, 583 F.2d 1166, 1168 (10th Cir. 1978), *aff'd*, 445 U.S. 40, 100 S.Ct. 906, 63 L.Ed.2d 186 (1980); *United States v. Rauhoff*, 525 F.2d 1170, 1178 (7th Cir.1975). Accordingly, we reject this claim.

2

In Issue 38, Rodriguez claims that the trial court's restriction on defense counsel's cross-examination and impeachment of Patricia Thomas violated his due process rights.

■■■ The trial court has discretion to determine the scope and limits of cross-examination, and, absent an abuse of discretion, the court's rulings will not be disturbed on appeal. *People v. Walker*, 666 P.2d 113, 122–23 (Colo.1983). Our review of the trial court's rulings on the scope of defense counsel's cross-examination of Patricia Thomas fails to reveal any abuse of discretion, and, accordingly, we reject Issue 38.

3

In Issue 39, Rodriguez claims that the trial court's granting of the prosecution's "Motion in Limine re: Proper Impeachment of Patricia Thomas" constitutes reversible error. The prosecution's motion in limine requested suppression of the following evidence: (1) Thomas' conviction in Denver County Court for second-degree motor vehicle theft; (2) Thomas' alleged recantation of a statement given to Denver Police in a juvenile burglary case; (3) the granting of a personal recognizance bond to Thomas when she was incarcerated for failure to appear on a traffic case; (4) Thomas' juvenile record; (5) Thomas' psychiatric background; and (6) an accusation by Rodriguez that Thomas stole jewelry from Lorraine Martelli. R., v. 3 at 471–73. The trial court granted the motion in limine as to evidence concerning Thomas' juvenile

record and psychiatric background, subject to reconsideration if Rodriguez demonstrated either the relevance of such evidence at trial or bias on the part of the district attorney's office relating to Thomas. R., v. 4 at 128–29. The trial court denied each of the remaining requests for suppression. *Id.*

■■■ Here, Rodriguez contends that the district court's granting of the motion in limine prevented effective cross-examination and impeachment of Thomas and thereby prevented the jury from being apprised of her true motives and biases. However, he fails to show how the suppression of Thomas' juvenile record and psychiatric background substantially affected his fundamental right to cross-examine and confront Thomas. We therefore conclude that the trial court properly exercised its discretion in partially granting the prosecution's motion in limine. *See People v. Snyder*, 874 P.2d 1076, 1080 (Colo.1994) (stating that trial court's determination on admissibility of evidence will not be overturned absent an abuse of discretion).

B

In Issue 95, Rodriguez claims that the trial court committed prejudicial error by refusing to allow the jail psychiatrist, Dr. Kathy Morall, to testify. Defense counsel Eisner asked the court whether it would allow him to call Dr. Morall to testify as to the prescription drugs taken by Rodriguez at the time of trial, the effect of the drugs on Rodriguez' demeanor, and that she prescribed the drugs because Rodriguez was anxious. R., v. 34 at 145–148.[40] *Id.* The record contradicts Rodriguez' claim that the trial court refused to allow Dr. Morall to testify. Rather, the trial court stated: "I am not saying she can't testify, but I am just saying that [the prosecution] then [has] a right to cross-examine her." *Id.* at 147. We find no prejudicial error and reject Issue 95.

---

**39.** In its "Application for Witness Immunity," the prosecution requested that the trial court grant Patricia Thomas "absolute immunity from prosecution." R., v. 2 at 8. The trial court entered an order granting Patricia Thomas "[i]mmunity from prosecution for any transaction arising out of the above case." *Id.*

**40.** Eisner represented to the court that Dr. Morall would testify as follows: "I am a doctor at the jail; I prescribed this medication; he was anxious; this is what it does." R., v. 34 at 147.

C

In Issue 30, Rodriguez contends that the trial court unjustifiably refused to grant a continuance to allow Rodriguez to call David Martinez as a witness. We conclude that Rodriguez' argument is meritless.

On December 9, 1986, Rodriguez called Martinez as a defense witness. R., v. 29 at 109–112. Martinez invoked his Fifth Amendment privilege against self-incrimination. *Id.* The trial court released Martinez after being advised by Rodriguez' counsel that they did not want to further call him as a witness. *See* R., v. 30 at 108. Contrary to Rodriguez' misrepresentations on this appeal, the record shows that, subsequent to the time the court released Martinez, Rodriguez did not move the court for a continuance in order to allow Martinez to further testify. Accordingly, we reject Issue 30.

In Issue 31, Rodriguez asserts that the trial court erroneously denied his motion for a continuance to secure the attendance of Sam Cruz, who allegedly would have testified that the knife admitted into evidence as the weapon used to kill Lorraine Martelli was the same knife he gave Patricia Thomas as a birthday present. Rodriguez claims that Cruz would have impeached Thomas' testimony that she had never seen the knife before Rodriguez used it to kill Lorraine Martelli. Rodriguez subpoenaed Cruz as a witness, and Cruz failed to appear. *See* R., v. 30 at 98. Rodriguez moved for a continuance to secure Cruz' attendance and also requested that the trial court allow defense investigators to testify as to statements made by Cruz in the event the court denied the motion for continuance. *Id.* The prosecution objected to the motion for continuance on the ground that Cruz' testimony would be cumulative of the testimony presented by Mary Compos at trial. *Id.* at 100. On direct examination by Robin Desmond, Compos testified as follows:

DESMOND: [I]n September of 1984, did you attend a birthday party for Patricia Thomas?

COMPOS: Yes.

*Id.* at 57.

DESMOND: In September of 1984, did Patricia Thomas receive a knife for her birthday?

COMPOS: Yes. She did.

DESMOND: Did she show it to you?

COMPOS: Yes.

*Id.* at 58.

DESMOND: Mary, I am going to hand you what has been marked as People's Exhibit C–1.[41] Have you ever seen that knife before?

COMPOS: Yes.

DESMOND: Where?

COMPOS: At [Patricia Thomas'] party.

DESMOND: Who showed it to you?

COMPOS: She did.

DESMOND: How do you know that's the same knife?

COMPOS: By the name of it and what it looks like.

DESMOND: What do you mean by the name of it?

COMPOS: It says "Tiger" on it.

*Id.* at 59 (footnote added).

The prosecution also objected to defense investigators testifying as to Cruz' statements because such testimony would constitute hearsay. *Id.* at 99. The trial court denied Rodriguez' motion for a continuance and his alternative request to have the investigators testify as to Cruz' statements. *Id.* at 101.

The granting or denying of a motion for continuance lies within the sound discretion of the trial court and will not be overturned on appeal unless the record reflects a clear abuse of that discretion. *People v. Wells,* 776 P.2d 386, 389 (Colo.1989); *Miller v. People,* 178 Colo. 397, 399–400, 497 P.2d 992, 993 (1972). Here, Cruz' testimony would merely have been cumulative to Compos' testimony at trial. Rodriguez fails to show that the trial court's denial of his motion for continuance prevented him from effectively impeaching Thomas, and, accord-

**41.** People's Exhibit C–1 was the knife admitted into evidence as the weapon used to kill Lorraine Martelli. The handle of this knife was inscribed with the word "Tiger."

ingly, we conclude that the district court properly exercised its discretion.

■ Rodriguez also contests the trial court's denial of his request to introduce Cruz' statements through the testimony of defense investigators. The admission of evidence falls within the trial court's discretion and will not be disturbed on appeal absent an abuse of discretion. *People v. Ibarra,* 849 P.2d 33, 38 (Colo.1993). "To show an abuse of discretion, an appellant must establish that, under the circumstances, the trial court's decision to reject the evidence was manifestly arbitrary, unreasonable, or unfair." *Id.* Here, the trial court reasonably concluded that the introduction of Cruz' statements through defense investigators would violate the prohibition against hearsay, *see* C.R.E. 802, and, accordingly, we find no error.

### D

In Issue 96, Rodriguez contends that the trial court erroneously refused his request to call District Attorney Mike Little as a witness. We reject this claim.

At trial, the prosecution introduced letters from Rodriguez to his girlfriend, Margie Marquez, another prisoner at the jail, in which Rodriguez admitted that he killed Lorraine Martelli. *People v. Rodriguez,* 794 P.2d 965, 970 (Colo.1990) (*Rodriguez IV*), *cert. denied,* 498 U.S. 1055, 111 S.Ct. 770, 112 L.Ed.2d 789 (1991). In 1985, Marquez had two separate felony theft cases pending and was represented by Deputy Public Defender David Joyce. *Rodriguez v. District Court,* 719 P.2d 699, 701 (Colo.1986) (*Rodriguez I*). Without Joyce's knowledge, Marquez met with Deputy District Attorneys Mike Little and Mike Kane and informed them that she had letters which incriminated Rodriguez in the murder and kidnapping of Lorraine Martelli. *Id.* At a hearing in connection with Marquez' felony theft cases, Little informed Joyce that a possible conflict of interest had developed between Marquez and the public defender's office because Marquez had initiated contact with the district attorney's office. *Id.* However, Little did not inform Joyce why Marquez had initiated the contact. *Id.* Joyce requested and was allowed to

withdraw as counsel for Marquez in the theft cases. *Id.* Marquez later delivered the incriminating letters to the district attorney's office. *Id.*

At the guilt phase of Rodriguez' trial, Marquez testified that Rodriguez wrote her the letters and that, in doing so, he intended to give Marquez the opportunity to present the letters to Little in exchange for the reduction or dismissal of the theft charges pending against her. R., v. 30 at 69–73. The record reflects the following exchange on cross-examination of Marquez by Silverman:

SILVERMAN: You know this lady over here, Ms. Robin Desmond?

MARQUEZ: Yes.

EISNER: Can we approach the bench?

THE COURT: Yes.

(Whereupon, the following was had at the bench between the Court and counsel.)

EISNER: I anticipate he is trying to go into the fact David Joyce and Robin Desmond are public defenders and work in the same law firm. I don't think, Your Honor, that is relevant.

SILVERMAN: I will not bring up the fact they're public defenders, but I will bring out the fact they work together at the same law firm.

THE COURT: Do you have any objection?

EISNER: No.

*Id.* at 128–29.

During further cross-examination of Marquez, Silverman did not bring out the fact that Joyce and Desmond were both public defenders. *Id.* at 129. After the trial court excused Marquez as a witness, defense counsel Desmond told the court that she wanted to call Little as a witness to rebut the prosecution's insinuation that Joyce and Desmond impermissibly colluded to form a theory which explained why Rodriguez wrote the incriminating letters to Marquez. *Id.* at 164–65. Desmond sought to elicit testimony from Little that Marquez' counsel did not know that Marquez arranged to turn the letters over to the district attorney's office. *Id.* The trial court told Desmond that it would

deny any attempt to call Little as a witness. *Id.*

In our view, the record does not support Rodriguez' contention that the prosecution created a false impression of collusion between Desmond and Joyce. Silverman merely elicited testimony from Marquez that Desmond and Joyce worked in the same law firm, and Eisner explicitly stated that he had no objection to such a question. *Id.* at 129. Furthermore, Silverman specifically asked Marquez whether Joyce had knowledge of the plan between Marquez and Rodriguez to turn Rodriguez' incriminating letters over to Little to secure a reduction or dismissal of Marquez' theft cases; Marquez answered that her attorney did not know of such a plan. *Id.* Finally, Rodriguez had the opportunity on redirect examination to elicit testimony from Marquez rebutting any inference of collusion which had been created by the prosecution, but failed to do so. We conclude that the trial court's refusal to allow Rodriguez to call Little as a witness did not affect Rodriguez' substantial rights.

## VIII

### *Exculpatory Evidence*

In Issues 27 and 28, Rodriguez collectively asserts that the state's destruction of exculpatory evidence violated due process of law and requires that his death sentence and convictions be vacated. We disagree.

The Due Process Clause of the Fourteenth Amendment mandates that the state disclose to criminal defendants favorable evidence which is material to either guilt or punishment. *See California v. Trombetta,* 467 U.S. 479, 485, 104 S.Ct. 2528, 2532, 81 L.Ed.2d 413 (1984); *Brady v. Maryland,* 373 U.S. 83, 87, 83 S.Ct. 1194, 1196–97, 10 L.Ed.2d 215 (1963); *People v. Sheppard,* 701 P.2d 49, 51 (Colo.1985). In *People v. Greathouse,* 742 P.2d 334, 338–39 (Colo.1987), we adopted the standard set forth in *Trombetta* for determining the value of exculpatory evidence in a due process claim. In *Greathouse,* we held that a defendant must first

show that the state suppressed or destroyed constitutionally material evidence. 742 P.2d at 339. "When evidence can be collected and preserved in the performance of routine procedures by state agents, the failure to do so is tantamount to suppression of the evidence." *Id.* To meet *Trombetta's* standard of constitutional materiality, the evidence must: (1) possess an exculpatory value that was apparent before the evidence was destroyed; and (2) be of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means. *Trombetta,* 467 U.S. at 489, 104 S.Ct. at 2534; *Greathouse,* 742 P.2d at 338–39.

In Issue 27, Rodriguez alleges that the prosecution destroyed exculpatory photographs taken by the police which showed bruises and cuts on David Martinez' body and that these photographs would have proven that Martinez sexually assaulted and killed Lorraine Martelli.[42]

In our view, the record is inconclusive as to whether the police ever took photographs showing cuts and bruises on Martinez' body. Detective George Kennedy, who took part in the arrest of Martinez and transported him to police headquarters, testified that he did not photograph or physically examine Martinez while Martinez was unclothed. R., v. 27 at 79. Sergeant Robert Nichols testified that police disrobed Martinez at police headquarters and took some photographs, but did not conclusively state whether those photographs showed bruises and cuts on Martinez' body. *Id.* at 159–60. After Nichols' testimony, defense counsel Eisner told the district court that Rodriguez had not received the photographs Nichols described. *Id.* at 160. In response, prosecutor Silverman stated that he believed Nichols was confused and that "as far as I know David Martinez was never stripped down." *Id.* at 161.

Assuming that such photographs were taken and had exculpatory value that was apparent before their alleged destruction by the state, Rodriguez fails to satisfy the

---

**42.** At trial, the court admitted Exhibits D–57 and D–58 which were photographs of cuts on David Martinez' hands. The photographs at issue here allegedly showed cuts and bruises on other parts of Martinez' body.

second prong of *Trombetta*—that he could not obtain comparable evidence by other reasonably available means. Detective Raymond Estrada testified that he took Martinez to police headquarters and had Martinez remove his clothes. R., v. 28 at 150. Estrada stated that he examined Martinez' naked body and saw no fresh injuries, except for the cuts on Martinez' hands. *Id.* at 151. Estrada further testified that he took a video of an interview with Martinez at police headquarters. *Id.* at 155–57. In that video, Martinez took off his shirt and close-up shots were taken of a bruise on his elbow and discoloration of his bicep. *Id.*

At trial, Eisner cross-examined Estrada regarding the videotape. R., v. 28 at 155–56. Rodriguez offered no evidence to establish that the videotape failed to accurately show the bruises and cuts contained in the photographs at issue. Accordingly, we conclude that the videotape contained comparable evidence of cuts and bruises on Martinez' body and that the destruction of exculpatory photos, if they existed, did not violate Rodriguez' due process rights.

In Issue 28, Rodriguez contends that the state destroyed an exculpatory photograph showing bruises and cuts on Patricia Thomas' chest. On direct examination by the prosecution, Officer Jody Roblez testified that she physically examined Thomas and observed welt marks and a bruise in the middle of Thomas' chest. R., v. 27 at 124. Roblez stated that the police took a photograph of these injuries. *Id.* Roblez further testified that she noted these injuries in her written report. *Id.* The prosecution stipulated that the photo lab personnel inadvertently failed to properly develop the photograph. *Id.* at 125. Defense counsel Eisner stated to the court that he wanted to make a record on the destruction of the photograph as exculpatory evidence and that he intended to bring in the photo lab personnel to testify. *Id.* at 25. However, Eisner did not call the photo lab personnel to present evidence relating to the photographs.

Rodriguez did not make a motion for relief after learning that the photograph of Thomas' injuries had been destroyed, and the court entered no order regarding the destruction of such evidence.

Here, Rodriguez claims that the destruction of the photograph violated due process because the photograph would have impeached Thomas' testimony in which she denied any involvement in the abduction, rape, and murder of Lorraine Martelli. We hold that the destruction of the photograph at issue does not amount to a violation of due process because comparable evidence was available. Roblez testified that she observed a bruise and welts on Thomas' chest, *id.* at 124, and Eisner cross-examined Roblez regarding the nature of these injuries. Rodriguez also had the opportunity to impeach Thomas by introducing Officer Roblez' notes describing Thomas' injuries, but failed to do so. Given the existence and availability of Officer Roblez' testimony and notes, we reject Rodriguez' contention that the destruction of the photograph denied him due process.

## IX

### Jury Instructions

Rodriguez claims unconstitutional deficiencies in the guilt phase jury instructions on first-degree sexual assault, second-degree kidnapping, aggravated robbery, aggravated motor vehicle theft, conspiracy to commit first-degree murder after deliberation, and complicity.

■■■■ A defendant can be convicted only upon proof beyond a reasonable doubt of every element of the crime charged. *Chambers v. People,* 682 P.2d 1173, 1175 (Colo. 1984). Thus, a court must instruct a jury on each essential element of every crime charged "to enable them to assess whether every element of an offense has been proved beyond a reasonable doubt." *Id.* at 1175–76. A failure to do so is plain error. *Id.* at 1176.

### A

Issues 109, 110, 111, and 132 allege deficiencies in the following portion of Instruction No. 16, the guilt phase jury instruction on sexual assault in the first degree:

INSTRUCTION NO. 16

The elements of Sexual Assault in the First Degree are:

(1) That the Defendant,

(2) in the City and County of Denver, State of Colorado on or about November 14, 1984,

(3) knowingly,

(4) inflicted sexual penetration on Lorraine Martelli, and

(5) caused submission of Lorraine Martelli,

(6) through the actual application of physical force or physical violence, and

(7) the Defendant was physically aided or abetted by one or more persons in the commission of the act or the Defendant was armed with a deadly weapon or that Lorraine Martelli suffered serious bodily injury.

R., v. 3 at 577.

Rodriguez claims the following deficiencies: (1) Paragraph 7 did not modify the phrase "the Defendant was armed with a deadly weapon" with "and used the deadly weapon to cause submission of the victim;" (2) the instruction did not specify that the deadly weapon was "a knife;" [43] (3) Paragraph 7 did not specify that its alternative elements must have occurred "in the commission of the sexual assault;" (4) the instruction did not specify that the mental state of "knowingly" applied to each element of the offense; and (5) the instruction did not require jury unanimity on either the mode of sexual penetration or on the alternative elements in Paragraph 7.

Instruction No. 16 adequately instructed the jury on the requisite *mens rea* because the term "knowingly," when offset from other elements, modifies all succeeding conduct elements. *See People v. Bossert,* 722 P.2d 998, 1011 (Colo.1986); *People v. Freeman,* 668 P.2d 1371, 1377–78 (Colo.1983).

The requirement of a unanimous jury was not compromised by Paragraph 4 of Instruction No. 16. Rodriguez' theory of defense focused not on whether the sexual assault occurred, but on whether he or David Martinez committed the assault. *See People v. Rodriguez,* 794 P.2d 965, 970 (Colo.1990) (*Rodriguez IV*), *cert. denied,* 498 U.S. 1055, 111 S.Ct. 770, 112 L.Ed.2d 789 (1991). "[W]hen the evidence does not present a reasonable likelihood that jurors may disagree on which acts the defendant committed, the prosecution need not designate a particular instance," *Thomas v. People,* 803 P.2d 144, 153 (Colo.1990), nor, in the case of sexual assault, a particular mode of sexual penetration. Likewise, the instruction need not specify the type of deadly weapon which Rodriguez used.[44]

We conclude, however, that Paragraph 7 is constitutionally deficient and cannot support a conviction for first-degree sexual assault as a class 2 felony. Paragraph 7 attempts to summarize the three alternative factors which convert first-degree sexual assault from a class 3 felony into a class 2 felony. *See* § 18–3–402(2), 8 C.R.S. (1978). Section 18–3–402(2) provides for enhancement of the felony class if:

(a) In the commission of the sexual assault the actor is physically aided or abetted by one or more other persons; or

**43.** At the pretrial motions hearing, defense counsel indicated that the information charging Rodriguez with sexual assault had been amended by striking the words "to-wit, a knife." R., v. 13 at 21–22. However, the record does not contain a copy of the information as amended. Therefore, our analysis assumes, as does Rodriguez' brief, that the information was not amended.

**44.** The information charging Rodriguez with sexual assault alleged that Rodriguez was "armed with a deadly weapon, to-wit: a KNIFE, and used said deadly weapon to cause submission of the victim." R., v. 1 at 2. Instruction No. 16 stated only that "the Defendant was armed with

a deadly weapon." Instruction No. 25 defined "deadly weapon" as "a firearm, whether loaded or unloaded; a knife; a bludgeon; or any other weapon, device, instrument, material or substance, whether animate or inanimate." R., v. 3 at 587. Rodriguez has not argued that the instructional definition of "deadly weapon" unconstitutionally expanded upon the offense charged in the information, although he has made analogous arguments. *See* part V of this opinion. For the reasons discussed in that part, we conclude that the instruction did not unconstitutionally expand upon the offense charged.

(b) The victim suffers serious bodily injury; or

(c) The actor is armed with a deadly weapon and uses the deadly weapon to cause submission of the victim.

§ 18–3–402(2). The presence of any one of these three alternatives is the only difference between first-degree sexual assault as a class 2 felony and first-degree sexual assault as a class 3 felony.

■■■■ Paragraph 7 instructed on all three alternative factors, but inadequately instructed as to alternative (c) of section 18–3–402(2). Under the instruction as given, the jury could have convicted Rodriguez of the higher class of felony based only upon his possession of the knife during the sexual assault, rather than upon his possession and *use* of the knife during the sexual assault. Record evidence supports either of the other two alternatives. However, because the jury returned only a general verdict, the prosecution must have proved *each* alternative beyond a reasonable doubt. *See James v. People*, 727 P.2d 850, 853 (Colo.1986). The jury was not instructed on both elements of alternative (c) and could not have assessed whether the prosecution had proven each element of that alternative beyond a reasonable doubt. *See Chambers*, 682 P.2d at 1175–76. This deficiency constitutes plain error.

However, other than this deficiency, the instruction tracked the language of both the sexual assault statute and the model jury instruction. *See* § 18–3–402(2)(c); CJI–Crim. 12:04. The instruction adequately apprised the jury of the essential elements of first-degree sexual assault as a class 3 felony, and the jury unanimously found each of those elements.

We remand Rodriguez' conviction for first-degree sexual assault as a class 2 felony to the district court with directions to vacate that judgment and enter a judgment and sentence for the lesser included offense of first-degree sexual assault as a class 3 felony. *See* § 18–1–408(5), 8B C.R.S. (1986); *People v. Henderson*, 810 P.2d 1058, 1062–63 (Colo. 1991) (discussing enhancement of second-degree kidnapping conviction).

In Issues 112 and 142, Rodriguez alleges insufficient evidence to support the enhancement of his conviction for first-degree sexual assault from a class 3 to a class 2 felony. In light of our holding here, these issues are rendered moot.

B

In Issues 113 and 114, Rodriguez alleges constitutional deficiencies in the following guilt phase instruction:

INSTRUCTION NO. 18

The elements of the crime of Kidnapping in the Second Degree are:

(1) That the defendant,

(2) in the City and County of Denver, State of Colorado on or about November 14, 1984,

(3) knowingly,

(4) forcibly, or otherwise, seized and carried Lorraine Martelli from one place to another,

(5) without her consent, and

(6) without lawful justification, and

(7) Lorraine Martelli was the victim of a sexual assault.

R., v. 3 at 579 (quoted in relevant part).

Rodriguez argues two deficiencies in this instruction: (1) the instruction did not specify that the mental state of "knowingly" applied to each element of the offense; and (2) Paragraph 7 did not articulate the essential elements of sexual assault.

Instruction No. 18 adequately instructed the jury on the requisite *mens rea* because the term "knowingly," when offset from other elements, modifies all succeeding conduct elements. *See Bossert*, 722 P.2d at 1011; *Freeman*, 668 P.2d at 1377–78.

■■■ As stated in part IX(A) above, Instruction No. 16 adequately advised the jury of the essential elements of first-degree sexual assault as a class 3 felony. The trial court need not repeat these elements in Instruction No. 18. The failure to do so did not affect any of Rodriguez' substantial rights and, therefore, was harmless. *See* Crim.P. 52;

*People v. Mozee,* 723 P.2d 117, 129 (Colo. 1986).

## C

In Issues 115 and 116, Rodriguez alleges error in the guilt phase instruction for aggravated robbery, which read, in relevant part, as follows:

### INSTRUCTION NO. 19

The elements of the crime of Aggravated Robbery are:

(1) That the defendant,

(2) in the City and County of Denver, State of Colorado, on or about November 14, 1984,

(3) knowingly,

(4) took anything of value,

(5) from the person or presence of Lorraine Martelli,

(6) by the use of force, threats, or intimidation, and

(7) during the act of robbery or the immediate flight therefrom,

(8) knowingly,

(9) put the person robbed, or any other person, in reasonable fear of death or bodily injury,

(10) by the use of force threats or intimidation,

(11) with a deadly weapon.

R., v. 3 at 580.

Specifically, Rodriguez contends that: (1) Paragraph 11 did not specify that the deadly weapon was "a knife;" and (2) the instruction did not specify that the mental state of "knowingly" applied to each element of the offense. We find these arguments wholly without merit.

■■■ The instruction need not specify the type of deadly weapon which Rodriguez used. "[W]hen the evidence does not present a reasonable likelihood that jurors may disagree on which acts the defendant committed, the prosecution need not designate a particular instance," *Thomas,* 803 P.2d at 153, nor, in the case of aggravated robbery, a particular type of deadly weapon.

Instruction No. 19 adequately instructed the jury on the requisite *mens rea* because the term "knowingly," when offset from other elements, modifies all succeeding conduct elements. *See Bossert,* 722 P.2d at 1011; *Freeman,* 668 P.2d at 1377–78.

## D

In Issues 117 and 118, Rodriguez contends that the following portion of Instruction No. 17 inadequately instructed the jury on the essential elements of first-degree aggravated motor vehicle theft:

### INSTRUCTION NO. 17

The elements of the crime of First Degree Aggravated Motor Vehicle Theft are:

(1) That the defendant,

(2) in the City and County of Denver, State of Colorado, on or about November 14, 1984,

(3) knowingly,

(4) obtained or exercised control over a motor vehicle,

(5) belonging to Lorraine Martelli,

(6) without authorization or by threat,

(7) and the defendant did use the motor vehicle in the commission of Murder In The First Degree or Sexual Assault In The First Degree or Second Degree Kidnapping.

R., v. 3 at 578.

Rodriguez claims two errors: (1) the instruction omitted the elements of the predicate offenses of first-degree murder, first-degree sexual assault, and second-degree kidnapping; and (2) the instruction did not specify that the mental state of "knowingly" applied to each element of the offense.

As stated above, the term "knowingly," when offset from other instructional elements, modifies all succeeding conduct elements. *See Bossert,* 722 P.2d at 1011; *Freeman,* 668 P.2d at 1377–78. Thus, Instruction No. 17 adequately instructed the jury on the requisite *mens rea.*

■■■ The instructions, taken together, adequately advised the jury of the essential elements of first-degree murder, first-degree

sexual assault, and second-degree kidnapping. The trial court need not repeat these elements in Instruction No. 17. The refusal to do so did not affect any of Rodriguez' substantial rights and, therefore, was not harmful error. *See* Crim.P. 52; *Mozee,* 723 P.2d at 129.

## E

In Issues 123, 124, and 129,[45] Rodriguez contends that the following portion of the guilt phase instruction on conspiracy to commit first-degree murder was constitutionally deficient:

### INSTRUCTION NO. 20

The elements of the crime of Conspiracy To Commit Murder In The First Degree (after deliberation) are:

(1) That the defendant,

(2) in the City and County of Denver, State of Colorado, on or about November 14, 1984,

(3) with the intent to promote or facilitate the commission of the crime of Murder In The First Degree (after deliberation),

(4) agreed with another person or persons that they, or one or more of them, would engage in conduct which constitutes Murder In The First Degree (after deliberation) or an attempt to commit Murder In The First Degree (after deliberation), and

(5) the defendant, or a person with whom the defendant conspired, has performed an overt act in pursuance of such conspiracy.

R., v. 3 at 581.

Rodriguez alleges the following errors: (1) Instruction No. 20 does not include all the elements of conspiracy to commit first-degree murder; (2) Instruction No. 20 did not list the elements of first-degree murder; and (3) the court did not instruct the jury on the meaning of "attempt."

45. Issue 129 also alleges error in the guilt phase instructions regarding conspiracy to commit second-degree kidnapping and conspiracy to commit aggravated motor vehicle theft. These por-

 The essential elements of a conspiracy are: (1) an agreement (2) between two or more persons (3) to commit or attempt to commit a crime. § 18–2–201(1), 8 C.R.S. (1978); *Young v. People,* 180 Colo. 62, 64, 502 P.2d 81, 82 (1972). The essential elements are all present in Instruction No. 20.

 Instruction No. 20 need not repeat the elements of first-degree murder after deliberation, as Instruction No. 13 adequately advised the jury of those elements. *See* R., v. 3 at 573. The instructions, taken as a whole, informed the jury of the elements of conspiracy to commit first-degree murder after deliberation and did not prejudice Rodriguez' substantial rights.

 Finally, although "a criminal attempt is not readily understandable to a person of ordinary intelligence without some further explanation by the court," *People v. Leonard,* 673 P.2d 37, 42 (Colo.1983) (discussing same in context of entry of plea), the trial court's failure to instruct on "attempt" here was harmless error, as the jury specifically found Rodriguez guilty of first-degree murder after deliberation. Thus, although Instruction No. 20 is no model of precision, the jury's verdict on first-degree murder after deliberation enables this court to determine upon which theory the jury based its verdict, *but cf. James,* 727 P.2d at 853, and to uphold Rodriguez' conviction for conspiracy to commit first-degree murder after deliberation.

## F

In Issues 130 and 131, Rodriguez asserts constitutional error in the following guilt phase jury instruction on complicity:

### INSTRUCTION NO. 12

A person is guilty of an offense committed by another person if he is a complicitor. To be guilty as a complicitor, the following must be established beyond a reasonable doubt:

1. A crime must have been committed

tions of Issue 129 are rendered moot by the district court's vacation of those convictions and our affirmance thereof. *See infra* part XIV.

2. Another person must have committed all or part of the crime

3. The defendant must have had knowledge that the other person intended to commit all or part of the crime

4. The defendant did intentionally aid, abet, advise, or encourage the other person in the commission or planning of the crime.

R., v. 3 at 572.

Rodriguez argues the following errors: (1) Paragraph 4 did not adequately advise the jury of the requisite *mens rea*; (2) the inclusion of the word "encourage" in Paragraph 4 expanded upon the statutorily prohibited conduct; and (3) the "all or part" language of Paragraphs 3 and 4 is contrary to the complicity statute.[46]

The relevant statute states: "A person is legally accountable as principal for the behavior of another constituting a criminal offense if, with the intent to promote or facilitate the commission of the offense, he aids, abets, or advises the other person in planning or committing the offense." § 18–1–603, 8 C.R.S. (1978).

Rodriguez asserts that the court should have instructed the jury using Paragraph 4 of his proposed jury instruction:

*Having this knowledge*, the defendant did intentionally aid, abet, advise, or encourage the other person in the commission or planning of the crime.

R., v. 3 at 597 (emphasis added). Rodriguez argues that the effect of this omission was "to require a guilty verdict even though the actions of Mr. Rodriguez which aided or abetted the commission of the murder after deliberation were done *without knowledge that the actual perpetrator intended to commit the murder.*" Rodriguez' Opening Brief at 351–52.

The instruction as given adequately advised the jury of the requisite *mens rea.* As stated above, the *mens rea* term, when offset from other instructional elements, modifies all succeeding conduct elements. *Bossert,* 722 P.2d at 1011; *see Freeman,* 668 P.2d at 1377–78. Further, "[s]ince complicity is not a substantive crime, the statutory definitions of *mens rea* do not apply." *People v. R.V.,* 635 P.2d 892, 894 (Colo.1981). It is sufficient if the instruction informs the jury that the accused is a complicitor "if, with the intent to promote or facilitate the commission of the offense, he aids, abets, or advises [the person who commits the offense] in planning or committing [that] offense." *See* § 18–1–603; *R.V.,* 635 P.2d at 893–94. The instruction as given was adequate in that respect.

The inclusion of the word "encourage" does not expand upon the statutorily prohibited conduct because "[t]he plain meaning of 'abet' includes 'encourage.'" *Alonzi v. People,* 198 Colo. 160, 166, 597 P.2d 560, 564 (1979).

Finally, Rodriguez contends that the "all or part" language of Paragraphs 3 and 4 violates due process because it allowed the jury to convict Rodriguez of first-degree murder committed by a principal, even if he were aware only of the principal's intent to commit or commission of a lesser offense.[47] That is, the jury could convict Rodriguez of the first-degree murder of Lorraine Martelli even if he only agreed to her assault. Although the instruction given followed the model jury instruction, *see* CJI–Crim. 6:04, we agree that the inclusion of the language "all or part" was erroneous. We conclude, however, that the error was harmless.

Record evidence supports Rodriguez' conviction for first-degree murder after deliberation as either a complicitor or a principal. Patricia Thomas testified that Rodriguez said

**46.** Rodriguez also claims error in that the information did not charge complicity. However, the prosecution need not separately charge the crime of complicity. *People v. Thompson,* 655 P.2d 416, 417–18 (Colo.1982).

**47.** Rodriguez contends that the prosecution relied on complicity "in arguing for a guilty verdict on the murder and other charges" and that "[t]he prosecution argued that Mr. Rodriguez

was guilty as a complicitor, particularly of first-degree murder after deliberation." Rodriguez' Opening Brief at 350–51. Our review of the record reveals that the prosecution argued complicity only for the charge of first-degree murder after deliberation. We conclude that any error in the complicity instruction neither affected Rodriguez' substantial rights nor prejudiced his defense on the other charges.

that they would have to kill Lorraine Martelli because Martelli had seen their faces. R., v. 25 at 200. Thomas also testified that Rodriguez alone stabbed and killed Martelli. *Id.* at 210; R., v. 26 at 20. The forensic serologist confirmed the presence of Martelli's blood on Rodriguez' underwear, jacket, and jeans after his arrest. R., v. 28 at 193–97.

Furthermore, in returning a guilty verdict on the charge of conspiracy to commit first-degree murder after deliberation, the jury necessarily found that Rodriguez specifically intended to promote or facilitate the first-degree murder of Lorraine Martelli. *See Rodriguez IV,* 794 P.2d at 989–90. This finding indicates the jury's unanimous belief that Rodriguez agreed to the commission of first-degree murder in its entirety, rather than intending commission of part of the offense or of a lesser included offense. The instructional error as to Rodriguez' complicity did not affect his substantial rights nor prejudice his defense. The error is harmless. *See* Crim.P. 52.

Instruction No. 19 adequately advised the jury of the essential elements of aggravated robbery, and Rodriguez' conviction on that count must stand.

### G

In Issues 134, 136, 137, 138, and 139, Rodriguez collectively asserts that the "crime of violence" instructions in the guilt phase of his trial impermissibly tainted the jury's decision to impose the death penalty.

▉ By information, the prosecution charged Rodriguez with a violation of section 16–11–309, 8A C.R.S. (1986), which requires a mandatory sentence for one convicted of a crime of violence. A crime of violence is "a crime in which the defendant used, or possessed and threatened the use of, a deadly weapon during the commission or attempted commission" of certain statutorily enumerated crimes. § 16–11–309(2)(a)(I). The crime of violence statute is a sentencing provision and does not create a separate substantive offense. *Brown v. District Court,* 194 Colo.

45, 47, 569 P.2d 1390, 1391 (1977). A conviction under section 16–11–309 requires a judge to sentence a defendant "to a term of incarceration greater than the maximum in the presumptive range, but not more than twice the maximum term, provided for such offense." § 16–11–309(1)(a).

The jury convicted Rodriguez of five mandatory sentencing counts for crimes of violence. R., v. 3 at 554–558. However, the record reveals that the trial court never imposed sentence on these jury verdicts. The trial court entered a "Judgment of Conviction: Sentence: and Order to Sheriff (Mittimus)" which failed to include the jury's guilty verdicts on Rodriguez' crime of violence charges and did not impose the mandatory sentence for those convictions. R., v. 4 at 804–07.

▉ The trial court's failure to impose mandatory sentences on the crimes of violence convictions moots Rodriguez' claims that his sentences for the crime of violence convictions should be vacated.[48] We also refuse to vacate Rodriguez' death sentence because that sentence was not based on his crime of violence convictions. Rather, the jury imposed the death sentence based on its finding that the prosecution proved the existence of statutory aggravating factors and that these factors outweighed any mitigating factors. *See Rodriguez IV,* 794 P.2d at 986–87; R., v. 4 at 746–53. The aggravating factors found by the jury did not require the jury to determine whether Rodriguez committed a crime of violence, and neither the prosecution nor the defense presented evidence at the penalty phase that the jury convicted Rodriguez of crimes of violence.

### H

In summary, Rodriguez' arguments regarding the guilt phase jury instructions on crime of violence are moot. The instructions on second-degree kidnapping, aggravated robbery, and aggravated motor vehicle theft were not erroneous. The instructions on complicity and conspiracy to commit first-

---

**48.** In Issue 135, Rodriguez alleges insufficient evidence to support the crime of violence convic-

tions. This issue is likewise rendered moot.

degree murder after deliberation contained only harmless error. The instruction on first-degree sexual assault was erroneous, and that error requires that we remand Rodriguez' conviction for first-degree sexual assault as a class 2 felony to the district court with directions to vacate that judgment and enter judgment and sentence for the lesser offense of first-degree sexual assault as a class 3 felony.

## X

### Guilt Phase Closing Arguments

In Issue 106, Rodriguez challenges his convictions and death sentence, claiming that the prosecution's closing arguments at the guilt phase of his trial violated the Due Process Clauses of the federal and Colorado Constitutions, his constitutional right to trial by jury, and the prohibition against cruel and unusual punishment.[49] We reject this argument.

" [A] criminal conviction is not to be lightly overturned on the basis of a prosecutor's comments standing alone, for the statements or conduct must be viewed in context; only by so doing can it be determined whether the prosecutor's conduct affected the fairness of the trial." *United States v. Young*, 470 U.S. 1, 11, 105 S.Ct. 1038, 1044, 84 L.Ed.2d 1 (1985). The closing arguments of counsel are not evidence and the jury in Rodriguez' case was properly instructed on the function and limitations of closing argument. *See* R., v. 3 at 560. Clos-

ing arguments must be considered in light of the objections, the rulings, and the record in a particular case. We address claims of prosecutorial misconduct in closing argument on a case-by-case basis. *See Harris v. People*, 888 P.2d 259, 267 n. 7 (Colo.1995).

In *People v. Rodgers*, 756 P.2d 980 (Colo. 1988), we concluded that, during closing argument, the prosecution improperly commented on the defendant's exercise of his constitutional right to a jury trial. *Id.* at 983. We set forth the following standard for evaluating the prejudicial effect of an improper argument on a defendant's conviction:

[I]f the asserted error is of constitutional dimension, reversal is required unless the [reviewing] court is convinced that the error was *harmless beyond a reasonable doubt*. If there is a reasonable possibility that the defendant could have been prejudiced the error cannot be harmless beyond a reasonable doubt.

*Id.* at 984 (citations and internal quotation marks omitted); *see People v. Davis*, 794 P.2d 159, 189 (Colo.1990).[50]

In *Rodgers*, we determined that the prosecution's improper comment did not warrant reversal of the defendant's conviction because the evidence against the defendant was "overwhelming." *Id.* at 984. We concluded that:

The evidence at this trial was sufficient in both quantity and quality to support the conclusion that the jury could not have arrived at a verdict other than guilty. In this context, the prosecutor's conduct "was

**49.** Rodriguez alleges twenty-seven instances of prosecutorial misconduct during closing arguments at the guilt phase.

**50.** Here, Rodriguez contends that the allegedly improper arguments violated his constitutional right to a fair and impartial trial by jury, due process, and the prohibition against cruel and unusual punishment. In most instances, Rodriguez did not make a contemporaneous objection to the arguments which he now claims constitute reversible error. Where no contemporaneous objection is made to the asserted error, the court normally reviews the alleged error under the "plain error" standard. *Harris*, 888 P.2d at 267. However, in *People v. Rodriguez*, 794 P.2d 965 (Colo.1990) (*Rodriguez* IV), *cert. denied*, 498 U.S. 1055, 111 S.Ct. 770, 112 L.Ed.2d 789 (1991), we declined to review Rodriguez' claims of prosecutorial misconduct during penalty phase closing

arguments under the "plain error" standard, noting that "[b]ecause death is a punishment qualitatively unlike any other, and there is a corresponding need for reliability in the sentencing proceeding, we have elected to examine the record of the closing arguments as if there had been contemporaneous objections." *Id.* at 972 (citations omitted). For purposes of fairness and consistency, we review Rodriguez' contentions here of prosecutorial misconduct as if contemporaneous objections had been made. We review his claims under the standard that error must be "harmless beyond a reasonable doubt." *See United States v. Hasting*, 461 U.S. 499, 510, 103 S.Ct. 1974, 1981, 76 L.Ed.2d 96 (1983); *Chapman v. California*, 386 U.S. 18, 24, 87 S.Ct. 824, 828, 17 L.Ed.2d 705 (1967); *Rodgers*, 756 P.2d at 984; *Davis*, 794 P.2d at 189.

not so offensive as to require reversal of the defendants' convictions." *People v. Plotner*, 188 Colo. 297, 302, 534 P.2d 791, 794 (1975) (prosecutor's statement during closing argument regarding his personal opinion of the defendant's guilt was improper, but not reversible error). *Where it appears that no other verdict could have been properly rendered, prosecutorial misconduct is not reversible error. Hillen v. People*, 59 Colo. 280, 284, 149 P. 250, 252 (1915).

In light of the overwhelming evidence presented at trial against the defendant, we conclude that the prosecutor's improper remark during closing argument was harmless beyond a reasonable doubt.

*Id.* at 985 (emphasis added); *see also Harris*, 888 P.2d at 268 (stating that "the sufficiency of the evidence presented at trial will be considered on appeal when evaluating claims of prosecutorial misconduct"); *Grandbouche v. People*, 104 Colo. 175, 185, 89 P.2d 577, 581 (1939) (holding that "[t]he rule is that where the guilt of an accused is evident, incidental improper action upon the part of the prosecuting officer may be overlooked"); *Miller v. People*, 70 Colo. 313, 317, 201 P. 41, 42 (1921) (same as *Grandbouche*).

In his postconviction motion, Rodriguez asserts for the first time that the prosecution's closing arguments at the guilt phase of his trial require reversal of his convictions. After reviewing the record, we conclude that certain parts of the arguments made by the prosecution were improper. Although the evidence of guilt in this case is overwhelming, we do not condone the prosecution's arguments which extended into opinion, the integrity of the police and the prosecution, and to matters that did not comply with the American Bar Association Standards relating to prosecutorial closing arguments. *See* American Bar Association Standards for Criminal Justice: Prosecution and Defense Function,

§ 3–5.8 at 106 (3d ed. 1993).[51] Although the prosecution's arguments in some instances were overzealous and improper, these arguments did not rise to the level of reversible constitutional error in this case.

▉ Here, the prosecution's arguments do not constitute reversible error because "[t]he evidence at ... trial was sufficient in both quality and quantity to support the conclusion that the jury could not have arrived at a verdict other than guilty." *Rodgers*, 756 P.2d at 985. In *Rodriguez IV*, we expressly stated: "We have reviewed the record in this case with great care. We conclude that there was *overwhelming* evidence of the defendant's guilt and personal participation in the kidnapping, sexual assault and murder of Lorraine Martelli." 794 P.2d at 991 (emphasis added); *see also infra* part XVIII(C) (detailing evidence against Rodriguez). We conclude that, in light of the massive and overwhelming evidence against Rodriguez, "the jury could not have arrived at a verdict other than guilty," *Rodgers*, 756 P.2d at 985, and the prosecutor's closing arguments at the guilt phase, though improper, could not have influenced the jury to reach a different result. Viewed in the context of the entire case, the prosecutor's closing arguments did not "undermine the fundamental fairness of the trial and contribute to a miscarriage of justice." *Young*, 470 U.S. at 16, 105 S.Ct. at 1047. According, we reject Issue 106.

## XI

### *Habitual Criminal Proceeding*

On December 13, 1986, the trial court conducted a habitual criminal proceeding pursuant to section 16–13–101, 8 C.R.S. (1984 Supp.), and the jury found beyond a reasonable doubt that Rodriguez had three prior felony convictions. R., v. 33 at 63–65. Sec-

---

**51.** ABA Standard § 3–5.8 provides:

(a) In closing argument to the jury, the prosecutor may argue all reasonable inferences from evidence in the record. The prosecutor should not intentionally misstate the evidence or mislead the jury as to the inferences it may draw.

(b) The prosecutor should not express his or her personal belief or opinion as to the truth or falsity of any testimony or evidence or the guilt of the defendant.

(c) The prosecutor should not make arguments calculated to appeal to the prejudices of the jury.

(d) The prosecutor should refrain from argument which would divert the jury from its duty to decide the case on the evidence.

tion 16–13–101 requires the trial court to adjudge a defendant with three prior felony convictions a habitual criminal and to sentence that defendant to life imprisonment. The trial court did not sentence Rodriguez on the habitual criminal counts before the penalty phase of his trial. *See* R., v. 33 at 63–66; R., v. 34 at 50–53.

At the penalty phase, the prosecution argued that Rodriguez might escape from prison if he received a life sentence and that the jury should consider Rodriguez' future dangerousness in deciding whether to return a sentence of life imprisonment instead of death. *See People v. Rodriguez,* 794 P.2d 965, 976 (Colo.1990) (*Rodriguez IV*), *cert. denied,* 498 U.S. 1055, 111 S.Ct. 770, 112 L.Ed.2d 789 (1991); R., v. 35 at 115. In Issue 101, Rodriguez contends that the trial court's refusal to sentence him on the habitual criminal counts prior to the penalty phase prevented him from informing the jury that he would never be eligible for parole and violated his due process right to rebut the prosecution's arguments of future dangerousness.

Rodriguez relies on *Simmons v. South Carolina,* —— U.S. ——, —— – ——, 114 S.Ct. 2187, 2190–96, 129 L.Ed.2d 133 (1994), and *Clark v. Tansy,* 118 N.M. 486, 882 P.2d 527, 533–34 (1994). In *Simmons,* the United States Supreme Court held that, where a capital defendant's future dangerousness is at issue and state law prohibits his release on parole, due process requires that the sentencing jury be informed that the defendant is parole ineligible. —— U.S. at ——, 114 S.Ct. at 2193.

In *Clark,* the prosecutor specifically relied on the defendant's future dangerousness in arguing for the death penalty and incorrectly represented to the jury that the defendant's convictions for noncapital offenses made the defendant eligible for parole in ten years. 882 P.2d at 532. Assuming maximum good time for the defendant's noncapital offenses, the defendant would not have been eligible for parole for thirty-five years. *Id.* The jury sentenced the defendant to death. *Id.* 882 P.2d at 529. The New Mexico Supreme Court applied *Simmons* and held that, prior to a jury's capital sentencing deliberations, a

court must inform the jury of the defendant's minimum length of incarceration as an alternative to a death sentence if the defendant decides it is in his best interest for the jury to be apprised of such information. *Id.* 882 P.2d at 533. The court vacated the defendant's death sentence, stating: " 'The State thus succeeded in securing a death sentence on the ground, at least in part, of petitioner's future dangerousness, while at the same time concealing from the sentencing jury the true meaning of its noncapital sentencing alternatives.' " *Id.* (quoting *Simmons,* —— U.S. at ——, 114 S.Ct. at 2193). The court also held that "[b]ecause the length of incarceration facing a defendant if he is not sentenced to death is accurate and relevant information that must be presented to a capital jury to rebut the prosecution's case for death, … the trial court has no discretion to delay imposing sentence on noncapital charges." *Id.* 882 P.2d at 534.

We find Rodriguez' case distinguishable from *Simmons* and *Clark.* Here, the trial court accurately informed the jury of its noncapital sentencing alternatives prior to the jury's capital sentencing deliberations. Pursuant to section 16–11–103(1)(b), 8 C.R.S. (1984 Supp.), which required the court to instruct the jury that life imprisonment means imprisonment without the possibility of parole for twenty years, the trial court gave the following instruction at the penalty phase:

### INSTRUCTION NO. 24

A sentence of life in prison means that Mr. Rodriguez will be sentenced to the Colorado Department of Corrections for life, and that he must spend twenty calendar years in prison before he would be eligible to apply for release on parole from that sentence.

This does not mean that Mr. Rodriguez would be paroled from the life sentence after twenty calendar years. It means that he could apply for parole at that time. A prisoner serving a life sentence has no right to ever be paroled. Parole is purely a privilege, not a right. If Mr. Rodriguez applied for parole after twenty calendar

years, the Parole Board would then decide whether or not to parole Mr. Rodriguez.

The fact that a person may be eligible for parole at some time in the future is a factor to be considered in determining whether a life or death sentence is appropriate. You should also be aware that when a defendant is facing multiple charges in addition to murder he can be sentenced to a number of years to be served consecutively to a life sentence, which would increase the amount of time to be served before becoming parole eligible. In fact, it is possible that enough consecutive sentences could be given to assure that a defendant would never be eligible for parole in a natural lifetime. That is also a proper factor for your consideration.

R., v. 4 at 783.

■ Contrary to Rodriguez' assertion, the trial court's failure to impose sentence on his noncapital offenses before the jury's capital sentencing deliberations did not violate Rodriguez' due process right to have accurate information presented to the jury to rebut the prosecution's case for the death penalty. The instruction given provided the jury with a fundamental understanding of the potential sentencing alternatives by detailing that Rodriguez could be eligible for parole in twenty years or receive consecutive sentences which would keep him in prison for the remainder of his natural life. By doing so, the court allowed Rodriguez to deny or explain the prosecution's claims of future dangerousness and ensured that Rodriguez was not sentenced to death " 'on the basis of information which he had no opportunity to deny or explain.' " See Skipper v. South Carolina, 476 U.S. 1, 5 n. 1, 106 S.Ct. 1669, 1671 n. 1, 90 L.Ed.2d 1 (1986) (quoting Gardner v. Florida, 430 U.S. 349, 362, 97 S.Ct. 1197, 1207, 51 L.Ed.2d 393 (1977)). We find no violation of due process and, accordingly, reject Issue 101.[52]

## XII

### Sufficiency of the Evidence

In Issue 141, Rodriguez contends that the evidence presented to the jury was insufficient to support his convictions for aggravated robbery and felony murder and that his death sentence based thereon must be vacated.[53] We reject this contention.

The prosecution charged Rodriguez with aggravated robbery under section 18–4–302, 8 C.R.S. (1978), and the trial court provided the jury with the following instruction:

### INSTRUCTION NO. 19

The elements of the crime of Aggravated Robbery are:

(1) That the defendant,

(2) in the City and County of Denver, State of Colorado, on or about November 14, 1984,

(3) knowingly,

(4) took anything of value,

(5) from the person or presence of Lorraine Martelli,

(6) by the use of force, threats, or intimidation, and

(7) during the act of robbery or the immediate flight therefrom,

(8) knowingly,

(9) put the person robbed, or any other person, in reasonable fear of death or bodily injury,

(10) by the use of force threats or intimidation,

(11) with a deadly weapon.

R., v. 3 at 580 (quoted in relevant part). The jury found Rodriguez guilty of aggravated robbery. R., v. 3 at 550.

Here, Rodriguez contends that the prosecution failed to establish that Rodriguez used a deadly weapon during the robbery of Lorraine Martelli or immediate flight therefrom and that, therefore, "there was a total failure of proof that anyone was, by means of force

---

52. We decline to adopt the portion of Clark which holds that "the trial court has no discretion to delay imposing sentence on noncapital charges." See Clark, 882 P.2d at 527.

53. Rodriguez' claim that the evidence was insufficient to establish felony murder is rendered moot by our holding in part XIV of this opinion that the district court properly vacated Rodriguez' conviction for felony murder.

threats or intimidation by means of a knife, put into fear of death or injury." Rodriguez' Opening Brief at 386–87.

In reviewing a claim challenging the sufficiency of the evidence to support a conviction, we view the evidence in the light most favorable to the prosecution. *People v. Gonzales,* 666 P.2d 123, 127 (Colo.1983); *People v. Larson,* 194 Colo. 338, 341, 572 P.2d 815, 817 (1977). At trial, Patricia Thomas testified that: (1) Rodriguez and his brother, Chris Rodriguez, forced Lorraine Martelli into her car and drove away; (2) Rodriguez took money from Lorraine Martelli's purse; (3) Rodriguez stabbed and killed Lorraine Martelli with a knife in the back seat of her car; and (4) Rodriguez kept Lorraine Martelli's money and car. R., v. 25 at 192–216.

The evidence established that Rodriguez used a knife to kill Lorraine Martelli during the continuing process of taking her money and car. The perpetration of the robbery did not cease at the moment Rodriguez forcibly took the money and car from Lorraine Martelli, but continued after Rodriguez killed Lorraine Martelli with the knife. *See People v. Morgan,* 637 P.2d 338, 345 (Colo.1981) (stating that the perpetration of a robbery does not come to an end at the moment the criminal receives the victim's money); *Whitman v. People,* 161 Colo. 110, 116, 420 P.2d 416, 419 (1966) (same). We hold that, based on the evidence presented, the jury could reasonably conclude beyond a reasonable doubt that Rodriguez committed each element of the offense of aggravated robbery.

## XIII

### *Judicial Bias*

In Issues 11 and 150, Rodriguez alleges prejudice resulting from Judge Connie Peterson's involvement in postconviction proceedings. We hold these issues meritless.

Judge Peterson served as the trial judge during the guilt and penalty phases of Rodriguez' trial. After direct appeal, we remanded the case to the trial court to set a date for the imposition of Rodriguez' death sentence. *People v. Rodriguez,* 794 P.2d 965, 991 (Colo. 1990) (*Rodriguez IV*), *cert. denied,* 498 U.S. 1055, 111 S.Ct. 770, 112 L.Ed.2d 789 (1991).

In September 1990, Rodriguez filed a motion to recuse Judge Peterson from presiding over postconviction proceedings because she had filed an ethical complaint against appellate counsel Michael Heher concerning his representation of Rodriguez during the direct appeal. Am. R., v. 3 at 589–602. Rodriguez' case was then assigned to Judge J. Stephen Phillips, and Judge Peterson no longer presided over the case. Rodriguez then filed a "Motion for Ruling on Motion to Recuse Judge Connie L. Peterson and for Substitution of Another Judge." *Id.* at 619. The motion stated:

> Although it appears that this case has been assigned to Judge Phillips instead of Judge Peterson at this time, a ruling on the motion to recuse is still necessary. Until the motion is granted, the danger exists that Judge Peterson and Judge Phillips will continue to confer about and/or discuss this case. Those judges have obviously already done so.

*Id.* Judge Phillips denied Rodriguez' "Motion for Ruling on Motion to Recuse Judge Connie L. Peterson and for Substitution of Another Judge," stating: "[the motion is] [m]oot. This case has been returned to Courtroom 16 where Judge Phillips presides." *Id.* at 623.

On December 31, 1990, Rodriguez filed a Crim.P. 35(b) motion for reconsideration of sentence with Judge Peterson. Am. R., v. 4 at 811. Rodriguez also filed a motion for extension of time to submit an amended Crim.P. 35(b) motion. In an order dated January 3, 1991, Judge Peterson stated:

> The Defendant filed a Motion for Reconsideration of Sentence on December 31, 1990, designating Courtroom 9 [Judge Peterson's courtroom]. This is a Courtroom 16 case [Judge Phillips' courtroom] and will continue to be processed by Courtroom 16. Accordingly, the motion is referred to Courtroom 16. There is nothing in the motion which requires review by the trial judge. As previously ruled by Judge Phillips, the Defendant's motion to recuse [Judge Peterson] is moot.

*Id.* at 810. Also, on January 3, 1990, Judge Phillips granted Rodriguez' motion for exten-

sion of time. *Id.* at 809. On February 11, 1991, Rodriguez filed an amended Crim.P. 35(b) motion with Judge Phillips. On February 21, 1991, Judge Phillips denied Rodriguez' amended Crim.P. 35(b) motion. *Id.* at 823.

In Issue 11, Rodriguez claims that "Judge Peterson's continued involvement in Mr. Rodriguez' case during postconviction proceedings, despite her bias against Mr. Rodriguez and his counsel, and despite the pendency of a *Motion to Recuse* her, was prejudicial error."[54] Rodriguez' Opening Brief at 84. We disagree.

The disqualification of judges is governed by section 16–6–201, 8A C.R.S. (1986), and Crim.P. 21(b). Section 16–6–201 provides, in pertinent part:

> (1) A judge of a court of record shall be disqualified to hear or try a case if:
>
> . . . .
>
> (d) He is in any way interested or prejudiced with respect to the case, the parties, or counsel.

*See* Crim.P. 21(b). "The purpose of the statute and rule for disqualification of a trial judge is to guarantee that no person is forced to stand trial before a judge with a 'bent of mind.'" *People v. Botham,* 629 P.2d 589, 595 (Colo.1981) (quoting *Berger v. United States,* 255 U.S. 22, 41 S.Ct. 230, 65 L.Ed. 481 (1921)).

■ Here, the district court properly determined that Rodriguez' motion to recuse Judge Peterson became moot upon the transfer of Rodriguez' case to Judge Phillips. Contrary to Rodriguez' assertions, after the transfer of the case, Judge Peterson did not involve herself in Rodriguez' postconviction proceedings in anything more than an administerial role. As evidenced by her order of January 3, 1991, Judge Peterson transferred Rodriguez' Crim.P. 35(b) motion to Judge Phillips and did not rule on the merits of that motion. Furthermore, Rodriguez fails to identify any ruling by Judge Peterson subsequent to the transfer of the case to Judge

Phillips which demonstrates a substantial "bent of mind" against Rodriguez. Accordingly, we reject Rodriguez' claim of judicial bias in Issues 11 and 150.

## XIV

### *Vacation of Duplicative Convictions*

The district court vacated as duplicative Rodriguez' convictions for felony murder, conspiracy to commit second-degree kidnapping, and conspiracy to commit first-degree aggravated motor vehicle theft. R., v. 1 at 216–219; Am.R., v. 9 at 2235–36. The court then concluded that "this is the extent of relief available to the defendant." *Id.* at 217, 219. The district court did not err in vacating the duplicative convictions or in upholding the death sentence after that vacation.

■ "[C]onspiracy constitutes a single offense, although the agreement upon which the charge is founded contemplates the performance of several criminal acts." *People v. Bradley,* 169 Colo. 262, 265, 455 P.2d 199, 200 (1969). Although Rodriguez and his cohorts agreed to several criminal acts and then carried out that agreement, under the facts of this case, the conspiracy violated only a single statute, and Rodriguez can constitutionally receive only a single penalty for a single crime. *Id.; see* Colo. Const. art. II, § 18; § 18–2–201(4), 8 C.R.S. (1978) (stating that "[i]f a person conspires to commit a number of crimes, he is guilty of only one conspiracy so long as such multiple crimes are part of a single criminal episode"); *Braverman v. United States,* 317 U.S. 49, 53, 63 S.Ct. 99, 102, 87 L.Ed. 23 (1942) ("Whether the object of a single agreement is to commit one or many crimes, it is in either case that agreement which constitutes the conspiracy which the statute punishes. The one agreement cannot be taken to be several agreements and hence several conspiracies because it envisages the violation of several statutes rather than one.").

---

54. In Issue 11, Rodriguez also contends that the district court's committed reversible error by: (1) refusing to disclose communications between Judges Peterson, Phillips, and Federico Alvarez; and (2) denying Rodriguez' request for a judge from another judicial district to hear his postconviction claims. These issues were not adequately presented to the district court in the Crim. P. 35(c) motion. *See supra* part III.

Likewise, Rodriguez cannot be convicted for both felony-murder and first-degree murder after deliberation for the murder of a single victim. *See People v. Glover,* 893 P.2d 1311, 1314 (Colo.1995); *People v. Lowe,* 660 P.2d 1261, 1269–71 (Colo.1983); *see also infra* part XV.

Throughout his brief, and particularly in Issue 13, Rodriguez argues that the vacation of the duplicative convictions mandates vacation of his death sentence because "[t]he death verdict is tainted by the consideration of illegal convictions and is itself illegal and unreliable." Rodriguez' Opening Brief at 96; *see Johnson v. Mississippi,* 486 U.S. 578, 108 S.Ct. 1981, 100 L.Ed.2d 575 (1988) (holding that a capital sentencer violates the Eighth Amendment by considering a conviction which is later reversed as unconstitutional).

As stated in part I of this opinion, the sentencing jury found six statutory aggravating factors relevant to this case, *see* § 16–11–103(6), 8A C.R.S. (1986):(1) committing murder while under a felony sentence of imprisonment; (2) intentionally killing a person kidnapped by him or by anyone associated with him; (3) intentionally killing a person in furtherance of an agreement to kill; (4) intentionally causing the death of a person in the course of or in furtherance of a felony or in his immediate flight therefrom; (5) killing in an especially heinous, cruel or depraved manner; and (6) committing murder for the purpose of avoiding or preventing a lawful arrest or prosecution. *See* R., v. 4 at 746–753.

The evidence supporting the vacated convictions also supports two of the aggravating factors found by the jury: (1) intentionally killing a person in furtherance of an agreement to kill, § 16–11–103(6)(e); and (2) intentionally causing the death of a person in the course of or in furtherance of a felony or in the immediate flight therefrom, § 16–11–103(6)(g). However, section 16–11–103 does not require a conviction for either felony murder or conspiracy to commit murder before those aggravating factors are found. Rather, the statute defines the relevant aggravating factors as follows: "[t]he defendant has been a party to an agreement to kill another person in furtherance of which a person has been intentionally killed;" and "[t]he defendant committed a class 1, 2, or 3 felony and, in the course of or in furtherance of such or immediate flight therefrom, he intentionally caused the death of a person other than one of the participants." [55] § 16–11–103(6)(e) and (g). Further, in Instruction No. 19, the trial court instructed the jury as follows:

These seven alleged aggravating factors are the only aggravating factors you may consider in this case.

The fact that you have found Mr. Rodriguez guilty of the crime of murder in the first degree is not an aggravating factor. Except as required by [the aggravating factor of section 16–11–103(6)(g) ], the fact that you have found Mr. Rodriguez guilty of other crimes is not an aggravating factor.

R., v. 4 at 777. Thus, the jury was specifically instructed not to consider Rodriguez' convictions as aggravating factors, and the jury is presumed to have followed those instructions. *See Armentrout v. FMC Corp.,* 842 P.2d 175, 187 (Colo.1992) (civil case holding same).

Even after the vacation of the felony murder conviction, Rodriguez meets the requirements of the aggravating factor found in section 16–11–103(6)(g). Rodriguez stands convicted of first-degree sexual assault, second-degree kidnapping, and aggravated robbery. When the jury convicted Rodriguez of first-degree felony murder, they necessarily found that Rodriguez intentionally caused his victim's death in the course of, in furtherance of, or in flight from one of these felonies.

---

55. This statutory language largely tracks the statute which defines felony murder. *Compare* § 16–11–103(6)(g) *with* § 18–3–102(1)(b), 8 C.R.S. (1978). However, the felony murder statute limits the predicate felony to the commission or attempted commission of "arson, robbery, burglary, kidnapping, sexual assault in the first or second degree ... or a class 3 felony for sexual assault on a child." § 18–3–102(1)(b). The statutory aggravating factor encompasses any murder intentionally committed in the course of, in furtherance of, or in flight from a class 1, 2, or 3 felony. § 16–11–103(6)(g). Thus, the jury could appropriately find the aggravating factor to exist even where it cannot convict the defendant of felony murder.

Both the conviction for murder after deliberation and the conviction for felony murder were constitutionally obtained. The fact that both convictions cannot constitutionally stand does not require nullification of the jury's finding which supported the felony murder conviction and the aggravating factor.

This situation differs from that in *Johnson*, 486 U.S. at 584–90, 108 S.Ct. at 1985–89. In *Johnson*, the capital sentencer might have relied, in part, upon a prior felony conviction which derived from an unconstitutionally obtained confession. The Supreme Court held that, even if the prosecution had not argued the conviction in support of a death sentence, "there would be a possibility that the jury's belief that petitioner had been convicted of a prior felony would be decisive in the choice between a life sentence and a death sentence." *Id.* at 586, 108 S.Ct. at 1987 (citation and internal quotation marks omitted). However, in *Johnson*, the conviction which the sentencing jury considered was constitutionally unsound for two reasons: first, it was based upon an involuntary confession; and, second, the defendant was unconstitutionally denied his right to appeal. *Id.* at 582, 108 S.Ct. at 1984–85. In contrast, Rodriguez' conviction for felony murder was not defective and would stand had he not been convicted of murder after deliberation for the same crime.

▆▆▆▆ Likewise, the jury could appropriately consider the aggravating factor found in section 16–11–103(6)(e): intentionally committing a murder pursuant to an agreement to do so. Rodriguez' conviction for conspiracy to commit murder is the only conspiracy conviction relevant to the determination of the aggravating factors. *See* § 16–11–103(6).[56] The district court appropriately upheld Rodriguez' conviction for conspiracy to commit murder while vacating the other two conspiracy convictions. *See* Am.R., v. 9 at 2235–36. When a conviction must be vacated as duplicative, the district court should "select[ ] the combination of offenses that produce[s] the most convictions and the longest sentences in order to maximize the effect of

the juries' verdicts." *Glover*, 893 P.2d at 1315. Although the three conspiracies of which Rodriguez was convicted are each punishable as a class 5 felony, *see* § 18–2–201(5), 8 C.R.S. (1978), retention of the conviction for conspiracy to commit murder would likely produce the longest sentence due to the greater applicability of the aggravating factors found in section 16–11–103.

*Clemons v. Mississippi*, 494 U.S. 738, 110 S.Ct. 1441, 108 L.Ed.2d 725 (1990), and *Zant v. Stephens*, 462 U.S. 862, 103 S.Ct. 2733, 77 L.Ed.2d 235 (1983), do not support the argument that Rodriguez' death sentence must be set aside due to the vacation of his convictions for felony murder, conspiracy to commit second-degree kidnapping, and conspiracy to commit aggravated motor vehicle theft. These cases are inapposite because both cases dealt with a death sentence imposed by a jury that had relied upon a constitutionally invalid statutory aggravating factor. *See Clemons*, 494 U.S. at 742–43, 110 S.Ct. at 1444–45 (jury relied upon the aggravating circumstance that the murder was "especially heinous, atrocious or cruel," which the United States Supreme Court determined was unconstitutionally vague); *Stephens*, 462 U.S. at 885–87, 103 S.Ct. at 2747–49 (jury relied upon the aggravating circumstance that the defendant had a "substantial history of serious assaultive criminal convictions," which the Georgia Supreme Court invalidated as unconstitutionally vague). By contrast, the aggravating factors at issue here are neither unconstitutional per se nor supported by evidence unconstitutionally obtained or admitted. Rodriguez' three vacated convictions were not unconstitutionally entered or obtained and are vacated only because of their duplicity.

▆▆▆▆ Accordingly, we need not vacate Rodriguez' death sentence due to the vacation of his convictions for felony murder, conspiracy to commit second-degree kidnapping, and conspiracy to commit aggravated motor vehicle theft. The evidence supporting both the vacated convictions and the challenged aggravating factors was properly be-

---

56. As discussed below, the facts underlying the other conspiracy convictions are relevant to the capital sentencer, *see* § 16–11–103(1)(b), but

those convictions, standing alone, would not constitute statutory aggravating factors.

fore the sentencing jury. *See* § 16–11–103(1)(b) (allowing the capital sentencer to consider "[a]ll evidence ... that the court deems relevant to the nature of the crime, ... including any evidence presented in the guilt phase of the trial"). Although the district court's handling of this case is far from ideal, its failure to earlier vacate the duplicative convictions affected neither the aggravating factors which the jury applied nor the resultant sentence of death.

In part IX(A) of this opinion, we remand Rodriguez' conviction for first-degree sexual assault as a class 2 felony to the district court with directions to vacate that judgment and sentence and to enter judgment and sentence for the lesser included offense of first-degree sexual assault as a class 3 felony. We conclude that this remand also does not affect Rodriguez' death sentence for reasons analogous to those stated above.

## XV

### *Merger*

In Issues 143, 144, and 145, Rodriguez argues that various of his convictions should "merge" together. We conclude that these arguments are meritless.

A defendant can be convicted of multiple offenses arising out of a single transaction. *See* § 18–1–408, 8B C.R.S. (1986). However, a defendant cannot be convicted of an offense which is a lesser included offense of another crime of which he is convicted. *Id.; see People v. Henderson,* 810 P.2d 1058, 1061 (Colo.1991). "A lesser offense is included within a greater offense when the establishment of the essential elements of the greater offense necessarily establishes all the elements required to prove the lesser offense." *People v. Nhan Dao Van,* 681 P.2d 932, 934 (Colo.1984). If a defendant is convicted of both a greater offense and a lesser included offense, the convictions "merge." Merger in Colorado requires a comparison of the elements of the applicable statutes, not of the evidence presented on those elements. *See Henderson,* 810 P.2d at 1063. For example, a defendant cannot be convicted of both felony murder and of the underlying causal felony because

proof of the felony murder necessarily includes the very same elements required for the underlying felony. *Callis v. People,* 692 P.2d 1045, 1054–55 (Colo.1984); *People v. Bartowsheski,* 661 P.2d 235, 245–47 (Colo. 1983).

In Issue 143, Rodriguez contends that his convictions for the underlying felonies merge into his conviction for felony murder. In light of the district court's vacation of Rodriguez' felony murder conviction and our affirmance of that vacation, Issue 143 is rendered moot. *See supra* part XIV.

In Issue 144, Rodriguez argues that his first-degree sexual assault conviction merged into his second-degree kidnapping conviction because "[o]ne of the essential elements of the second degree kidnapping allegation ... was that the victim was sexually assaulted." Rodriguez' Opening Brief at 393. We have held that convictions for kidnapping and for sexual assault do not merge. *See Henderson,* 810 P.2d at 1063–64 (holding that merger did not apply because sexual assault was not a lesser included offense of second-degree kidnapping involving sexual assault). We conclude that Rodriguez' convictions for second-degree kidnapping and for first-degree sexual assault do not merge and that, accordingly, Issue 144 is meritless.

In Issue 145, Rodriguez argues that his convictions for first-degree murder, first-degree sexual assault, and second-degree kidnapping all merge into his conviction for first-degree aggravated motor vehicle theft because those convictions were predicate "elements" of first-degree aggravated motor vehicle theft and because the Double Jeopardy Clauses in the United States and Colorado Constitutions prohibit multiple punishments for the same or included offenses. *See* U.S. Const. Amend. V (as applied to the states through U.S. Const. Amend. XIV, § 1); Colo. Const. art. II, § 18. As charged, Rodriguez' conviction for first-degree aggravated motor vehicle theft as a class 4 felony required that the jury find that Rodriguez "[u]se[d] the motor vehicle in the commission of a crime other than a traffic offense." *See* § 18–4–409(2)(d), 8 C.R.S. (1978); R., v. 1 at 3. Both the information and the guilt phase jury in-

struction stated the predicate crime as either first-degree murder, first-degree sexual assault, or second-degree kidnapping. R., v. 1 at 3; R., v. 3 at 578.

 In a case such as this, where a defendant receives multiple sentences in a single criminal trial, the constitutional guarantee against double jeopardy is "designed to ensure that the sentencing discretion of courts is confined to the limits established by the legislature." *Ohio v. Johnson*, 467 U.S. 493, 499, 104 S.Ct. 2536, 2540–41, 81 L.Ed.2d 425 (1984); *see Jones v. Thomas*, 491 U.S. 376, 381, 109 S.Ct. 2522, 2525–26, 105 L.Ed.2d 322 (1989). We employ an "identical analysis … to determine whether an offense is the same or lesser included for purposes of both double jeopardy and merger," *Henderson*, 810 P.2d at 1061, and "may properly look to double jeopardy analysis for guidance." *People v. Moore*, 877 P.2d 840, 843 (Colo.1994). "The purpose is to ensure that sentencing courts do not exceed, by the device of multiple punishments, the limits prescribed by the legislative branch of government, in which lies the substantive power to define crimes and prescribe punishments." *Thomas*, 491 U.S. at 381, 109 S.Ct. at 2525–26. Thus, our task is to construe section 18–1–408(5) and "is essentially one of [determining] legislative intent." *Johnson*, 467 U.S. at 499, 104 S.Ct. at 2541.

 Rodriguez' argument does not analogize to that requiring the merger of the conviction for the underlying causal felony into the conviction for felony murder. In felony murder, the underlying offenses are less serious than felony murder itself. *See id.* at 845. Such need not be the case with aggravated motor vehicle theft, nor is it the case here. Simply put, Rodriguez' convictions for first-degree murder, first-degree sexual assault, and second-degree kidnapping are not "lesser" offenses than the offense of aggravated motor vehicle theft but, rather, are significantly more serious. *See id.* at 845–46. As such, a different analysis is required than that employed by this court in *Bartowsheski*, 661 P.2d at 235. *See Moore*, 877 P.2d at 845.

If, as Rodriguez argues, his convictions for crimes of greater degree merged into his conviction for aggravated motor vehicle theft, the result would be not only anomalous, but absurd. Such a result is not favored. *See Higgins v. People*, 868 P.2d 371, 373 (Colo. 1994); *see also* § 18–1–102(1)(c), 8B C.R.S. (1986) (stating that one purpose of the Colorado Criminal Code is "[t]o differentiate on *reasonable* grounds between serious and minor offenses" (emphasis added)); § 18–1–102.5(1)(a) (stating that another purpose of the Code is "[t]o punish a convicted offender by assuring the imposition of a sentence he deserves in relation to the seriousness of his offense"). "[N]either the Double Jeopardy Clause nor any other constitutional provision exists to provide unjustified windfalls." *Thomas*, 491 U.S. at 387, 109 S.Ct. at 2529.

We conclude that section 18–1–408(5) does not require that Rodriguez' convictions merge. First, the motor vehicle theft is an offense against property whereas the underlying felonies are offenses against a person. Thus, as in *Moore*, the crimes have different objects or victims. *Moore*, 877 P.2d at 845. Second, as discussed above, this situation is not analogous to that of felony murder. *See id.* Merger in this case would provide Rodriguez with an "unjustified windfall[ ]," *see Thomas*, 491 U.S. at 387, 109 S.Ct. at 2529, and, accordingly, merger does not apply. Rodriguez stands legally convicted of all four crimes.

## XVI

*Miscellaneous Postconviction Rulings*

### A

 On January 2, 1991, Rodriguez filed a Crim.P. 35(b) motion for reduction of sentence. Am.R., v. 4 at 788–808. On that same day, the district court granted Rodriguez an extension until February 11, 1991, to file an amended Crim.P. 35(b) motion. *Id.* at 780. On February 11, 1991, Rodriguez filed an amended Crim.P. 35(b) motion, and, on February 21, 1991, the district court denied the motion. *Id.* at 823. In Issues 15, 16, and 18, Rodriguez challenges the district court's

denial of his Crim.P. 35(b) motion.[57]

### 1

In Issue 15, Rodriguez contends that the district court's failure to conduct a hearing on his Crim.P. 35(b) motion constitutes reversible error. Rodriguez concedes that normally the court need not conduct a hearing on a Crim.P. 35(b) motion, but asserts that, because he is a capital defendant, he is entitled to a hearing. Rodriguez' Opening Brief at 112.

A defendant seeking postconviction relief pursuant to Crim.P. 35 is entitled to a prompt evidentiary hearing "unless the motion, the files and record clearly establish that the allegations presented in the defendant's motion are without merit and do not warrant postconviction relief." *People v. Trujillo,* 190 Colo. 497, 499, 549 P.2d 1312, 1313 (1976) (citation and internal quotation marks omitted); *see White v. Denver Dist. Court,* 766 P.2d 632, 634 (Colo.1988).

Here, the district court determined that the facts asserted as a basis for relief did not warrant a reduction in sentence. Rodriguez offers only a bare assertion that his status as a capital defendant mandates a hearing and fails to identify any specific facts which show that he was entitled to a reduction in sentence. Accordingly, we uphold the district court's refusal to conduct a hearing.

### 2

Prior to Rodriguez' filing of either his original or amended Crim.P. 35(b) motion, the district court stated that its *"primary* concern" in a Crim.P. 35 proceeding would be with "changes in Mr. Rodriguez' circumstances since the sentencing trial and with information not then reasonably available through the exercise of due diligence." Am. R., v. 3 at 690. In its order denying Rodri-

guez' Crim.P. 35(b) motion, the court noted that the information contained in the motion relating to Rodriguez' background was available to the jury at the sentencing trial and that the information supplied in the Crim.P. 35(b) motion which was *not* available to the sentencing jury did not warrant a reduction in sentence. Am.R., v. 4 at 823. In Issue 16, Rodriguez contends that the district court erred in refusing to consider any reasons for reducing his sentence which were available at the penalty phase.

In reviewing a Crim.P. 35(b) motion, the court must consider all relevant and material factors which could affect its decision to modify a defendant's sentence, including new evidence and facts known at the time the original sentence was imposed. *Spann v. People,* 193 Colo. 53, 55, 561 P.2d 1268, 1269 (1977). A court must then exercise its discretion in deciding whether to modify a previously imposed sentence and, absent an abuse of such discretion, its decision will not be disturbed on review. *Id.* Here, the district court properly exercised its discretion in stating that it would focus *primarily* on evidence not available at the sentencing trial. Am.R., v. 3 at 690. The motion included evidence available to the jury at the penalty phase and the district court stated that it examined the entire motion before denying it. Am.R., v. 4 at 823. Rodriguez fails to show that the district court confined its review to evidence that was not available to the jury at sentencing, and, accordingly, we reject Issue 16.

### 3

Rodriguez contends the district court files did not contain a copy of Rodriguez' Crim.P. 35(b) motion when the court denied the motion on February 21, 1991.[58] In Issue 18, Rodriguez states: "[t]he court did not have

---

**57.** In *People v. Malacara,* 199 Colo. 243, 247–48, 606 P.2d 1300, 1302–03 (1980), we held that a defendant appealing a denial of a Crim.P. 35(b) motion for reduction of sentence has a right to appellate review of the propriety of the sentencing proceeding, but has no right to review of the propriety of the sentence. Here, Issues 15, 16, and 18 challenge the propriety of the proceeding in which the district court denied Rodriguez' Crim.P. 35(b) motion and do not challenge the

propriety of the sentence. Accordingly, we address these issues.

**58.** On December 28, 1994, Rodriguez filed a document entitled "Notice of Additional Missing Parts of the Record," which included a copy of his amended Crim.P. 35(b) motion for reduction of sentence filed with the district court on February 11, 1991.

that motion before it at that time, and it did not exercise its discretion appropriately because it did not know what the arguments and evidence in support of the motion were." Rodriguez' Opening Brief at 118.

■■■ In its February 21, 1994, order, the district court specifically denied Rodriguez' motion for reconsideration of sentence of February 11, 1994, and stated that it had examined the motion. Am.R., v. 4 at 823. The district court's order shows that it reviewed the motion and considered the arguments contained therein in refusing to reduce Rodriguez' sentence. Accordingly, we conclude that the alleged absence in the record of Rodriguez' amended Crim.P. 35(b) motion constitutes harmless error.

B

In Issues 17 and 19, Rodriguez collectively claims that the district court erroneously denied him assistance in the investigation and preparation of his Crim.P. 35 motions. Specifically, he contests the district court's denial of (1) his motions for release of records relating to his background and upbringing, *see, e.g.*, Am.R., v. 4 at 778; and (2) his motions relating to investigative expenses which he requested the state to incur to research his childhood. *See, e.g.*, Am.R., v. 3 at 679. Our review of the record reveals no error.

■■■ In Rodriguez' motions for release of records, he requested information relating to his childhood that had already been presented at the penalty phase of trial. Furthermore, Rodriguez' motions to incur investigative expenses failed to establish either that the funds requested would be used to gather any new mitigating evidence or to indicate what evidence defense counsel hoped to uncover by such investigation. Accordingly, the district court had an adequate basis upon which to conclude that Rodriguez' motions sought cumulative information and

were not relevant to the determination of his postconviction motions.

Rodriguez also contends that the district court's refusal to conduct hearings on these motions constitutes reversible error. The record supports the district court's determination that Rodriguez' motions did not allege facts sufficient to warrant a hearing, and we find no error. *See Trujillo*, 190 Colo. at 499, 549 P.2d at 1313–14.

C

In Issue 12, Rodriguez asserts that the district court's denial of his motion to strike the death penalty and appoint a special prosecutor requires that his death sentence be vacated. We conclude that the district court properly exercised its discretion.

On March 17, 1994, Rodriguez filed a "Motion to Strike the Death Penalty, for Appointment of a Special Prosecutor, and for Additional Appropriate Relief" based on a newspaper article written by former Colorado Governor Richard Lamm which criticized the judiciary for its failure to enforce the death penalty. R., v. 1 at 261–272. The article used Rodriguez' case as an example of the protracted length of death penalty litigation and criticized certain Colorado Supreme Court justices as well as certain district court judges based on their involvement in Rodriguez' case. In his motion, Rodriguez alleged that prosecutor Craig Silverman served as a primary source for Lamm's article and that the article was an attempt by the prosecution to intimidate the judiciary regarding delays in Rodriguez' case. *Id.* Rodriguez also claimed that the prosecution's overt attempts to influence the judiciary irreparably tainted the entire legal process and necessitated that his death sentence be vacated. *Id.* at 261–62. After hearing counsel's arguments, the district court denied Rodriguez' motion.[59] R., v. 67 at 18–22.

---

59. In denying Rodriguez' motion, the court expressed concerns over delays in Rodriguez' case. Rodriguez claims that the district court's recognition and attempts to explain delays in his case demonstrates the court's submission to the intimidation and pressure caused by Lamm's article. Given the fact that Rodriguez' case had been before the district court on postconviction proceedings for over three years, we conclude that the district court's statements regarding the delay in proceedings were accurate and did not reflect any submission to the alleged intimidation.

Section 20-1-107, 8B C.R.S (1986) provides that "[i]f the district attorney is interested or has been employed as counsel in any case which it is his duty to prosecute or defend, the court ... may appoint a special prosecutor." In *People v. Garcia*, 698 P.2d 801 (Colo.1985), we set forth the standard for evaluating a motion to disqualify a district attorney:

> [T]he determination of whether a district attorney and his staff should be disqualified is a matter largely within the discretion of the district court. The trial court should consider whether disqualification appears reasonably necessary to insure the integrity of the fact-finding process, the fairness or appearance of fairness of trial, the orderly or efficient administration of justice, or public trust or confidence in the criminal justice system. The goal of the court should be to shape a remedy which will assure fairness to the parties and the integrity of the judicial process. Among the relevant factors to be considered by the court are the nature, relevance and necessity of the testimony, the size and degree of integration of the district attorney's staff, and the degree to which the testimony is contested.

*Id.* at 806-07 (citations and internal quotation marks omitted).

At the hearing on newly discovered evidence on March 17, 1994, Silverman informed the district court that former Governor Lamm wrote the article at issue on his own initiative, without influence or pressure from the prosecution, and that any information Silverman provided Lamm was a matter of public record. Am.R., v. 67 at 16–17. We conclude that Lamm's article expressed his personal beliefs regarding the propriety of actions taken by the judiciary and did not establish that the prosecution held an interest in Rodriguez' case apart from its professional responsibility of upholding the law. *See People v. District Court*, 189 Colo. 159, 162, 538 P.2d 887, 889 (1975) (holding that paid political advertisement which contained editorial indicating a belief that district attorney, who was candidate for mayor, was properly prosecuting criminal case against named defendant did not warrant disqualification of

district attorney from continuing to prosecute that defendant's case). In his motion and argument to the district court, Rodriguez failed to demonstrate that the prosecution's continued involvement would deny him a fair trial, and, accordingly, we uphold the district court's order denying relief. *See Wheeler v. District Court*, 180 Colo. 275, 279, 504 P.2d 1094, 1096 (1973).

Rodriguez also contends that the denial of his motion without a hearing violated due process of law. A court may rule on a motion without a hearing if the facts contained in the motion fail to establish a sufficient basis for relief. *Trujillo*, 190 Colo. at 499, 549 P.2d at 1314. The district court properly refused to conduct a hearing based on its determination that Rodriguez' motion did not establish a sufficient basis for disqualifying the prosecution, and, accordingly, we find no abuse of discretion.

### D

In Issue 14, Rodriguez contends that he was denied his right to counsel due to the state's obstruction of the attorney-client relationship. Rodriguez filed numerous motions with the district court concerning the conditions surrounding his imprisonment and his inability to communicate confidentially with his attorney. *See* Rodriguez' Opening Brief at 100–112. He also asserts that the district court's denial of these motions without a hearing constitutes reversible error. *See id.* We conclude that Rodriguez is not entitled to any relief.

The supervision and management of the internal procedures of correctional institutions is within the discretion of institutional officials and is not subject to judicial scrutiny absent exceptional circumstances. *See Johnson v. Heggie*, 362 F.Supp. 851, 853 (D.Colo.1973). In denying one of Rodriguez' numerous motions, the district court properly held that, "I'm going to continue to allow the custodian and law enforcement authorities to determine the appropriate procedures for the confinement of [Rodriguez]." R., v. 67 at 24–25. In addition, the district court noted that the Colorado State Public Defender's Office had al-

ready brought a civil action in the Eleventh Judicial District on behalf of Rodriguez and another death row inmate, alleging that prison procedures in Fremont County prevented free and effective contact between the inmates and their attorneys. R., v. 1 at 220–21; see R., v. 67 at 27–29. The district court concluded that the issues repeatedly presented in Rodriguez' numerous motions had been previously litigated in the Eleventh Judicial District and that it could not properly review another judicial district court's action. R., v. 1 at 220–21; R., v. 67 at 24–26; see People ex rel. Wyse v. District Court, 180 Colo. 88, 94, 503 P.2d 154, 157 (1972). We hold that the district court properly analyzed and disposed of Rodriguez' claims regarding the state's alleged obstruction of his right to counsel.

■■■ We also reject Rodriguez' assertion that the district court's denial of these motions without a hearing constitutes reversible error. A defendant is not entitled to a hearing on a postconviction claim under Crim.P. 35 if "the motion, the files and record clearly establish that the allegations presented in the defendant's motion are without merit and do not warrant postconviction relief." Trujillo, 190 Colo. at 499, 549 P.2d at 1313. Based on its recognition that it should not intervene in matters of prison administration and its determination that Rodriguez had previously litigated such claims in the Eleventh Judicial District, the district court properly found that Rodriguez' claims lacked merit and did not warrant a hearing. We refuse to disturb this decision.

## XVII

### Newly Discovered Evidence

In Issues 20, 22, and 149, Rodriguez asserts that the district court erred in denying his motion for a new trial based on newly discovered evidence. We conclude that each of these issues is meritless.

On March 17, 1994, the district court conducted a hearing on Rodriguez' claims of newly discovered evidence. The newly discovered evidence consisted of letters from Chris Rodriguez to a prison inmate in Texas in which Chris Rodriguez stated that he, rather than Frank Rodriguez, killed Lorraine Martelli. At the newly discovered evidence hearing, Chris Rodriguez testified that he and David Martinez killed Lorraine Martelli using two knives. Am.R., v. 67 at 44–45, 72–73. As discussed below, Martinez also testified at the hearing.

In Issue 20, Rodriguez asserts that the district court's refusal to allow him to .call witnesses and to present evidence to rebut Martinez' testimony at the March 17, 1994, hearing constituted prejudicial error.

Martinez was brought to the hearing as a witness for Rodriguez, but Rodriguez decided not to call him as a witness. However, the prosecution did call Martinez as a witness. Martinez testified that neither he, Chris Rodriguez, nor Patricia Thomas stabbed Lorraine Martelli. Id. at 101–102. Martinez refused to specifically testify that Rodriguez stabbed Lorraine Martelli because he feared being labeled a "snitch" in prison. Id. at 101. However, the prosecution later called two law enforcement officials who testified that, while Martinez was sitting in the jury box waiting to be called as a witness at the March 17, 1994, hearing, he told prosecutor Craig Silverman that Rodriguez was the only person who stabbed Lorraine Martelli. Id. at 142–44, 146–148.

On cross-examination by Rodriguez' counsel Michael Heher, Martinez denied killing Lorraine Martelli and testified that he cut his hands while handling the knife which Rodriguez later used to kill the victim. Id. at 114–15. After cross-examination, Heher requested that the district court allow him to call Detectives Raymond Estrada and Donald Gabel to rebut Martinez' testimony regarding the cuts on his hands, his relationship with Patricia Thomas, and the bloody condition of his clothes at the time of his arrest. Id. at 150–53. Both detectives had testified at the guilt phase of Rodriguez' trial. See R., v. 28 at 111–24, 133–61, 178–79. The detectives were not present at the hearing, and Heher indicated that he would need a subpoena for the physical evidence as to which the detectives would testify. Id. The district court denied Heher's request and declined to continue the hearing on the basis that it had adequate evidence before it upon which to

assess Martinez' credibility and to rule on the issue of newly discovered evidence. *Id.* at 153–54, 158.

 The admission of rebuttal testimony lies within the discretion of the district court and is not subject to review absent an abuse of discretion. *See Wertz v. People,* 160 Colo. 260, 264, 418 P.2d 169, 171 (1966) (discussing same in context of rebuttal testimony at trial). The record shows that Rodriguez intended to offer the excluded rebuttal witness testimony for the purpose of impeaching Martinez' credibility. Am.R., v. 67 at 155–58. This conclusion is further supported by Rodriguez' argument on this appeal that

> [t]he evidence which the court would not allow Mr. Rodriguez to present would have affirmatively refuted numerous specific factual allegations made by the State's witness about the incident which led to Mr. Rodriguez' conviction and sentence. His credibility would thus have been shown to be *nil.*

Rodriguez' Opening Brief at 124.

 We conclude that the district court did not abuse its discretion by refusing to allow Rodriguez to present rebuttal evidence to impeach Martinez. At his trial, Rodriguez presented evidence to support his theory that the presence of cuts on Martinez' hands conclusively demonstrated that Martinez, not Rodriguez, killed Lorraine Martelli. The jury rejected this theory at the guilt phase of the trial and, at the penalty phase, returned a sentence of death. At the March 17, 1994, hearing, Martinez did not testify as to any newly discovered evidence which could have materially affected the validity of Rodriguez' conviction and sentence. The district court had the trial court record before it and could sufficiently assess Martinez' credibility without hearing Rodriguez' proffered rebuttal evidence which merely would have repeated testimony and physical evidence presented at trial. Accordingly, we will not disturb the district court's decision.

In Issue 22, Rodriguez asserts that the district court applied an incorrect standard in ruling on his postconviction motion based on newly discovered evidence, and, in Issue 149, he contends that the evidence presented at the March 17, 1994, hearing warranted the requested relief. We disagree.

In *People v. Gutierrez,* 622 P.2d 547 (Colo. 1981), we set forth the standard for evaluating a motion for a new trial based on newly discovered evidence:

> "To succeed on a motion for a new trial on this ground, the defendant should show that the evidence was discovered after the trial; that defendant and his counsel exercised diligence to discover all possible evidence favorable to the defendant prior to and during the trial; that the newly discovered evidence is material to the issues involved, and not merely cumulative or impeaching; and that on retrial the newly discovered evidence would probably produce an acquittal."

*Id.* at 559 (quoting *People v. Scheidt,* 187 Colo. 20, 22, 528 P.2d 232, 233 (1974)). Rodriguez relies on *People v. Estep,* 799 P.2d 405 (Colo.App.1990), *cert. denied,* No. 90SC367 (Colo. Nov. 13, 1990), and argues that the district court relied completely on its own evaluations of the credibility of witnesses in denying his motion. In *Estep,* the court of appeals reversed the district court's denial of the defendant's motion for a new trial based on newly discovered evidence, stating:

> In our view, the determination of the character of the new evidence to probably produce an acquittal in a new trial is not to be based on the court's experience in evaluating the credibility of witnesses. Rather that determination should be premised on whether the new evidence, as developed in trial, when considered with all the other evidence is such that a *reasonable jury* would probably conclude that there existed a reasonable doubt as to defendant's guilt. and thereby bring about an acquittal verdict.

*Id.* at 407; *see also Gutierrez,* 622 P.2d at 559–60.

 Here, the record contains no evidence that the district court relied completely on its own evaluation of the credibility of the witnesses in denying Rodriguez' motion for a new trial. The district court noted that the standard articulated in *Gutierrez* and *Estep* controlled its determination of Rodriguez' motion. Am.R., v. 67 at 171. In accor-

dance with that standard, the court first determined that the evidence presented by Rodriguez was discovered after trial and that Rodriguez and his counsel exercised diligence to discover such evidence prior to and during the trial. *Id.* at 171–72. The court then assessed whether the newly discovered evidence was material to the validity of Rodriguez' conviction and sentence by considering factors which would affect the credibility of both Martinez and Chris Rodriguez from the standpoint of a reasonable juror, not from the standpoint of its own judicial experience. *Id.* at 173–184. In assessing the credibility of Chris Rodriguez, the court considered how a reasonable juror would view the fact that Chris Rodriguez testified that he killed Lorraine Martelli, but also stated that he could not recall any other major details of the events surrounding and leading up to the murder. *Id.* at 177–82. The court also considered how a reasonable juror would view the fact that Chris Rodriguez maintained at his trial that he did not kill Lorraine Martelli and the fact that he refused to testify at Rodriguez' trial. *Id.* With regard to the credibility of Martinez' testimony, the court considered how a reasonable juror would view Martinez' fear of being regarded as a "snitch" and the fact that Martinez had a discretionary parole hearing coming up shortly after the March 17, 1994, hearing, at which time he could potentially be released from prison. *Id.* at 174–77. We conclude that the district court applied a proper standard for the evaluation of Rodriguez' claims of newly discovered evidence and reject Issue 22.

▇▇▇ "Motions for new trial based on newly discovered evidence are not looked on with favor, and a denial of such a motion will not be overturned absent a showing of clear abuse of discretion." *Gutierrez,* 622 P.2d at 559. The district court's conclusion that the newly discovered evidence presented at the March 17, 1994, hearing did not entitle Rod-

riguez to relief is amply supported by the testimony at that hearing. Accordingly, we reject Issue 149.

## XVIII

### *Ineffective Assistance of Counsel*

The district court denied Rodriguez' postconviction claims of ineffective assistance of counsel.[60] We affirm.

### A

David Eisner and Robin Desmond of the Colorado State Public Defender's Office represented Rodriguez at his initial advisement after his arrest in 1984. In 1985, the district court granted the prosecution's motion to disqualify the public defender's office due to a conflict of interest and appointed private counsel to represent Rodriguez. *See Rodriguez v. District Court,* 719 P.2d 699, 703 (Colo.1986) (*Rodriguez I*). In *Rodriguez I,* we held that Rodriguez could waive conflict-free representation, *id.* at 705–09, and the public defender's office then resumed its representation of Rodriguez. After we affirmed the judgments of conviction and the death penalty sentence in *People v. Rodriguez,* 794 P.2d 965 (Colo.1990) (*Rodriguez IV*), *cert. denied,* 498 U.S. 1055, 111 S.Ct. 770, 112 L.Ed.2d 789 (1991), Rodriguez filed a motion for postconviction relief, claiming that he received ineffective assistance of counsel at the penalty phase of trial and on direct appeal.

At a hearing limited to Rodriguez' postconviction claims of ineffective assistance of counsel, Rodriguez called four witnesses to testify: appellate counsel Michael Heher; trial counsel Robin Desmond; defense investigator Judith Sholl; and expert witness Clive Stafford–Smith.[61] Heher testified that, subsequent to trial, he discovered evidence that Rodriguez had been physically and sexually abused as a child and that trial counsel failed to discover this mitigating evidence.

---

**60.** Before the district court, Richard Hostetler represented Rodriguez on his claims of ineffective assistance of counsel. After the district court denied these claims, the court appointed Nora V. Kelly to represent Rodriguez on this appeal regarding his claims of ineffective assistance of counsel.

**61.** The district court qualified Stafford–Smith as an expert on death penalty law in general, but not as an expert on Colorado death penalty law. R., v. 63 at 57–58.

R., v. 62 at 68, 84–89, 93–94. Defense counsel Hostetler attempted to question Heher about this potentially mitigating evidence to demonstrate that Rodriguez' trial counsel failed to adequately investigate that evidence in accordance with the standard of practice in capital cases. R., v. 62 at 91–99. The district court sustained the prosecution's objections to Heher's testimony on the basis that Rodriguez' failure to inform his trial attorneys about the alleged abuse foreclosed further investigation into the subject. *Id.* In accordance with Heher's testimony, trial counsel Desmond testified that she and co-counsel Eisner failed to adequately investigate potential mitigating factors and that, in her opinion, presentation to the jury of child abuse allegations would have resulted in the imposition of a life sentence instead of the death penalty. R., v. 65 at 32–39. Defense investigator Sholl explained that she had no formal training in interviewing defendants concerning physical or sexual child abuse. R., v. 63 at 8–10. Sholl stated that she had asked Rodriguez if he had been abused and that, after he answered in the negative, she "doubted" that she had pressed the issue. R., v. 63 at 16–17. Finally, expert witness Stafford–Smith testified that, in his view, Rodriguez' trial counsel's performance fell outside the range of professionally competent assistance and violated Rodriguez' constitutional right to effective representation. R., v. 63 at 106–123.

Applying the test set forth in *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), the district court denied Rodriguez' Crim.P. 35(c) motion, finding that Rodriguez failed to demonstrate deficient performance by trial or appellate counsel which had a reasonable probability of having affected the result. Am.R., v. 7 at 1762–68.

On this appeal, Rodriguez contends that the following actions denied him his constitutional right to effective assistance of counsel: (1) trial counsel's failure to discover and present mitigating evidence of child abuse; (2) trial counsel's failure to "follow through" on evidence of Rodriguez' mental illness; and (3) the state's interference with the function of defense counsel. He also contends that the district court did not have a complete record before it when it denied Rodriguez' claims of ineffective assistance and committed reversible error by refusing to enter into evidence the record on direct appeal or to hear testimony from appellate counsel Heher regarding ineffective assistance on appeal. We address each of Rodriguez' claims in turn.

**B**

A defendant's right to effective assistance of counsel is guaranteed by the United States and Colorado Constitutions. U.S. Const. amend. VI, XIV; Colo. Const. art. II, § 16. To obtain relief on a claim of ineffective assistance of counsel, a defendant must satisfy the test adopted by the United States Supreme Court in *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). *See Davis v. People,* 871 P.2d 769, 772–73 (Colo.1994) (applying the constitutional standards set forth in *Strickland*); *People v. Garcia,* 815 P.2d 937, 941 (Colo.1991) (same), *cert. denied,* 502 U.S. 1121, 112 S.Ct. 1242, 117 L.Ed.2d 475 (1992). Under *Strickland,* a defendant must first demonstrate that the acts or omissions of counsel fell outside the range of professionally competent assistance. 466 U.S. at 690, 104 S.Ct. at 2066. In making such a determination, courts are directed to "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." *Id.* at 689, 104 S.Ct. at 2065 (citation and internal quotation marks omitted). A fair assessment of counsel's performance "requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Id.*

In addition to showing that counsel's performance fell below the prevailing professional norms, a defendant must also affirmatively prove that he suffered prejudice as a result of counsel's deficient performance. *Id.* at 691, 104 S.Ct. at 2066. To establish prejudice, "[t]he defendant must

show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694, 104 S.Ct. at 2068. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* When a defendant challenges a death sentence, the question to be asked in assessing the prejudice from counsel's errors is "whether there is a reasonable probability that, absent the errors, the sentencer including an appellate court, to the extent it independently reweighs the evidence would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." *Id.* at 695, 104 S.Ct. at 2068–69.

## C

Rodriguez contends that his trial counsel performed an untimely and inadequate investigation of potential mitigating evidence of physical and sexual child abuse and that presentation of such evidence would have led the jury to impose a life sentence rather than a death sentence. We disagree.

▬▬▬ In order to ascertain whether trial counsel's failure to discover and present mitigating evidence of Rodriguez' child abuse constituted ineffective assistance of counsel,

> it must be determined whether a *reasonable investigation* should have uncovered such mitigating evidence. If so, then a determination must be made whether the failure to put this evidence before the jury was a *tactical choice* by trial counsel. If so, such a choice must be given a strong presumption of correctness, and the inquiry is generally at an end.... [If not], it must be determined that defendant suffered *actual prejudice* due to the ineffectiveness of his trial counsel before relief will be granted.

*Middleton v. Dugger,* 849 F.2d 491, 493 (11th Cir.1988); *see Strickland,* 466 U.S. at 691, 104 S.Ct. at 2066 (stating that "counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary"). The reasonableness of an attorney's decision to forego investigation or to limit investigation into potentially mitigating evidence is "di-

rectly related to the information the defendant has supplied." *United States v. Rhodes,* 913 F.2d 839, 844 (10th Cir.1990) (citation and internal quotation marks omitted), *cert. denied,* 498 U.S. 1122, 111 S.Ct. 1079, 112 L.Ed.2d 1184 (1991); *see United States v. Miller,* 907 F.2d 994, 998 (10th Cir.1990) (stating that "[t]he adequacy or reasonableness of an attorney's actions is necessarily conditioned by the defendant's own actions or inaction"). Where counsel completely fails to conduct any investigation of a client's background or where counsel's strategy for not investigating or submitting such mitigating evidence is remarkably deficient, a claim for ineffective assistance of counsel will be sustained. *See, e.g., Baxter v. Thomas,* 45 F.3d 1501, 1512–15 (11th Cir.) (counsel's failure to conduct investigation which would have uncovered existing records of defendant's long history of mental illness fell outside the range of professional competence), *cert. denied,* —— U.S. ——, 116 S.Ct. 385, 133 L.Ed.2d 307 (1995); *Brewer v. Aiken,* 935 F.2d 850, 857–59 (7th Cir.1991) (counsel's almost complete lack of investigation into defendant's mental and family history as well as failure to argue mitigating factors to jury at penalty phase amounted to ineffective assistance); *Middleton,* 849 F.2d at 493–95 (counsel's failure to uncover mitigating evidence of mental illness, physical and sexual child abuse, and drug abuse chronicled in psychiatric, family court, youth services, and prison records, fell outside scope of professionally competent assistance).

▬▬▬ Rodriguez faults trial counsel for failing to discover mitigating evidence which Rodriguez declined to divulge prior to the penalty phase. Trial counsel's alleged failure to investigate or present mitigating evidence does not constitute ineffective assistance "when the essential and foundational information required to trigger such an investigation is withheld from the defendant's attorney by the defendant himself." *Miller,* 907 F.2d at 999; *see Dooley v. Petsock,* 816 F.2d 885, 890–91 (3d Cir.) (holding that "trial counsel cannot be ineffective for failing to raise claims to which his client has neglected to supply the essential underlying facts ... clairvoyance is not required of counsel"), *cert. denied,* 484 U.S. 863, 108 S.Ct. 182, 98

L.Ed.2d 135 (1987); *Mitchell v. Kemp,* 762 F.2d 886 (11th Cir.1985) (stating that the reasonableness of the scope of counsel's investigation often depends upon what information defendant communicates to counsel), *cert. denied,* 483 U.S. 1026, 107 S.Ct. 3248, 97 L.Ed.2d 774 (1987).

Here, the record discloses that, prior to the penalty phase, both trial counsel Desmond and defense investigator Sholl specifically asked Rodriguez whether he had suffered abuse as a child and that Rodriguez denied any abuse. R., v. 63 at 16–17; R., v. 65 at 35. In addition, defense counsel conducted a comprehensive investigation of Rodriguez' background, including interviewing Rodriguez and his family members and obtaining records of Rodriguez' history in the Department of Corrections. At trial, the defense presented the results of their background investigation in a document entitled "A Life History of Frank Rodriguez." *See Rodriguez IV,* 794 P.2d at 971. Nothing in their investigation led trial counsel to believe that Rodriguez had suffered physical and sexual child abuse. We conclude that Rodriguez' trial counsel conducted a reasonable investigation into potentially mitigating evidence and that Rodriguez' affirmative denials that he suffered child abuse foreclosed further investigation into the subject. *See Rhodes,* 913 F.2d at 844–45 (counsel's failure to conduct independent investigation into client's criminal history did not constitute ineffective assistance where client failed to give attorney any indication that investigation was warranted); *Miller,* 907 F.2d at 998–99 (counsel's failure to investigate or discover evidence of client's mental illness does not amount to ineffective assistance because client never revealed his problems to counsel); *Funchess v. Wainwright,* 772 F.2d 683, 689 (11th Cir.1985) (defense counsel was not ineffective for failing to investigate evidence of mental illness because defendant never told counsel of any psychological prob-

lems), *cert. denied,* 475 U.S. 1031, 106 S.Ct. 1242, 89 L.Ed.2d 349 (1986).

Rodriguez contends that trial counsel's use of a defense investigator of a different race than Rodriguez was unreasonable and that mitigating evidence of child abuse would have more likely been disclosed by Rodriguez had the investigator been of the same race. Before trial, defense investigator Sholl replaced Jose Martinez, an Hispanic investigator. We find Rodriguez' claim wholly lacking in merit. Rodriguez' assertion that race is a determinative factor in the preparation and discovery of mitigating evidence is pure speculation, and Rodriguez cannot blame his counsel for failing to discover evidence of child abuse that he himself withheld prior to trial.

Even assuming that trial counsel rendered ineffective assistance in failing to discover evidence of Rodriguez' child abuse, Rodriguez has failed to demonstrate actual prejudice. Given the brutal circumstances surrounding the murder of Lorraine Martelli and the overwhelming evidence of aggravation against Rodriguez,[62] we are not persuaded that trial counsel's failure to present the proposed mitigating evidence of child abuse materially affected the imposition of Rodriguez' death sentence. *See Andrews v. Collins,* 21 F.3d 612, 624 (5th Cir.1994) (stating that, in light of evidence that defendant stood over victim and shot him directly in the forehead and that defendant altered bullet to cause more severe devastation on impact, defendant failed to show actual prejudice suffered from counsel's alleged deficiency), *cert. denied,* —— U.S. ——, 115 S.Ct. 908, 130 L.Ed.2d 790 (1995); *Glass v. Blackburn,* 791 F.2d 1165, 1170–71 (5th Cir.1986) (holding that the jury would not have rendered a different verdict had mitigating evidence been offered because the murders were calculated and cold-blooded and the victims suffered severe mental anguish both before and during the murders), *cert. denied,* 481 U.S. 1042, 107 S.Ct. 1985, 95 L.Ed.2d 824 (1987).

---

**62.** Evidence presented at trial established that Rodriguez vaginally and anally raped Lorraine Martelli, severely beat her, tortured her with knife cuts around her neck and face, and killed her in cold blood by stabbing her twenty-eight times. Evidence at the penalty phase established

that, when Rodriguez deliberately murdered Lorraine Martelli, he was on parole for aggravated robbery, had three prior felony convictions, and had in the past threatened to kill witnesses to his crimes. The jury found that six statutory aggravating factors existed beyond a reasonable doubt.

Accordingly, we conclude that trial counsel's alleged deficiency in failing to investigate and present evidence of child abuse did not rise to the level of ineffective assistance of counsel.

### D

Rodriguez claims that trial counsel rendered ineffective assistance by failing to "follow through" and to present evidence of Rodriguez' mental illness. Again, we disagree.

■ In a capital case, the decision to present evidence of mental illness is within the sound strategic judgment of counsel. *See Whitmore v. Lockhart,* 8 F.3d 614, 617 (8th Cir.1993); *Laws v. Armontrout,* 863 F.2d 1377, 1387–89 (8th Cir.1988), *cert. denied,* 490 U.S. 1040, 109 S.Ct. 1944, 104 L.Ed.2d 415 (1989). "An attorney is not obligated to present mitigation evidence if, after reasonable investigation, he or she determines that such evidence may do more harm than good." *Harris v. Dugger,* 874 F.2d 756, 763 (11th Cir.), *cert. denied,* 493 U.S. 1011, 110 S.Ct. 573, 107 L.Ed.2d 568 (1989); *see Davis v. People,* 871 P.2d 769, 773 (Colo.1994) ("[W]hen faced with overwhelming aggravating circumstances, trial counsel reasonably may conclude that the testimony of certain character witnesses would be of little help to the defense."). In *Laws,* the Eighth Circuit held that counsel's failure to present psychiatric evidence at the penalty phase of a capital murder prosecution did not amount to ineffective assistance:

> Counsel could easily have concluded that the decision to present psychological testimony would have disastrous consequences. Skillful cross-examination could have revealed that although [the defendant] suffered from no mental impairment that would negate responsibility for the murders he had committed, he was nonetheless a maladjusted man with a propensity for violence. Such cross-examination could have alienated the jury against his client.

863 F.2d at 1389.

■ Rodriguez claims that trial counsel knew about Rodriguez' mental illness, but failed to present such evidence in mitigation. However, the record reflects that trial counsel called Kent Wilson, director of Psychological Services for the Denver Juvenile Court, as a witness at the penalty phase. Wilson testified about two evaluations he performed on Rodriguez in 1973 and 1974 in which he concluded that Rodriguez had an "anti-social personality." R., v. 34 at 254–61; R., v. 35 at 12–17.

The record also reflects that, at the penalty phase, trial counsel contemplated calling Dr. Kathy Morall, Rodriguez' prison psychiatrist, as a witness to testify regarding prescribed medications taken by Rodriguez, but declined to do so when it became apparent that the prosecution's cross-examination could produce results detrimental to Rodriguez' defense. R., v. 34 at 145–48. Trial counsel knew of Rodriguez' psychiatric problems and prescribed medications and made an informed judgment that presentation of such testimony would do more harm than good. *See Strickland,* 466 U.S. at 690–91, 104 S.Ct. at 2065–67; *Smith v. Dugger,* 840 F.2d 787, 795 (11th Cir.1988), *cert. denied,* 494 U.S. 1047, 110 S.Ct. 1511, 108 L.Ed.2d 647 (1990); *Davis* 871 P.2d at 773.

Rodriguez failed to make any showing at the postconviction hearing that he suffered actual prejudice from trial counsel's alleged failure to present evidence of mental illness. Accordingly, we conclude that trial counsel acted well within the bounds of professional competency in deciding not to present further evidence of Rodriguez' mental illness.

### E

Rodriguez contends that trial counsel performed deficiently by: (1) wrongfully conceding guilt at trial; (2) failing to object to certain evidence which proved damaging at the penalty phase; and (3) presenting damaging evidence at the penalty phase. Rodriguez has established no error.

At trial, the prosecution presented strong evidence of Rodriguez' guilt. Patricia Thomas, a participant in the kidnapping of Lorraine Martelli, testified that Rodriguez raped Lorraine Martelli and then killed her. R., v. 25 at 208, 210; R., v. 26 at 20. The prosecution also introduced letters written by Rodriguez to Margie Marquez in which Rodriguez

admitted that he killed Lorraine Martelli. *Rodriguez IV,* 794 P.2d at 970. The forensic serologist confirmed the presence of Martelli's blood on Rodriguez' underwear, jacket, and jeans after his arrest. R., v. 28 at 193–97.

■ At the guilt phase of trial, the defense conceded Rodriguez' participation in the events leading to Lorraine Martelli's death, but disputed Rodriguez' culpability for deliberated first-degree murder by arguing that David Martinez and Chris Rodriguez killed the victim. Defense counsel carried this theory into the penalty phase in the form of an "equity defense," arguing that sentencing Rodriguez to death would be extremely inequitable because neither David Martinez nor Chris Rodriguez were sentenced to death. The defense also argued that Rodriguez wrote the letters to Marquez so that Marquez could turn the letters over to the district attorney and seek reduction of the criminal charges pending against her.

Based on the strength of the prosecution's evidence, defense counsel could have lost credibility with the jury by arguing Rodriguez' innocence in the guilt phase. Given Rodriguez' three prior convictions,[63] a guilty verdict on any of the several charged offenses relating to the abduction, rape, and murder of Lorraine Martelli would have resulted in a mandatory sentence of life imprisonment. *See* § 16–13–103, 8 C.R.S. (1984 Supp.). Accordingly, trial counsel might reasonably have concluded that, in light of the evidence of guilt presented, they could not save Rodriguez from a life sentence and focused instead on precluding the imposition of a death sentence. *See Romero v. Lynaugh,* 884 F.2d 871, 877 (5th Cir.1989) (holding that counsel's decision not to argue the absurd or burden the jury with the obvious did not amount to ineffective assistance), *cert. denied,* 494 U.S. 1012, 110 S.Ct. 1311, 108 L.Ed.2d 487 (1990); *Davis,* 871 P.2d at 769 (stating that "rather than attempt to argue the absurd," trial counsel conceded the obvious strength of the prosecution's case and

instead focused on preventing a death sentence). In addition, trial counsel's strategy of contesting only the charge of deliberated first-degree murder at the guilt phase strengthened their penalty phase argument that it would be inequitable to sentence Rodriguez to death when Chris Rodriguez received only a life sentence. "[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable," *Strickland,* 466 U.S. at 690, 104 S.Ct. at 2066, and, accordingly, Rodriguez' second guessing of trial counsel's strategy will not support a claim of ineffective assistance of counsel. *See, e.g., Davis,* 871 P.2d at 773; *People v. Bossert,* 722 P.2d 998, 1010 (Colo.1986).

■ Rodriguez also asserts that, at the guilt and penalty phases, trial counsel failed to object to evidence which ultimately proved damaging at the penalty phase. However, Rodriguez failed to show that trial counsel's conduct did not relate to a reasonable trial strategy of contesting only the deliberated first-degree murder charge and establishing the "equity defense" at the penalty phase.

In addition, Rodriguez failed to show actual prejudice. The prosecution presented overwhelming evidence of aggravation at the penalty phase. For example, a woman testified that Rodriguez and Chris Rodriguez raped and sodomized her in 1978, R., v. 34 at 59–99, and that, following that assault, Rodriguez stated that he wanted to kill her so that she could not identify them, but that Chris Rodriguez convinced Rodriguez to let her go. *Id.* at 70. A man testified that, ten days before the murder of Lorraine Martelli, Rodriguez shot him four times in the head during an attempted robbery. *Id.* at 122–127. The prosecution also informed the jury that Rodriguez was on parole when he robbed, raped, and killed Lorraine Martelli. R., v. 35 at 107. Given the strength of the prosecution's evidence of guilt and aggravation, Rodriguez cannot demonstrate that, but for counsel's failure to object, he would have received a life sentence instead of the death penalty.

---

**63.** Rodriguez had previously been convicted of aggravated robbery, second-degree burglary, and criminal attempt to commit second-degree burglary. At the habitual criminal proceeding, the jury found beyond a reasonable doubt that Rodriguez had been convicted of each of these prior felonies. R., v. 33 at 63–65.

■ Finally, Rodriguez contends that trial counsel presented damaging evidence at the penalty phase regarding Rodriguez' criminal history, his acts of misconduct in prison, and his attempts to escape. Again, we perceive no error.

At the penalty phase, trial counsel chose the strategy of portraying Rodriguez as an underprivileged youth from a broken home who had been betrayed by the juvenile justice system. In their efforts to humanize Rodriguez to the jury, counsel presented a candid life history and personality profile of Rodriguez which informed the jury of his offenses as a juvenile and his violations in prison. Given the strength of the aggravating evidence, trial counsel made a reasonable decision that a credible picture of Rodriguez could not be presented without revealing his extensive history with the criminal justice system. Thus, trial counsel's strategy cannot be viewed as either incompetent or prejudicial. *See Davis,* 871 P.2d at 773; *Bossert,* 722 P.2d at 1010.

### F

Next, Rodriguez argues that the state's failure to provide him with a complete and adequate record to use in preparing his appeal violated his constitutional right to effective assistance of appellate counsel. We reject this argument.

Our examination of the record before us reveals the following sequence of events. On October 7, 1993, the district court denied Rodriguez' Crim. P. 35(c) motion regarding ineffective assistance of counsel. Subsequent to this ruling and the district court's denial of Rodriguez' remaining postconviction claims on February 14, 1994, and March 17, 1994, Rodriguez filed a notice of appeal with this court. Upon consideration of the notice of appeal, we ordered that the record of Rodriguez' case be filed with this court. On October 20, 1994, we remanded the case to the district court to determine whether and to what extent the record required correction or modification. Upon remand, the district court found that several boxes of material relevant to the record were not transmitted as part of the record on appeal of the denial of Rodriguez' Crim. P. 35(c) motion and di-

rected a recertification of the entire record. In November and December 1994, the district court delivered a recertified record to this court. The district court did not have the documents contained in the recertified record when the court denied Rodriguez' postconviction motion relating to claims of ineffective assistance of counsel on October 7, 1993, or when it denied Rodriguez' remaining postconviction claims on February 14, 1994, and March 17, 1994.

Rodriguez now contends that the state denied him his right to effective assistance of counsel by failing to provide a complete and adequate record for counsel to use in preparing his direct appeal.

■ Ordinarily, to prevail on an ineffective assistance of counsel claim, a defendant must show that "counsel's performance was deficient" and that "the deficient performance prejudiced the defense." *Strickland,* 466 U.S. at 687, 104 S.Ct. at 2064. However, in *Perry v. Leeke,* the United States Supreme Court expressly noted that "direct governmental interference with the defendant's right to counsel is a different matter." 488 U.S. 272, 279, 109 S.Ct. 594, 599, 102 L.Ed.2d 624 (1989). The Court stated: " '[A]ctual or constructive denial of the assistance of counsel *altogether'* is not subject to the kind of prejudice analysis that is appropriate in determining whether the quality of a lawyer's performance itself has been constitutionally ineffective." *Id.* at 280, 109 S.Ct. at 600 (quoting *Strickland,* 466 U.S. at 692, 104 S.Ct. at 2067) (emphasis added). In these limited circumstances, a showing of prejudice is not required to establish a violation of a defendant's constitutional right to effective assistance of counsel. *Id.* The Supreme Court has found a violation of the constitutional right to effective assistance of counsel without any showing of prejudice only when counsel was either totally absent or altogether prevented from assisting the defendant during a critical stage of the proceeding. *United States v. Cronic,* 466 U.S. 648, 659 n. 25, 104 S.Ct. 2039, 2047 n. 25, 80 L.Ed.2d 657 (1984); *see, e.g., Geders v. United States,* 425 U.S. 80, 91, 96 S.Ct. 1330, 1336–37, 47 L.Ed.2d 592 (1976) (trial court prevented defendant from consulting with his

attorney during a 17-hour overnight recess during trial); *Herring v. New York*, 422 U.S. 853, 863–64, 95 S.Ct. 2550, 2555–56, 45 L.Ed.2d 593 (1975) (trial court refused to allow defense counsel to make closing arguments in a bench trial); *Davis v. Alaska*, 415 U.S. 308, 318, 94 S.Ct. 1105, 1111, 39 L.Ed.2d 347 (1974) (trial court prohibited defense counsel from cross-examining prosecution witness as to potential bias); *Brooks v. Tennessee*, 406 U.S. 605, 612–13, 92 S.Ct. 1891, 1895–96, 32 L.Ed.2d 358 (1972) (trial court required defendant to be first defense witness); *Ferguson v. Georgia*, 365 U.S. 570, 593–96, 81 S.Ct. 756, 768–70, 5 L.Ed.2d 783 (1961) (trial court prohibited defense counsel from conducting direct examination of defendant).

■■■ The cases cited above are inapposite to Rodriguez' case. In the present case, the state of the record did not altogether prevent Rodriguez' counsel from assisting Rodriguez in the preparation of his appeal. On direct appeal, Rodriguez' counsel filed a 138-page brief and an appendix listing 102 additional issues. According, we conclude that the incompleteness of the record did not amount to an actual or constructive denial of counsel for which prejudice would be presumed.

■■■ Thus, in order to prevail on his claim of state interference with the right to effective assistance of counsel, Rodriguez must show that "counsel's performance was deficient" and that "the deficient performance prejudiced the defense." *Strickland*, 466 U.S. at 687, 104 S.Ct. at 2064. However, Rodriguez merely asserts that the existence of an incomplete record, standing alone, denied him effective assistance of counsel. He makes no attempt to identify how counsel performed deficiently in preparing his appeal or how the incomplete record prejudiced his counsel's ability to raise any issue on appeal. Accordingly, we conclude that Rodriguez' vague and unsupported claim of error does not establish a violation of his right to effective assistance of counsel.

Rodriguez also tangentially asserts that the absence of a complete record for use on appeal violated his due process rights and mandates reversal of his convictions and death sentence. We disagree.

■■■ As a general proposition, a criminal defendant is entitled to a record on appeal which includes a complete transcript of the proceedings at trial. *See Hardy v. United States*, 375 U.S. 277, 279–82, 84 S.Ct. 424, 426–28, 11 L.Ed.2d 331 (1964). We have not previously identified the standard for determining whether an incomplete trial record entitles a defendant to a new trial.[64] In *United States v. Selva*, 559 F.2d 1303 (5th Cir.1977), the Fifth Circuit provided the following standard of review:

> When … a criminal defendant is represented on appeal by counsel other than the attorney at trial, the absence of a substantial and significant portion of the record, even absent any showing of specific prejudice or error, is sufficient to mandate reversal. The wisdom of this rule is apparent. When a defendant is represented on appeal by the same attorney who defended him at trial, the court may properly require counsel to articulate the prejudice that may have resulted from the failure to record a portion of the proceedings.

*Id.* at 1306 (footnote and citations omitted); *see United States v. Preciado–Cordobas*, 981 F.2d 1206, 1212 (11th Cir.1993) (applying the *Selva* standard); *United States v. Valdez*, 861 F.2d 427, 431 (5th Cir.1988), *cert. denied*, 489 U.S. 1083, 109 S.Ct. 1539, 103 L.Ed.2d 844 (1989); *United States v. Renton*, 700 F.2d 154, 157 (5th Cir.1983).[65] We decline to

---

**64.** In *People v. Killpack*, 793 P.2d 642, 643 (Colo. App.1990), and *People v. Anderson*, 837 P.2d 293, 300 (Colo.App.1992), *cert. denied*, No. 92SC451 (Colo. Oct. 13, 1992), the court of appeals applied the standard articulated in *United States v. Selva*, 559 F.2d 1303 (5th Cir.1977).

**65.** The federal cases cited above addressed the burden placed upon a defendant to obtain relief for a violation of the Court Reporter Act, 28 U.S.C. § 753 (1994). Subsection (b) of the Act provides in relevant part:

> Each session of the court and every other proceeding designated by rule or order of the court or by one of the judges shall be recorded verbatim.... Proceedings to be recorded under this section include (1) all proceedings in criminal cases had in open court;....

Section 13–5–127, 6A C.R.S. (1987), is analogous to the Court Reporter Act and provides:

adopt a rigid approach that turns on whether the defendant is represented by new counsel on appeal and hold that, to obtain relief on a due process claim arising from an incomplete record, a defendant must *always* demonstrate specific prejudice resulting from the state of that record. *See United States v. Wilson*, 16 F.3d 1027, 1031 (9th Cir.1994); *United States v. Sierra*, 981 F.2d 123, 125–26 (3d Cir.1992), *cert. denied*, —— U.S. ——, 113 S.Ct. 2949, 124 L.Ed.2d 696 (1993); *United States v. Gallo*, 763 F.2d 1504, 1531 (6th Cir.1985), *cert. denied*, 475 U.S. 1017, 106 S.Ct. 1200, 89 L.Ed.2d 314 (1986); *State v. Williams*, 227 Conn. 101, 629 A.2d 402, 405–07 (1993); *Smith v. State*, 291 Md. 125, 433 A.2d 1143, 1146–48 (1981); *State v. Borden*, 605 S.W.2d 88, 92 (Mo.1980); *State v. Madera*, 206 Mont. 140, 670 P.2d 552, 565 (1983); *State v. Dupris*, 373 N.W.2d 446, 449 (S.D. 1985); *State v. Helmick*, 169 W.Va. 94, 286 S.E.2d 245, 249 (1982). Rodriguez' bare assertion that the incomplete record prejudiced counsel's ability to prepare Rodriguez' appeal does not amount to a showing of specific prejudice, and, accordingly, Rodriguez is not entitled to relief.

G

Next, Rodriguez contends that the district court did not have a complete record of Rodriguez' mental illness when it denied his postconviction claim of ineffective assistance. We reject this argument.

On October 7, 1993, the district court denied Rodriguez' postconviction claim that counsel's failure to investigate and present mitigating evidence of mental illness constituted ineffective assistance of counsel. At that time, the record did not contain a transcript of a hearing held on October 28, 1986, between District Judge Connie Peterson and Rodriguez' trial counsel, Desmond and Eisner.[66] Judge Peterson called the hearing to understand the effects of prescribed medication taken by Rodriguez and to address any issue that might later be raised on ap-

peal because of Rodriguez' medicated state at trial. *See* Sealed Tr. of Hearing (Oct. 28, 1986). At the hearing, Drs. Kathy Morall and Seymoure Sundell, who treated Rodriguez in jail, testified concerning the effects of Rodriguez' prescribed medication. *Id.*

Rodriguez contends that a transcript of the October 28, 1986, hearing was crucial to the district court's determination of whether trial counsel rendered ineffective assistance by failing to "follow through" on evidence of mental illness. However, our examination of the transcript reveals that the hearing related solely to the effects that prescribed medications had on Rodriguez and did not contain testimony regarding counsel's decision to further investigate or present a claim of mental illness. As discussed in part VII(B) of this opinion, Rodriguez' trial counsel reasonably decided not to call Dr. Morall to testify at trial regarding Rodriguez' mental illness after concluding that Dr. Morall's testimony might prejudice Rodriguez' defense.

▮ Prior to its denial of Rodriguez' postconviction claims alleging ineffective assistance of counsel, the district court reviewed the record, which included a transcript of the bench conference at which defense counsel decided not to call Dr. Morall. *See* R., v. 34 at 145–48; *supra* part VII(B). Rodriguez fails to establish that the lack of a transcript of the October 28, 1986, hearing prejudicially affected the district court's determination that Rodriguez received effective assistance of counsel at trial. Accordingly, we conclude that the district court had an adequate record upon which to deny Rodriguez' claims of ineffective assistance of counsel for failure to present evidence of Rodriguez' mental illness.

In Issue 148, Rodriguez contends that the district court's failure to provide him with a transcript of the October 28, 1986, hearing violated his constitutional right to rebut the prosecution's arguments at the penalty phase

The shorthand reporter, on the direction of the court, shall take down in shorthand all the testimony, rulings of the court, exceptions taken, oral instructions given, and other proceedings had during the trial of any cause, and in such causes as the court may designate.

66. This hearing was not transcribed until August 1, 1994. The prosecution was not present at the hearing, and the district court ordered the hearing transcript sealed.

relating to Rodriguez' future dangerousness. Specifically, Rodriguez alleges that:

> [t]his transcript would have significantly bolstered Mr. Rodriguez' claim on direct appeal that the prosecution being permitted to make these arguments after the court assured defense counsel that they would not be allowed to do so, thus fooling defense counsel into not presenting evidence on those issues, and after having suppressed other proposed evidence concerning such issues, violated Mr. Rodriguez' rights.

Rodriguez' Opening Brief at 403–04. We reject this argument.

■■■ The prosecution notified Rodriguez that, pursuant to section 16–11–103(1)(b), it intended to present evidence relevant to establish Rodriguez' character, background, and history. R., v. 38 at 253. Rodriguez notified the prosecution that he did *not* intend to rely on the statutory mitigating factor that "the defendant is not a continuing threat to society." *Id.* at 255; *see* § 16–11–103(5)(k). Rodriguez' claim that he needed the transcript to rebut the prosecution's charges of future dangerousness is entitled to little weight. Furthermore, Rodriguez fails to establish that he was prevented from calling Dr. Morall or Dr. Sundell to testify at the penalty phase regarding their testimony at the October 28, 1986, hearing. We conclude that the unavailability of the transcript did not prevent Rodriguez from presenting mitigating evidence to rebut the prosecution's arguments.

### H

At the Crim.P. 35(c) hearing on ineffective assistance of counsel, the district court refused to admit the record on appeal,[67] holding that Rodriguez' claim did not necessitate a review of the record because our decision in *Rodriguez IV*, 794 P.2d 965, foreclosed any claims of ineffective assistance based on appellate counsel's alleged inability to raise all available issues on appeal. R., v. 62 at 10–12. Here, Rodriguez claims that the district

court's refusal to admit into evidence the record on direct appeal and to hear testimony from appellate counsel Heher regarding his alleged inability to raise certain issues precluded Rodriguez from demonstrating ineffective assistance of counsel on appeal. We reject this argument.

The record reveals that Rodriguez attempted to enter the record on appeal into evidence specifically to show that the procedural limitations imposed by this court impaired Heher's ability to raise all available issues on appeal. *Id.* at 9–10. At the Crim.P. 35(c) hearing, Hostetler stated:

> As I indicated in the motion, there are two what I call species of ineffective assistance of counsel. There is that ineffective assistance of counsel that is caused by some sort of state interference. There is a second species of ineffective assistance of counsel that deals with substandard performance. *What I think we were trying to get into when we subpoenaed the records from the Colorado Supreme Court was we were getting into that first species of ineffective assistance of counsel, some sort of rulings by the court either on time limitations, page limitations or what have you, that may have impacted upon Mr. Heher's ability to file a complete brief.*

R., v. 65 at 95–96 (emphasis added).

■■■ Rodriguez did *not* try to enter the record into evidence to show that the claims appellate counsel *did* present were substandard. The district court did not need to admit the record on appeal in order to determine whether the limitations imposed by this court prejudiced Rodriguez' right to effective assistance of counsel. In *Rodriguez IV*, 794 P.2d at 971, we noted that Heher submitted a "Partial Opening Brief" more than quadruple the length permitted by C.A.R. 28, received several extensions of time beyond the forty days allowed by C.A.R. 31(a), and filed Rodriguez' brief nearly two years after the case had been docketed. Based on its review of *Rodriguez IV*, 794 P.2d 965, and a recognition that meritless attacks on the require-

---

67. Rodriguez' counsel, Hostetler, subpoenaed Mac V. Danford, the Clerk of the Colorado Supreme Court, to appear at the Crim.P. 35(c) hearing and to bring the Supreme Court's record relevant to Rodriguez' direct appeal. District Judge Federico Alvarez refused to admit the record of appeal. R., v. 62 at 4–12.

ments imposed by the Colorado Appellate Rules will not support a claim for relief, the district court had an adequate basis to address Rodriguez' claim of ineffective assistance of appellate counsel.[68]

■■■ The district court sustained the prosecution's objections to Heher's testimony that he rendered ineffective assistance by failing to raise all available issues on appeal. We find no error in the court's ruling.[69] In *Jones v. Barnes*, 463 U.S. 745, 754, 103 S.Ct. 3308, 3314, 77 L.Ed.2d 987 (1983), the United States Supreme Court held that appellate counsel's failure to include every conceivable issue available for appeal does not amount to ineffective assistance. The Court reasoned that counsel's duty to render effective advocacy requires prioritizing issues on appeal based upon their strength so as to avoid "burying good arguments ... in a verbal mound made up of strong and weak contentions." *Id.* at 753, 103 S.Ct. at 3313; *see People v. Galimanis*, 728 P.2d 761, 763 (Colo. App.1986) ("Effective advocacy requires the recognition that if there are one or two strong arguments for reversal, these should be presented forcefully and others of less merit eliminated.").

In his Crim.P. 35(c) motion, Rodriguez asserted the same argument which the Supreme Court rejected in *Jones*, stating: "The failure of Defendant Rodriguez' attorney to raise all available issues on appeal including issues relative to the guilt phase denied Defendant Rodriguez his constitutional right to effective assistance of counsel." Am.R., v. 7 at 1638. The district court did not need to hear testimony from Heher admitting that he failed to raise all available issues in preparing Rodriguez' appeal. Accordingly, we will not disturb the district court's ruling.

## I

We conclude that the district court properly denied Rodriguez' postconviction claims of ineffective assistance of counsel.

## XIX

### *Conclusion*

We have reviewed all remaining arguments in Rodriguez' appeal of the denial of his Crim.P. 35(c) motions and conclude that these arguments do not merit relief or discussion. Accordingly, we affirm in part the district court's denial of Rodriguez' postconviction claims and affirm the denial of his postconviction claims of ineffective assistance of counsel. We also affirm the district court's vacation of Rodriguez' convictions for first-degree felony murder, conspiracy to commit second-degree kidnapping, and conspiracy to commit aggravated motor vehicle theft and its subsequent refusal to vacate Rodriguez' sentence of death. We remand Rodriguez' conviction for first-degree sexual assault as a class 2 felony to the district court with directions to vacate that judgment and sentence and enter judgment and sentence for the offense of first-degree sexual assault as a class 3 felony. On remand, the district court shall also set a date for the execution of Frank Rodriguez.

SCOTT, J., concurs.

KIRSHBAUM, J., concurs in part and dissents in part.

LOHR, J., dissents.

## APPENDIX A

### RODRIGUEZ' ISSUES ON APPEAL OF CLAIMS FOR POSTCONVICTION RELIEF

1. THE DISTRICT COURT'S RULING THAT MR. RODRIGUEZ HAD ALREADY HAD APPELLATE REVIEW OF MANY CLAIMS IN HIS

---

**68.** In rejecting Rodriguez' claim that the limitations impacted upon Heher's ability to render effective assistance, the district court refused to render judgment as to the propriety of the Colorado Appellate Rules because rendering such a judgment would force the court to rule as to whether this court properly managed Rodriguez' appeal. R., v. 62 at 11, 109–112.

**69.** The district court also refused to hear testimony from Heher that the limitations imposed by this court on direct appeal impacted on his ability to render effective assistance on appeal. R., v. 62 at 11, 109–112.

POSTCONVICTION MOTIONS WAS ERRONEOUS.*

2. MR. RODRIGUEZ DID NOT FORFEIT HIS RIGHT TO POSTCONVICTION REVIEW BY NOT RAISING THE SAME CLAIMS ON DIRECT APPEAL.

3. THE DISTRICT COURT'S RULING THAT THIS COURT DECIDED SEVERAL OF MR. RODRIGUEZ' CLAIMS AGAINST HIM IN *PEOPLE V. TENNESON*, 788 P.2d 786 (Colo.1990), AND *PEOPLE V. DAVIS*, 794 P.2d 159 (Colo.1990), IS INCORRECT.

4. THE COURT ERRED BY REFUSING TO GRANT THE MOTION TO DEATH QUALIFY THE JUDGE.

5. THE DEATH PENALTY IN THIS CASE AND THE STATE'S DECISION TO SEEK IT ARE BASED UPON INVIDIOUS DISCRIMINATION, ARE UNGUIDED BY RATIONAL, RELEVANT AND CONSISTENT STANDARDS, AND ARE BASED ON IRRATIONAL AND ILLEGAL CRITERIA.

6. THE SENTENCE OF DEATH IS DISPROPORTIONATE TO SENTENCES IMPOSED IN OTHER CASES. THIS DEATH SENTENCE IS ARBITRARY AND CAPRICIOUS AND VIOLATES THE CRUEL AND UNUSUAL PUNISHMENT AND DUE PROCESS CLAUSES OF THE FEDERAL AND COLORADO CONSTITUTIONS AND THE DEATH STATUTE.

7. THE APPELLATE REVIEW PURSUANT TO C.R.S. § 16–11–103(7) MUST BE ADVERSARIAL IN NATURE OR THE STATUTE VIOLATES THE DUE PROCESS AND CRUEL AND UNUSUAL PUNISHMENT CLAUSES OF THE FEDERAL AND COLORADO CONSTITUTIONS, AND COLORADO'S RIGHT TO APPEAL CLAUSE; THUS, THE "NON–ADVERSARY" PROCEEDING IN THIS CASE VIOLATED THOSE PROVISIONS.

8. THE DEATH PENALTY STATUTE AND THE DEATH PENALTY ITSELF IS UNCONSTITUTIONAL FOR THE REASONS SET FORTH IN MR. RODRIGUEZ' MOTIONS TO STRIKE DEATH PENALTY AND THE ACCOMPANYING PLEADINGS AND MATERIALS.

9. COLORADO'S DEATH PENALTY STATUTE MUST PROVIDE FOR TRIAL COURT AND APPELLATE PROPORTIONALITY REVIEW OF DEATH SENTENCES OR IT VIOLATES THE CRUEL AND UNUSUAL PUNISHMENT, DUE PROCESS, AND EQUAL PROTECTION CLAUSES OF THE FEDERAL AND COLORADO CONSTITUTIONS. THE TRIAL COURT'S REFUSAL TO ALLOW MR. RODRIGUEZ TO PRESENT HIS EVIDENCE OR TO EVEN CONSIDER THE ISSUES VIOLATED THE DUE PROCESS, EQUAL PROTECTION, CRUEL AND UNUSUAL PUNISHMENT, COMPULSORY PROCESS AND CONFRONTATION CLAUSES OF THE FEDERAL AND COLORADO CONSTITUTIONS AND THE DEATH STATUTE.

10. JUDGE PHILLIPS WAS BIASED AGAINST MR. RODRIGUEZ AND MR. RODRIGUEZ' LAWYERS.

11. THE COURT'S REFUSAL TO DISCLOSE THE COMMUNICATIONS BETWEEN JUDGES PETERSON, PHILLIPS AND ALVAREZ ABOUT THIS CASE; THE REFUSAL OF THE COURT TO RULE ON THE MOTION TO RECUSE JUDGE PETERSON, CHIEF JUDGE PETERSON'S SIGNIFICANT INVOLVEMENT IN THE CASE, AND THE COURT'S REFUSAL TO HAVE A JUDGE FROM A DIFFERENT DISTRICT HEAR MR. RODRIGUEZ' MOTIONS, WERE ALL PREJUDICIAL ERROR.

---

* Rodriguez' brief on this appeal contains 150 issues, numbered from I to CLI. He omits XXIII.

For clarity, we have renumbered the issues in Arabic.

12. THE DENIAL OF THE *MOTION TO STRIKE THE DEATH PENALTY, FOR APPOINTMENT OF A SPECIAL PROSECUTOR, AND FOR ADDITIONAL APPROPRIATE RELIEF* WITHOUT A HEARING AND WITHOUT INTELLIGIBLE FINDINGS WAS ERROR, ESPECIALLY WHERE THE COURT APOLOGIZED FOR ITS FAILURE TO HURRY THE PROCESS ALONG WHERE ONE OF THE ISSUES WAS THE VITRIOLIC CHARGES MADE AGAINST IT AND THE SUPREME COURT ABOUT THIS CASE IN THE MEDIA BY EX–GOVERNOR LAMM AND THE PROSECUTION. THE MOTION SHOULD HAVE BEEN GRANTED DESPITE THE DENIAL OF A HEARING.

13. THE ILLEGALITY OF THE FIRST DEGREE MURDER AND TWO CONSPIRACY CONVICTIONS REQUIRES THAT THE DEATH SENTENCE BASED UPON THEM BE VACATED. THE MOTOR VEHICLE THEFT AND "CRIME OF VIOLENCE" CONVICTIONS, AND THE DEATH SENTENCE BASED ON THEM, ARE ALSO ILLEGAL SINCE THEY ARE BASED ON THE MURDER CONVICTION.

14. MR. RODRIGUEZ WAS DENIED THE RIGHT TO COUNSEL AND HIS OTHER RIGHTS DURING APPEAL AND POSTCONVICTION PROCEEDINGS DUE TO THE LACK OF CONFIDENTIALITY AND THE STATE'S OBSTRUCTION OF THE ATTORNEY–CLIENT RELATIONSHIP.

15. THE DENIAL OF MR. RODRIGUEZ' CRIM.P. 35(B) MOTION WITHOUT A HEARING WAS ERROR.

16. THE DISTRICT COURT'S REFUSAL TO CONSIDER ANY REASONS FOR REDUCING THE DEATH SENTENCE WHICH WERE OR WHICH MIGHT HAVE BEEN PRESENTED TO THE ORIGINAL SENTENCER IN ITS DECISION ON THE CRIM.P. 35(B) MOTION, WAS ERRONEOUS.

17. THE DISTRICT COURT'S DENIAL OF ANY ASSISTANCE FOR MR. RODRIGUEZ IN THE INVESTIGATION AND PREPARATION OF HIS CRIM.P. 35(B) MOTION WAS ERRONEOUS.

18. THE DENIAL OF THE MOTION FOR RECONSIDERATION WAS ERROR ON ITS MERITS AND BECAUSE THE COURT DID NOT HAVE THE MOTION BEFORE IT WHEN IT RULED.

19. MR. RODRIGUEZ WAS DENIED DUE PROCESS, EFFECTIVE ASSISTANCE OF COUNSEL, EQUAL PROTECTION, COMPULSORY PROCESS AND HIS RIGHTS UNDER CRIM.P. 35(C) AND THE CRUEL AND UNUSUAL PUNISHMENT CLAUSES BY THE COURT'S REFUSAL TO PROVIDE HIM WITH ADEQUATE OUT–OF–STATE INVESTIGATION FUNDS, ITS REFUSAL TO ALLOW HIM ACCESS TO ESSENTIAL RECORDS, AND ITS REFUSAL TO ALLOW HEARINGS ON MOTIONS.

20. THE TRIAL COURT'S REFUSAL TO ALLOW MR. RODRIGUEZ TO REBUT THE TESTIMONY OF THE PROSECUTION'S WITNESS AT THE HEARING WAS ERROR.

21. THE CUMULATIVE EFFECT OF THE ERRORS COMMITTED BY THE DISTRICT COURT BEFORE, DURING AND AFTER TRIAL AND DURING POSTCONVICTION PROCEEDINGS DENIED MR. RODRIGUEZ HIS FUNDAMENTAL RIGHTS.

22. THE COURT APPLIED AN INCORRECT STANDARD IN RULING ON MR. RODRIGUEZ' MOTION FOR RELIEF BASED ON NEWLY DISCOVERED EVIDENCE.

23. [OMITTED.]

24. THE TRIAL COURT'S REFUSAL TO REQUIRE THAT THE STATE PROVIDE DISCOVERY REGARD-

ING JOSEPH COUNCIL VIOLATED RULE 16 AND THE DUE PROCESS CLAUSES.

25. THE STATE'S FAILURE TO REVEAL THAT THE EXTREMELY LENIENT PLEA BARGAIN IT AFFORDED TO DAVID MARTINEZ WAS DONE IN ORDER TO OBTAIN THE TESTIMONY OF PATRICIA THOMAS, AND ITS MISREPRESENTATION THAT SUCH WAS NOT THE CASE, DENIED MR. RODRIGUEZ DUE PROCESS OF LAW AND HIS CONFRONTATION RIGHTS.

26. THE UNJUSTIFIABLE FAILURE OF THE POLICE TO OBTAIN APPARENTLY MATERIAL AND EXCULPATORY EVIDENCE FROM DAVID MARTINEZ AND PATRICIA THOMAS DENIED MR. RODRIGUEZ HIS RIGHTS UNDER THE DUE PROCESS, CONFRONTATION AND CRUEL AND UNUSUAL PUNISHMENT CLAUSES. THE POLICE REFUSED TO FOLLOW STANDARD PROCEDURES DURING THE ARREST OF PATRICIA THOMAS AND DAVID MARTINEZ, AND REFUSED TO COLLECT THAT EVIDENCE AT THE SCENE OF THAT ARREST.

27. THE STATE'S DESTRUCTION OF THE EXCULPATORY EVIDENCE OF THE PHOTOGRAPHS OF DAVID MARTINEZ, SHOWING BRUISES AND CUTS SUSTAINED DURING HIS RAPE AND KILLING OF THE VICTIM, VIOLATED THE CONFRONTATION, DUE PROCESS, COMPULSORY PROCESS AND CRUEL AND UNUSUAL PUNISHMENT CLAUSES OF THE FEDERAL AND COLORADO CONSTITUTIONS AND CRIM.P. 16.

28. THE STATE'S DESTRUCTION OF THE EXCULPATORY EVIDENCE OF THE PHOTOGRAPH OF PATRICIA THOMAS' BRUISES, CAUSED BY HER PARTICIPATION IN THE MURDER, VIOLATED THE DUE PROCESS, CONFRONTATION, COMPULSORY PROCESS AND CRUEL AND UNUSUAL PUNISHMENT CLAUSES OF THE FEDERAL AND COLORADO CONSTITUTIONS AND CRIM.P. 16.

29. THE FAILURE OF THE TRIAL COURT TO ORDER THE STATE TO PROVIDE MR. RODRIGUEZ WITH ORAL STATEMENTS OF PROSECUTION WITNESSES VIOLATED THE DUE PROCESS, CONFRONTATION, COMPULSORY PROCESS AND CRUEL AND UNUSUAL PUNISHMENT CLAUSES OF THE UNITED STATES AND COLORADO CONSTITUTIONS AND CRIM.P. 16.

30. THE COURT'S UNJUSTIFIABLE REFUSAL TO GRANT A CONTINUANCE IN ORDER FOR DAVID MARTINEZ TO BE AN AVAILABLE WITNESS, OR TO ASSIST MR. RODRIGUEZ IN OBTAINING HIS PRESENCE FOR TRIAL, OR TO ALLOW THE PRESENTATION OF EVIDENCE OF HIS STATEMENTS TO THE POLICE AND OTHERS THROUGH OTHER MEANS, VIOLATED MR. RODRIGUEZ' RIGHT TO CONFRONTATION, RIGHT TO COUNSEL, DUE PROCESS, COMPULSORY PROCESS AND THE CRUEL AND UNUSUAL PUNISHMENT CLAUSES.

31. MR. RODRIGUEZ WAS DENIED HIS RIGHTS TO DUE PROCESS, COMPULSORY PROCESS, CONFRONTATION AND THE PROHIBITION OF CRUEL AND UNUSUAL PUNISHMENT BY THE COURT'S REFUSAL TO ALLOW A CONTINUANCE SO THAT MR. RODRIGUEZ COULD OBTAIN THE PRESENCE AND TESTIMONY OF A CRITICAL, SUBPOENAED WITNESS AT TRIAL.

32. THE NUMEROUS DISCOVERY VIOLATIONS BY THE STATE AND THE TRIAL COURT'S REFUSAL TO IMPOSE ANY SANCTIONS AS A RESULT DENIED MR. RODRIGUEZ DUE PROCESS OF LAW

AND A FAIR TRIAL AND HIS RIGHTS TO CONFRONTATION AND THE PROHIBITIONS OF CRUEL AND UNUSUAL PUNISHMENT AS WELL AS HIS RIGHTS UNDER THE RULES AND STATUTES GOVERNING DISCOVERY.

33. THE SUPREME COURT'S REFUSAL TO ALLOW MR. RODRIGUEZ AN ADEQUATE OPPORTUNITY TO PREPARE AND FILE A COMPLETE AND ADEQUATE BRIEF ON APPEAL DENIED MR. RODRIGUEZ DUE PROCESS, EQUAL PROTECTION, HIS RIGHT TO APPEAL, AND HIS RIGHTS UNDER THE CRUEL AND UNUSUAL PUNISHMENT CLAUSES AND COLORADO STATUTES.

34. THE COLORADO SUPREME COURT'S GIVING PREFERENTIAL TREATMENT TO THE PROSECUTION AND ITS SUPPORTERS DURING ORAL ARGUMENTS IN THIS CASE, ARRANGING EXPANDED MEDIA COVERAGE OF THOSE ARGUMENTS CONTRARY TO ITS OWN RULES AND PROCEDURES, WHICH COVERAGE NATURALLY FOCUSSED ON THE PROSECUTION, DENIED MR. RODRIGUEZ DUE PROCESS, A FAIR TRIBUNAL, A FAIR APPEAL AND HIS RIGHTS UNDER THE CRUEL AND UNUSUAL PUNISHMENT CLAUSES.

35. THE COURT'S RULING THAT SEVERAL CLAIMS CONCERNED ONLY "CREDIBILITY OF PROSECUTION WITNESSES" AND THUS THAT THEY WERE NOT "AVAILABLE" WAS ERROR.

36. THE ABSOLUTE IMMUNITY GRANTED BY THE PROTECTION TO PATRICIA THOMAS WAS ILLEGAL. HER TESTIMONY WAS THUS OBTAINED BY ILLEGAL MEANS AND SHOULD NOT HAVE BEEN ALLOWED. THE "LICENSE TO LIE" SUBVERTED THE TRIAL PROCESS AND DENIED MR. RODRIGUEZ HIS MOST FUNDAMENTAL RIGHTS.

37. THE TESTIMONY OF PATRICIA THOMAS WAS THE RESULT OF MANIFEST PROSECUTORIAL MISCONDUCT AND ITS USE AGAINST MR. RODRIGUEZ DENIED HIS DUE PROCESS OF LAW AND HIS RIGHTS UNDER THE CRUEL AND UNUSUAL PUNISHMENT CLAUSES.

38. THE RESTRICTIONS ON DEFENSE COUNSEL'S CROSS–EXAMINATION AND IMPEACHMENT OF PATRICIA THOMAS VIOLATED THE CONFRONTATION, CRUEL AND UNUSUAL PUNISHMENT AND DUE PROCESS CLAUSES OF THE FEDERAL AND COLORADO CONSTITUTIONS.

39. THE GRANTING OF THE STATE'S MOTION IN LIMINE RE: PROPER IMPEACHMENT OF PATRICIA THOMAS DENIED MR. RODRIGUEZ HIS RIGHTS TO CONFRONT, CROSS–EXAMINE AND IMPEACH THE STATE'S EVIDENCE AGAINST HIM, AND HIS RIGHT TO PRESENT MITIGATION EVIDENCE, ALL UNDER THE U.S. AND COLORADO CONSTITUTIONS.

40. THE TRIAL COURT'S REFUSAL TO ALLOW PATRICIA THOMAS TO BE IMPEACHED WITH THE VIDEOTAPE OF HER INCONSISTENT STATEMENTS DENIED MR. RODRIGUEZ HIS RIGHTS TO CONFRONTATION, COMPULSORY PROCESS, DUE PROCESS AND A FAIR TRIAL, AND DEMONSTRATED A DOUBLE STANDARD BY THE COURT ON SUCH MATTERS.

41. THE COURT'S RULING THAT SEVERAL CLAIMS CONCERNED ONLY "INADEQUATE FOUNDATION FOR EXHIBITS" AND THUS THAT THEY WERE NOT "AVAILABLE" WAS ERROR.

42. THE ADMISSION OF THE "PROBABILITY" AND "RELIABILITY"

EVIDENCE CONCERNING THE HAIRS AND FIBERS WAS IMPROPER. THAT EVIDENCE WAS MANIFESTLY UNRELIABLE AND OUTSIDE THE SCOPE OF THE WITNESS' AREA OF KNOWLEDGE. THERE WAS NOT A SUFFICIENT FOUNDATION FOR THE RELIABILITY OF THAT EVIDENCE, AND IT WAS IN FACT COMPLETELY UNRELIABLE. ITS ADMISSION DENIED MR. RODRIGUEZ DUE PROCESS OF LAW AND HIS RIGHT TO A FAIR TRIAL BY IMPARTIAL JURY, AND HIS RIGHTS UNDER THE CRUEL AND UNUSUAL PUNISHMENT CLAUSES, UNDER THE FEDERAL AND COLORADO CONSTITUTIONS.

43. THE ADMISSION OF THE STATE'S IRRELEVANT, BASELESS EVIDENCE CONCERNING HOW DAVID MARTINEZ COULD HAVE OBTAINED THE TWO CUTS ON HIS HANDS VIOLATED THE RULES OF EVIDENCE REQUIRING A FOUNDATION, PERSONAL KNOWLEDGE, AND RELEVANCE FOR EVIDENCE, AND CRE 403 AND DENIED MR. RODRIGUEZ DUE PROCESS OF LAW.

44. OFFICER BROWN'S TESTIMONY CONCERNING THE "LIKELIHOOD" OF WHETHER THERE WAS SEMINAL FLUID ON MR. RODRIGUEZ' UNDERSHORTS WAS IMPROPERLY ADMITTED. IT WAS IRRELEVANT AND LACKED ANY FOUNDATION OR RELIABILITY. ITS ADMISSION ALSO DENIED MR. RODRIGUEZ DUE PROCESS OF LAW AND HIS RIGHT TO A FAIR TRIAL BY IMPARTIAL JURY.

45. THE ADMISSION OF EXHIBITS G–13, G–14, AND G–15 WAS ERROR. THERE WAS NO ADEQUATE FOUNDATION FOR THE EXHIBITS AND THEY WERE IRRELEVANT AND MISLEADING.

46. MR. RODRIGUEZ WAS DENIED HIS RIGHTS TO MAKE MOTIONS, OBJECTIONS AND RECORDS ON THE TRIAL PROCEEDINGS, AND THE DISTRICT COURT'S DENIAL OF A HEARING ON THESE MATTERS AND ITS FINDINGS ON THE ISSUES ARE ERRONEOUS.

47. THE COURT'S REFUSAL TO COMPLY WITH *BATSON* AND *FIELDS* WHEN MR. RODRIGUEZ MADE AN OBJECTION TO THE STATE'S EXCUSAL OF BLACK JURORS VIOLATED THE DUE PROCESS, EQUAL PROTECTION, TRIAL BY JURY AND CRUEL AND UNUSUAL PUNISHMENT CLAUSES, AS DID THE STATE'S USE OF ITS PEREMPTORY CHALLENGES IN THAT FASHION.

48. THE UNREASONABLE RESTRICTIONS PLACED ON DEFENSE COUNSEL'S VOIR DIRE REGARDING THE DEATH PENALTY, AND THE ORDER THAT HE COULD NOT OBJECT TO THE COURT'S CONDUCTING OF VOIR DIRE, DENIED MR. RODRIGUEZ HIS RIGHTS UNDER RULE 24, HIS RIGHTS TO A FAIR TRIAL BY IMPARTIAL JURY, TO APPEAL, TO DUE PROCESS OF LAW, TO COUNSEL, TO BE ABLE TO INTELLIGENTLY EXERCISE HIS PEREMPTORY AND CAUSE CHALLENGES, AND RIGHTS UNDER THE CRUEL AND UNUSUAL PUNISHMENT CLAUSES.

49. THE DEATH QUALIFICATION OF THE JURY DENIED MR. RODRIGUEZ A FAIR TRIAL BY IMPARTIAL JURY, A JURY DRAWN FROM A FAIR CROSS–SECTION OF THE COMMUNITY, AND DUE PROCESS OF LAW, AND HIS RIGHTS UNDER CRUEL AND UNUSUAL PUNISHMENT CLAUSES AND THE STATUTES AND RULES GOVERNING JURY SELECTION IN COLORADO.

50. THE TRIAL COURT'S REFUSAL TO ALLOW TWO JURIES, ONE

DEATH–QUALIFIED AND ONE NOT DEATH–QUALIFIED, DENIED MR. RODRIGUEZ AN OPPORTUNITY TO MAKE A RECORD IN THE MATTERS RELATING TO THE EFFECTS OF DEATH–QUALIFICATION.

51. THE TRIAL COURT ERRED BY ITS ORDER THAT ANY RECORD OF A JUROR'S DEMEANOR BY COUNSEL MUST BE SUBMITTED TO THE COURT IN WRITING.

52. THE TRIAL COURT ERRED BY REFUSING TO EXCUSE FOR CAUSE PROSPECTIVE JURORS WHO KNEW THAT CHRIS RODRIGUEZ HAD BEEN CONVICTED FOR, AND/OR SENTENCED TO LIFE IN PRISON FOR, THE SAME CASE. THIS INCLUDED SEVERAL JURORS WHO ACTUALLY SAT AS JURORS ON THE CASE. THE COURT ALSO REFUSED TO INSTRUCT THOSE JURORS AND PROSPECTIVE JURORS NOT TO DIVULGE THAT INFORMATION TO OTHERS AND NOT TO CONSIDER THAT INFORMATION IN DECIDING THE CASE. MR. RODRIGUEZ WAS THEREBY DENIED A FAIR TRIAL BY IMPARTIAL JURY AND DUE PROCESS OF LAW.

53. THE TRIAL COURT'S FAILURE TO HAVE THE PROSPECTIVE JURORS TAKE THEIR OATH TO TELL THE TRUTH BEFORE THEY WERE GIVEN AND TOLD TO FILL OUT THE JURORS QUESTIONNAIRES, AND ITS COMPLETE FAILURE TO HAVE MANY PROSPECTIVE JURORS EVER TAKE THEIR OATH, VIOLATED THE CONTROLLING STATUTE AND RULE AND DENIED MR. RODRIGUEZ DUE PROCESS AND A FAIR TRIAL BY IMPARTIAL JURY.

54. THE TRIAL COURT'S FAILURE TO ORDER MANY OF THE PROSPECTIVE JURORS NOT TO BE EXPOSED TO, OR BE AFFECTED BY, ANY PUBLICITY IN THE CASE, NOT TO DISCUSS THE CASE THEY WERE INVOLVED IN WITH ANYONE ELSE, ON THE FIRST DAY OF TRIAL BEFORE THOSE PROSPECTIVE JURORS WENT HOME, VIOLATED THE CONTROLLING RULES AND DENIED MR. RODRIGUEZ DUE PROCESS OF LAW AND A FAIR TRIAL BY IMPARTIAL JURY.

55. THE TRIAL COURT'S FAILURE TO EXCUSE FOR CAUSE PROSPECTIVE JUROR [R.K.] BECAUSE, INTER ALIA, HE WAS AWARE OF THE ALLEGED CONFESSION OF MR. RODRIGUEZ, WAS ERROR AND DENIED MR. RODRIGUEZ A FAIR TRIAL BY AN IMPARTIAL JURY.

56. THE COURT'S REFUSAL TO ALLOW INDIVIDUAL SEQUESTERED VOIR DIRE ON DEATH PENALTY ISSUES DENIED MR. RODRIGUEZ DUE PROCESS AND A FAIR TRIAL BY IMPARTIAL JURY. THIS WAS PARTICULARLY SO IN LIGHT OF THE INADEQUATE AND UNREASONABLE TIME ALLOWED FOR DEFENSE COUNSEL'S VOIR DIRE ON THOSE ISSUES.

57. THE COURT'S REFUSAL TO VIDEOTAPE THE JURY SELECTION PROCESS DENIED MR. RODRIGUEZ HIS RIGHTS UNDER THE DUE PROCESS, RIGHT TO APPEAL, CRUEL AND UNUSUAL PUNISHMENT AND TRIAL BY JURY CLAUSES. MR. RODRIGUEZ WAS DEPRIVED OF AN OPPORTUNITY TO MAKE AN ADEQUATE RECORD ON THE DEMEANOR OF THE PROSPECTIVE JURORS, ESPECIALLY SINCE THE COURT PREVENTED HIM FROM MAKING A CONTEMPORANEOUS ORAL RECORD ON THAT MATTER.

58. THE GROUNDS AND ALLEGATIONS CONTAINED IN THE *OB-*

*JECTIONS AND OBSERVATIONS, MOTION TO QUASH JURY PANEL AND MOTION FOR ADDITIONAL SPECIFIED AND OTHER APPROPRIATE RELIEF*, ENTITLE MR. RODRIGUEZ TO HAVE THE DEATH SENTENCE AND CONVICTIONS VACATED, AS DOES THE TRIAL COURT'S FAILURE TO ALLOW A HEARING AND THE COURT'S FAILURE TO GRANT RELIEF.

59. THE COURT'S REFUSAL TO ALLOW DEFENSE COUNSEL TO RE–OPEN VOIR DIRE OF THE PANEL OF PROSPECTIVE JURORS FIRST QUESTIONED BY MS. DESMOND WAS PREJUDICIAL ERROR SINCE THE ORIGINAL VOIR DIRE WAS INADEQUATE DUE TO THAT COUNSEL'S INEXPERIENCE AND MENTAL AND PHYSICAL STATE.

60. THE TRIAL COURT'S UNDISCLOSED COMMUNICATIONS WITH JURORS DURING TRIAL VIOLATED THE DUE PROCESS, CRUEL AND UNUSUAL PUNISHMENT AND TRIAL BY JURY CLAUSES OF THE FEDERAL AND COLORADO CONSTITUTIONS AS DID THE COURT'S REFUSAL TO ALLOW MR. RODRIGUEZ A HEARING AND A RECORD ON APPEAL ON THIS MATTER.

61. MR. RODRIGUEZ ASSERTS ALL OF THE CLAIMS PRESENTED IN HIS MOTION TO QUASH INFORMATION, MOTION TO QUASH JURY PANEL, MOTION TO STAY PROCEEDINGS, MOTION FOR HEARING, FILED NOVEMBER 25, 1986. THE DEATH SENTENCE AND CONVICTIONS SHOULD ALSO BE VACATED DUE TO THE TRIAL COURT'S INEXCUSABLE FAILURES TO ALLOW HEARINGS ON THE ISSUES RAISED THEREIN AND TO GRANT RELIEF AT THE TIME. THE COURT'S REFUSAL TO ALLOW THE ACCUSED AN OPPORTUNITY TO MAKE AN ADEQUATE RECORD OR SHOWING CONCERNING THE MANNER IN WHICH THE JURY PANEL WAS SELECTED AND CHOSEN, INCLUDING THE DECISIONS OF THE JURY COMMISSIONER EXCUSING PROSPECTIVE JURORS, DENIED MR. RODRIGUEZ DUE PROCESS OF LAW AND HIS RIGHT TO A FAIR TRIAL BY IMPARTIAL JURY. THE JURY SUMMONING AND SELECTION PROCESS IN THIS CASE VIOLATED THE DUE PROCESS AND TRIAL BY JURY CLAUSES OF THE FEDERAL AND STATE CONSTITUTIONS, AND THE CONTROLLING STATUTES.

62. MR. RODRIGUEZ WAS DENIED HIS FUNDAMENTAL RIGHTS BECAUSE THE TRIAL COURT EMPLOYED INCONSISTENT STANDARDS FOR EXCUSING PROSPECTIVE JURORS WHO WERE SUPPOSEDLY UNABLE TO FOLLOW THE LAW BECAUSE THEY WERE OPPOSED TO THE DEATH PENALTY AND THOSE WHO WERE UNABLE TO DO SO BECAUSE OF SOME BIAS IN FAVOR OF THE DEATH PENALTY. THE COURT TENDED TO EXCUSE THOSE WHO WERE OPPOSED TO DEATH MORE EASILY THAN THOSE PRONE TO KILL.

63. THE JURY SUMMONING AND SELECTION PROCESS IN THIS CASE VIOLATED THE DUE PROCESS AND TRIAL BY JURY CLAUSES OF THE FEDERAL AND STATE CONSTITUTIONS AND THE CONTROLLING STATUTES.

64. MR. RODRIGUEZ' RIGHTS UNDER THE TRIAL BY JURY, RIGHT TO COUNSEL, CRUEL AND UNUSUAL PUNISHMENT AND DUE PROCESS CLAUSES OF THE UNITED STATES AND COLORADO CONSTITUTIONS, AND CRIM.P. 24 WERE VIOLATED BY THE TRIAL

COURT'S TOTAL PRECLUSION OF *VOIR DIRE* BY DEFENSE COUNSEL ON CLAIMED HARDSHIPS, AND BY THE COURT'S INADEQUATE *VOIR DIRE* ON CLAIMED HARDSHIPS.

65. THE EXCLUSION OF DEFENSE COUNSEL FROM *VOIR DIRE* ON PUBLICITY AND CHALLENGE FOR CAUSE ISSUES AND THE TRIAL COURT'S OWN INADEQUATE *VOIR DIRE* AND INSTRUCTIONS ON THOSE ISSUES WAS PREJUDICIAL ERROR.

66. THE COURT'S REFUSAL TO *VOIR DIRE* ON THE MATTER OF THE FRONT–PAGE NEWS OF THE GOVERNOR OF NEW MEXICO'S COMMUTATION OF ALL DEATH ROW INMATES IN THAT STATE WAS AN ABUSE OF DISCRETION AND DENIED MR. RODRIGUEZ DUE PROCESS, A FAIR TRIAL BY IMPARTIAL JURY AND HIS RIGHTS UNDER THE CRUEL AND UNUSUAL PUNISHMENT CLAUSES AND CRIM.P. 24.

67. THE COURT'S REFUSAL TO EXCUSE JUROR [J.A.] FOR CAUSE WAS ERROR WHERE VOIR DIRE ESTABLISHED THAT THE POTENTIAL JUROR REFUSED TO BELIEVE THAT LIFE IN PRISON MEANT AT LEAST 20 YEARS OF INCARCERATION UNDER THE LAW.

68. THE TRIAL COURT ERRED BY ITS DENIAL OF THE CHALLENGE FOR CAUSE TO [JUROR J.B.] WHERE VOIR DIRE ESTABLISHED THAT THAT POTENTIAL JUROR WAS BIASED AGAINST MR. RODRIGUEZ.

69. THE TRIAL COURT ERRED BY ITS DENIAL OF THE CHALLENGE FOR CAUSE TO [JUROR D.L.].

70. THE TRIAL COURT ERRED BY ITS DENIAL OF THE CHALLENGE FOR CAUSE TO [JUROR D.G.]

71. THE TRIAL COURT ERRED BY ITS DENIAL OF THE CHALLENGE FOR CAUSE TO [JUROR R.M.].

72. THE TRIAL COURT ERRED BY ITS DENIAL OF THE CHALLENGE FOR CAUSE TO [JUROR R.K.].

73. THE TRIAL COURT ERRED BY ITS DENIAL OF THE CHALLENGE FOR CAUSE TO [JUROR K.G.], AND ITS REFUSAL TO ALLOW DEFENSE COUNSEL TO QUESTION HER AGAIN.

74. THE TRIAL COURT ERRED BY ITS DENIAL OF THE CHALLENGE FOR CAUSE TO [JUROR A.R.].

75. THE TRIAL COURT ERRED BY ITS DENIAL OF THE CHALLENGE FOR CAUSE TO [JUROR J.D.].

76. THE TRIAL COURT ERRED BY ITS DENIAL OF THE CHALLENGE FOR CAUSE TO JUROR [G.P.], AND BY ITS REFUSAL TO INSTRUCT HER AND THE OTHER JURORS NOT TO DISCUSS OR CONSIDER THAT FACT IN THEIR DELIBERATIONS.

77. THE TRIAL COURT'S EXCUSALS OF JURORS FOR THEIR VIEWS CONCERNING THE DEATH PENALTY WERE IMPROPER AND CONTRARY TO THE LAW, AND MR. RODRIGUEZ WAS THEREBY DENIED DUE PROCESS OF LAW, A FAIR TRIAL BY IMPARTIAL JURY AND HIS RIGHTS UNDER THE CRUEL AND UNUSUAL PUNISHMENT CLAUSES.

78. THE COURT ERRED BY REFUSING TO EXCUSE FOR CAUSE THE JURORS WHO WERE AWARE OF THE CONVICTION AND SENTENCE OF MR. RODRIGUEZ' BROTHER FOR THE SAME CHARGES.

79. THE COURT'S REFUSAL TO INSTRUCT THE SEVERAL PROSPECTIVE AND ACTUAL JURORS WHO WERE AWARE OF THE

CONVICTION OF MR. RODRI-GUEZ' BROTHER NOT TO CONSIDER THAT FACT AND NOT TO DISCUSS THAT CONVICTION WITH OTHER JURORS WAS PREJUDICIAL ERROR.

80. THE UNREASONABLE TIME AND SUBJECT MATTER LIMITATIONS PLACED ON DEFENSE COUNSEL'S VOIR DIRE VIOLATED CRIM.P. 24 AND THE DUE PROCESS AND TRIAL BY JURY CLAUSES OF THE FEDERAL AND COLORADO CONSTITUTIONS, AND DENIED MR. RODRIGUEZ HIS RIGHT TO THE INTELLIGENT EXERCISE OF PEREMPTORY AND CAUSE CHALLENGES. THE COURT'S ORDER THAT NO CONTEMPORANEOUS OBJECTIONS TO THE LIMITATIONS COULD BE MADE PREVENTED THE ACCUSED FROM MAKING A RECORD ON THE EFFECTS OF THE COURT'S ORDERS AND DENIED THE ACCUSED HIS FUNDAMENTAL RIGHTS.

81. MR. RODRIGUEZ WAS DENIED A FAIR TRIAL BY IMPARTIAL JURY, DUE PROCESS, A JURY DRAWN FROM A RANDOM CROSS SECTION OF THE COMMUNITY, AND HIS RIGHTS UNDER THE JURY SELECTION ACT, BY THE COURT'S MANNER OF ARBITRARILY AND UNFAIRLY DISTRIBUTING JURORS WHO UNSUCCESSFULLY CLAIMED HARDSHIPS AMONG THE PANELS OF THOSE WHO HAD NOT, BY ITS FAILURE TO ADEQUATELY ADVISE THE PROSPECTIVE JURORS OF THE MEANING OF AND MINIMAL REQUIREMENTS OF A HARDSHIP MERITING AN EXCUSE FROM JURY DUTY BEFORE ASKING THE ENTIRE VENIRE TO SEPARATE THEMSELVES ON THE BASIS OF CLAIMED HARDSHIPS, AND BY ITS FAILURE TO COMPLETE THE PROCESS OF EXAMINING AND QUALIFYING POTENTIAL JURORS WHO CLAIMED HARDSHIPS.

82. THE TRIAL COURT'S REFUSAL TO STRIKE THE PANEL OF PROSPECTIVE JURORS TO WHOM THE STATE ARGUED THAT MR. RODRIGUEZ TRIED TO GET SENTENCED AROUND CHRISTMAS FOR SYMPATHY PURPOSES, OR TO GRANT ANY OTHER RELIEF WAS ERROR.

83. THE TRIAL COURT USED AN INCORRECT LEGAL STANDARD IN ITS DECISIONS TO EXCLUDE JURORS BECAUSE OF THEIR SCRUPLES AGAINST THE DEATH PENALTY. THE DEATH SENTENCE MUST THUS BE VACATED.

84. THE TRIAL COURT'S USE OF AN IMPROPER STANDARD FOR EXCUSING SCRUPLED PROSPECTIVE JURORS VIOLATED MR. RODRIGUEZ' RIGHTS TO A FAIR AND IMPARTIAL JURY, DUE PROCESS OF LAW AND THE PROHIBITIONS OF CRUEL AND UNUSUAL PUNISHMENT.

85. THE TRIAL COURT ERRED BY REFUSING TO PRECLUDE THE PROSECUTION FROM ARGUING OR PRESENTING EVIDENCE ON THEORIES INCONSISTENT WITH FACTS OR THEORIES ARGUED WITH RESPECT TO THE CO-DEFENDANTS.

86. THE EXCLUSION OF RELEVANT AND EXCULPATORY EVIDENCE OF DAVID MARTINEZ' PHYSICAL CONDITION AFTER HIS ARREST VIOLATED THE DUE PROCESS, COMPULSORY PROCESS, CONFRONTATION AND CRUEL AND UNUSUAL PUNISHMENT CLAUSES.

87. THE DUE PROCESS, CRUEL AND UNUSUAL PUNISHMENT AND EQUAL PROTECTION CLAUSES OF THE FEDERAL AND COLORADO CONSTITUTIONS, AND THE DEATH STATUTE, WERE VIOLAT-

ED BY THE TRIAL COURT'S REFUSAL TO PUT A BURDEN OF PROOF ON THE PROSECUTION TO PROVE THAT MITIGATING FACTORS DID NOT EXIST.

88. THE TRIAL COURT'S ALLOWING DR. OGURA TO TESTIFY AS TO PHOTOGRAPHS NOT OFFERED OR ADMITTED INTO EVIDENCE WAS ERROR. MR. RODRIGUEZ WAS THUS DENIED DUE PROCESS OF LAW AND HIS RIGHT TO A FAIR AND IMPARTIAL JURY AND HIS RIGHTS UNDER THE CRUEL AND UNUSUAL PUNISHMENT CLAUSES, ALL UNDER BOTH THE FEDERAL AND COLORADO CONSTITUTIONS.

89. MR. RODRIGUEZ WAS NOT ADEQUATELY ADVISED OF AND DID NOT MAKE ADEQUATE WAIVERS OF HIS CONSTITUTIONAL RIGHT TO TESTIFY AT ANY OF THE THREE PARTS OF THE TRIAL IN THIS CASE.

90. THE ADMISSION OF THE CUMULATIVE, INFLAMMATORY PHOTOGRAPHS OF THE VICTIM AND THE SCENE WHERE THE CAR WAS LOCATED VIOLATED THE DUE PROCESS AND TRIAL BY JURY CLAUSES AND THE RULES OF EVIDENCE. THE SHOWING OF THOSE PHOTOS TO THE JURY BEFORE THEY WERE ADMITTED INTO EVIDENCE WAS ALSO ERROR.

91. THE COURT'S PERMITTING OF THE STATE'S EXAMINATION OF MARGIE MARQUEZ AS TO THE "STYLE" OF LETTERS FROM MR. RODRIGUEZ, AFTER SUSTAINING THE STATE'S OBJECTION TO THE SAME INQUIRY BY DEFENSE COUNSEL, IS INDICATIVE OF THE COURT'S BIAS AND WAS ONE-SIDED AND UNFAIR. MR. RODRIGUEZ WAS DENIED HIS RIGHTS TO DUE PROCESS OF LAW AND COMPULSORY PROCESS AND TO PRESENT EVIDENCE IN MITIGATION.

92. THE STATE'S CROSS–EXAMINATION OF [DENVER COUNTY JAIL CHAPLAIN], AN IMPORTANT MITIGATION WITNESS, CONCERNING HIS TESTIMONY IN THE TRIAL OF MR. RODRIGUEZ' BROTHER, CHRIS, THE LAWYER WHO REPRESENTED CHRIS, AND THE PHYSICAL CONDITIONS OF THE DENVER COUNTY JAIL, WAS IMPROPER, ALLOWED THE INTRODUCTION OF PREJUDICIAL AND IRRELEVANT MATTERS, AND WAS UNFAIR BECAUSE THE COURT HAD SUPPRESSED EVIDENCE OF THE ACTUAL CONDITIONS IN PRISON OFFERED BY MR. RODRIGUEZ.

93. THE TRIAL COURT'S RULING THAT THE STATEMENTS OF MR. RODRIGUEZ WERE VOLUNTARY WAS ERRONEOUS AND ALSO DENIED MR. RODRIGUEZ HIS RIGHT TO TESTIFY IN HIS OWN DEFENSE AND AT THE PENALTY PHASE.

94. THE COURT'S REFUSAL TO REQUIRE DAVID MARTINEZ TO COOPERATE WITH DEFENSE COUNSEL'S INVESTIGATION UNDER PENALTY OF CONTEMPT DENIED MR. RODRIGUEZ DUE PROCESS OF LAW AND HIS RIGHTS TO COMPULSORY PROCESS AND CONFRONTATION AND THE PROHIBITIONS OF CRUEL AND UNUSUAL PUNISHMENT.

95. THE TRIAL COURT'S REFUSAL TO ALLOW THE JAIL PSYCHIATRIST TO TESTIFY CONCERNING THE PSYCHOTROPIC DRUGS MR. RODRIGUEZ WAS TAKING DURING TRIAL, WHICH AFFECTED HIS DEMEANOR, WITHOUT A TOTAL WAIVER OF THE DOCTOR–PATIENT PRIVILEGE, AND WITHOUT ALLOWING THE STATE TO INQUIRE INTO THOSE

PRIVILEGED MATTERS, VIOLAT-ED THE DUE PROCESS AND CRUEL AND UNUSUAL PUNISH-MENT CLAUSES OF THE FEDERAL AND COLORADO CONSTITUTIONS AND THE DEATH STATUTE.

96. THE TRIAL COURT'S REFUSAL TO ALLOW MR. RODRIGUEZ TO CALL THE PROSECUTOR AS A WITNESS AFTER THE STATE INTENTIONALLY CREATED A FALSE AND EXTREMELY PREJUDICIAL IMPRESSION OF COLLUSION AND MISCONDUCT BY DEFENSE COUNSEL THROUGH ITS QUESTIONING OF MARGIE MARQUEZ, DENIED MR. RODRIGUEZ HIS CONSTITUTIONAL RIGHTS.

97. MR. RODRIGUEZ' STATEMENTS AND LETTERS TO MARGIE MARQUEZ WERE INVOLUNTARY AND WERE OBTAINED IN VIOLATION OF MR. RODRIGUEZ' RIGHTS TO DUE PROCESS, COUNSEL AND THE PRIVILEGE AGAINST SELF INCRIMINATION, ALL UNDER BOTH THE FEDERAL AND COLORADO CONSTITUTIONS AND SHOULD HAVE BEEN SUPPRESSED.

98. THE COURT'S ACTIONS RESULTING IN MR. RODRIGUEZ NOT BEING REPRESENTED BY COUNSEL AT THE FIRST DAY OF TRIAL DENIED MR. RODRIGUEZ DUE PROCESS OF LAW, A FAIR TRIAL BY IMPARTIAL JURY, AND HIS RIGHTS TO COUNSEL, EQUAL PROTECTION OF THE LAWS, AND THE PROHIBITIONS OF CRUEL AND UNUSUAL PUNISHMENT.

99. THE COURT'S "ORDER RE: TRIAL SCHEDULE" AND "AMENDED ORDER" VIOLATED MR. RODRIGUEZ' FUNDAMENTAL RIGHTS IN ALL OF THE RESPECTS NOTED IN THE *OBJECTIONS TO ORDER REGARDING TRIAL SCHEDULE AND AMENDED ORDER,*

AND IN ADDITION THOSE ORDERS DENIED MR. RODRIGUEZ ALL OF THE RIGHTS NOTED HEREIN. THE COURT'S REFUSAL TO ALLOW A HEARING ON THOSE CLAIMS ALSO VIOLATED THE FUNDAMENTAL RIGHTS NOTED HEREIN.

100. THE ORDER PROHIBITING [DENVER COUNTY JAIL CHAPLAIN] FROM WEARING HIS ECCLESIASTICAL COLLAR IF HE SAT WITH THE FAMILY OF MR. RODRIGUEZ DURING TRIAL WAS AN OUTRAGEOUS EXHIBITION OF THE TRIAL COURT'S FAVORITISM TOWARD THE PROSECUTION AND BIAS AGAINST THE ACCUSED. THIS FAVORITISM AND BIAS WAS DEMONSTRATED THROUGHOUT THE TRIAL BY THE COURT'S DISPARATE TREATMENT OF THE FAMILY OF MR. RODRIGUEZ AND THE SUPPORTERS OF THE PROSECUTION.

101. THE TRIAL COURT'S REFUSAL TO SENTENCE MR. RODRIGUEZ ON THE HABITUAL CRIMINAL COUNTS BEFORE THE PENALTY PHASE WAS PREJUDICIAL ERROR. THIS DENIAL OF THE RIGHT TO PRESENT EVIDENCE IN MITIGATION VIOLATED THE DUE PROCESS AND CRUEL AND UNUSUAL PUNISHMENT CLAUSES AND THE DEATH STATUTE.

102. THE TRIAL COURT'S REFUSAL TO COMPLY WITH THE SUPREME COURT'S ORDER REGARDING THE FIRST DAY OF TRIAL, AFTER THE COURT CONFESSED THE SHOW CAUSE ORDER ARISING FROM THE ORIGINAL PROCEEDING, VIOLATED THE DUE PROCESS, TRIAL BY JURY AND RIGHT TO COUNSEL CLAUSES, AS WELL AS THE ORDER OF THE SUPREME COURT.

103. THE TRIAL COURT ERRED BY IMPOSING AN UNREALISTIC AND UNDULY HARSH TRIAL

SCHEDULE. THE TRIAL COURT'S MANNER OF PROCEEDING DURING JURY SELECTION, FORCING DEFENSE COUNSEL TO WORK 12 TO 14 HOURS DAILY IN COURT, WITH NO OPPORTUNITY FOR EVEN A DECENT MEAL, INTERFERED WITH AND DESTROYED DEFENSE COUNSEL'S ABILITY TO BE PREPARED AND TO PROVIDE ASSISTANCE OF COUNSEL FOR MR. RODRIGUEZ AND DENIED MR. RODRIGUEZ THOSE RIGHTS AND DUE PROCESS OF LAW.

104. THE CHARGES AND DEATH SENTENCE SHOULD BE DISMISSED DUE TO THE PROSECUTIONS VIOLATIONS OF DUE PROCESS.

105. THE PROSECUTION'S OUTRAGEOUS MISCONDUCT REGARDING ITS DEALINGS WITH MARGIE MARQUEZ WHEN SHE WAS REPRESENTED BY COUNSEL FOR MR. RODRIGUEZ VIOLATED THE DUE PROCESS AND RIGHT TO COUNSEL CLAUSES.

106. THE STATE'S EGREGIOUS AND PERVASIVE MISCONDUCT DURING CLOSING ARGUMENTS AT THE GUILT/INNOCENCE PHASE DENIED MR. RODRIGUEZ HIS RIGHTS UNDER THE DUE PROCESS, TRIAL BY JURY AND CRUEL AND UNUSUAL PUNISHMENT CLAUSES, ESPECIALLY WHEN COMBINED WITH THE COURT'S ORDER THAT DEFENSE COUNSEL NOT OBJECT AND THE JURY INSTRUCTIONS.

107. THE TRIAL COURT ERRED BY REQUIRING THAT THE JURY FIND THAT MR. RODRIGUEZ WAS NOT GUILTY OF FIRST DEGREE MURDER AFTER DELIBERATION BEFORE IT WAS PERMITTED TO CONSIDER WHETHER HE WAS GUILTY OF SECOND DEGREE MURDER. THIS COERCED THE JURY INTO RETURNING A VERDICT OF GUILTY OF THE GREATER CHARGE AND VIOLATED THE PRINCIPLES SET FORTH IN *BECK V. ALABAMA*, 447 U.S. 625, 100 S.Ct. 2382, 65 L.Ed.2d 392 (1980).

108. THE JURY INSTRUCTIONS PERMITTED THE JURY TO FIND MR. RODRIGUEZ GUILTY FOR CONDUCT HE WAS NOT CHARGED WITH COMMITTING. THIS VIOLATED THE DUE PROCESS AND TRIAL BY JURY CLAUSES.

109. THE JURY INSTRUCTIONS FAILED TO EXPLAIN SEVERAL OF THE ESSENTIAL ELEMENTS OF FIRST DEGREE SEXUAL ASSAULT, AND THE INSTRUCTIONS ALLOWED A GUILTY VERDICT AND DEATH SENTENCE BASED UPON AN UNCHARGED CRIME SUPPLIED TO THE JURY BY THE COURT IN THE INSTRUCTIONS. MR. RODRIGUEZ WAS THEREBY DENIED HIS RIGHT TO TRIAL BY JURY. THE FELONY MURDER, KIDNAPPING AND MOTOR VEHICLE THEFT CONVICTIONS, AND THE DEATH PENALTY BASED UPON ALL OF THOSE CONVICTIONS SHOULD BE VACATED.

110. THE CONVICTION FOR FIRST DEGREE SEXUAL ASSAULT VIOLATES THE DUE PROCESS AND TRIAL BY JURY CLAUSES BECAUSE THE JURY WAS NOT REQUIRED TO UNANIMOUSLY DECIDE ON EITHER THE FACTS OR LEGAL THEORY BEHIND THE CHARGE. THE SEXUAL ASSAULT CONVICTION, AND THE FELONY MURDER, KIDNAPPING, AND FIRST DEGREE AGGRAVATED MOTOR VEHICLE THEFT CONVICTIONS PRESUMABLY BASED THEREUPON, ARE ALSO INVALID, AS IS THE DEATH SENTENCE.

111. THE JURY INSTRUCTIONS FAILED TO EXPLAIN SEVERAL OF THE ESSENTIAL ELEMENTS OF FIRST DEGREE SEXUAL AS-

SAULT. MR. RODRIGUEZ WAS THEREBY DENIED DUE PROCESS. THE FELONY MURDER, KIDNAPPING AND MOTOR VEHICLE THEFT CONVICTIONS, AND THE DEATH PENALTY BASED UPON THE SEXUAL ASSAULT, FELONY MURDER AND OTHER CONVICTIONS SHOULD ALSO BE VACATED, SINCE THEY ALSO VIOLATE THE DUE PROCESS AND CRUEL AND UNUSUAL PUNISHMENT CLAUSES.

112. THERE WAS INSUFFICIENT EVIDENCE TO SUPPORT THE CONVICTION FOR FIRST DEGREE SEXUAL ASSAULT. THE CONVICTION FOR THAT OFFENSE, AND THE MURDER, KIDNAPPING AND MOTOR VEHICLE THEFT CONVICTIONS BASED ON THAT ALLEGATION SHOULD ALSO BE VACATED. THE DEATH SENTENCE SHOULD ALSO BE VACATED, SINCE IT WAS BASED ON ALL OF THESE UNCONSTITUTIONAL CONVICTIONS.

113. MR. RODRIGUEZ WAS DENIED DUE PROCESS BECAUSE THE INSTRUCTIONS TO THE JURY OMITTED ESSENTIAL ELEMENTS OF THE SECOND DEGREE KIDNAPPING CHARGE. FURTHER, MR. RODRIGUEZ WAS DENIED DUE PROCESS AND HIS RIGHTS UNDER THE CRUEL AND UNUSUAL PUNISHMENT CLAUSES BY THE JURY'S CONSIDERATION OF THE UNCONSTITUTIONAL KIDNAPPING CONVICTION AS TO THE PENALTY.

114. THE INSTRUCTIONS CONCERNING THE CHARGE OF SECOND DEGREE KIDNAPPING OMITTED SEVERAL ESSENTIAL ELEMENTS OF THE OFFENSE AND DENIED MR. RODRIGUEZ A TRIAL BY JURY UNDER THE FEDERAL AND COLORADO CONSTITUTIONS. FURTHER, MR. RODRIGUEZ WAS DENIED DUE PROCESS AND HIS RIGHTS UNDER THE CRUEL AND UNUSUAL PUNISHMENT CLAUSES BY THE JURY'S CONSIDERATION OF THE UNCONSTITUTIONAL CONVICTION FOR SECOND DEGREE KIDNAPPING AND RELATED CONVICTIONS AS TO THE PENALTY.

115. THE INSTRUCTIONS TO THE JURY CONCERNING THE AGGRAVATED ROBBERY CHARGE OMITTED ESSENTIAL ELEMENTS OF THE OFFENSE AND THUS DENIED MR. RODRIGUEZ A TRIAL BY JURY. FURTHER, MR. RODRIGUEZ WAS DENIED DUE PROCESS, A TRIAL BY JURY AND HIS RIGHTS UNDER THE CRUEL AND UNUSUAL PUNISHMENT CLAUSES BY THE JURY'S CONSIDERATION OF THE UNCONSTITUTIONAL AGGRAVATED ROBBERY CONVICTION AND RELATED CONVICTIONS AS TO THE PENALTY.

116. THE TRIAL COURT'S INSTRUCTIONS TO THE JURY CONCERNING THE AGGRAVATED ROBBERY CHARGE OMITTED ESSENTIAL ELEMENTS OF THE OFFENSE AND THUS DENIED MR. RODRIGUEZ DUE PROCESS UNDER THE FEDERAL AND COLORADO CONSTITUTIONS. FURTHER, MR. RODRIGUEZ WAS DENIED DUE PROCESS OF LAW AND HIS RIGHTS UNDER THE CRUEL AND UNUSUAL PUNISHMENT CLAUSES BY THE JURY'S CONSIDERATION OF THE UNCONSTITUTIONAL AGGRAVATED ROBBERY CONVICTION AS TO THE PENALTY.

117. THE INSTRUCTIONS TO THE JURY REGARDING FIRST DEGREE AGGRAVATED MOTOR VEHICLE THEFT OMITTED NUMEROUS ESSENTIAL ELEMENTS OF THAT OFFENSE, THUS DENYING MR. RODRIGUEZ DUE PROCESS. THAT CONVICTION AND THE

DEATH SENTENCE BASED THEREUPON SHOULD BE VACATED.

118. THE INSTRUCTIONS TO THE JURY CONCERNING FIRST–DEGREE AGGRAVATED MOTOR VEHICLE THEFT OMITTED ESSENTIAL ELEMENTS OF THE OFFENSE AND DENIED MR. RODRIGUEZ A TRIAL BY JURY UNDER THE FEDERAL AND COLORADO CONSTITUTIONS. FURTHER, MR. RODRIGUEZ WAS DENIED DUE PROCESS AND HIS RIGHTS UNDER THE CRUEL AND UNUSUAL PUNISHMENT AND TRIAL BY JURY CLAUSES BY THE JURY'S CONSIDERATION OF THE UNCONSTITUTIONAL FIRST–DEGREE AGGRAVATED MOTOR VEHICLE THEFT CONVICTION AND THE PRESUMABLY RELATED CONSPIRACY CONVICTION AS TO THE PENALTY.

119. THE CIRCULAR CHARGES AND CONVICTIONS FOR FIRST DEGREE MURDER, FIRST DEGREE SEXUAL ASSAULT AND SECOND DEGREE KIDNAPPING, AND FIRST DEGREE AGGRAVATED MOTOR VEHICLE THEFT, AND THE CONSPIRACY CHARGES, VIOLATE THE DUE PROCESS AND DOUBLE JEOPARDY CLAUSES OF THE FEDERAL AND COLORADO CONSTITUTIONS, AND THEY AND THE DEATH SENTENCE SHOULD BE VACATED.

120. THE INSTRUCTIONS ON THE FELONY–MURDER CHARGE FAILED TO PROVIDE MANY OF THE ESSENTIAL ELEMENTS OF THE ALLEGED OFFENSE; THUS, THE DUE PROCESS CLAUSES WERE VIOLATED AND THE DEATH SENTENCE BASED ON THAT CONVICTION SHOULD BE VACATED UNDER THE DUE PROCESS, TRIAL BY JURY AND CRUEL AND UNUSUAL PUNISHMENT CLAUSES.

121. THE FELONY–MURDER CONVICTION IS INVALID BECAUSE THE INSTRUCTIONS FAIL TO REQUIRE THAT THE JURY UNANIMOUSLY AGREE ON AT LEAST ONE OF THE THREE DIFFERENT THEORIES OF LIABILITY THAT WERE PUT FORTH BY THE STATE. THE DEATH SENTENCE BASED THEREUPON SHOULD THUS BE VACATED.

122. THE INSTRUCTIONS ON THE FELONY–MURDER CHARGE FAILED TO PROVIDE MANY OF THE ESSENTIAL ELEMENTS OF THE ALLEGED OFFENSE; THUS, THE TRIAL BY JURY CLAUSES WERE VIOLATED AND THE DEATH SENTENCE BASED ON THAT CONVICTION SHOULD BE VACATED UNDER THE DUE PROCESS, TRIAL BY JURY AND CRUEL AND UNUSUAL PUNISHMENT CLAUSES.

123. THE JURY INSTRUCTIONS ON THE CHARGE OF CONSPIRACY TO COMMIT FIRST DEGREE MURDER WERE DEFICIENT AND DENIED MR. RODRIGUEZ HIS RIGHT TO A TRIAL BY JURY. THE DEATH SENTENCE BASED UPON THAT CONVICTION MUST ALSO BE VACATED.

124. THE JURY INSTRUCTIONS ON THE CHARGE OF CONSPIRACY TO COMMIT FIRST DEGREE MURDER WERE DEFICIENT AND DENIED MR. RODRIGUEZ HIS RIGHTS TO DUE PROCESS OF LAW. THE DEATH SENTENCE BASED UPON THAT CONVICTION MUST ALSO BE VACATED.

125. THE JURY INSTRUCTIONS ON THE CHARGE OF CONSPIRACY TO COMMIT SECOND DEGREE KIDNAPPING WERE DEFICIENT AND DENIED MR. RODRIGUEZ HIS RIGHT TO A TRIAL BY JURY.

126. THE JURY INSTRUCTIONS ON THE CHARGE OF CONSPIRACY

TO COMMIT SECOND DEGREE KIDNAPPING WERE DEFICIENT AND DENIED MR. RODRIGUEZ HIS RIGHTS TO DUE PROCESS OF LAW.

127. THE JURY INSTRUCTIONS ON THE CHARGE OF CONSPIRACY TO COMMIT MOTOR VEHICLE THEFT WERE DEFICIENT AND DENIED MR. RODRIGUEZ HIS RIGHT TO A TRIAL BY JURY.

128. THE INSTRUCTIONS ON THE CHARGE OF CONSPIRACY TO COMMIT MOTOR VEHICLE THEFT WERE DEFICIENT AND DENIED MR. RODRIGUEZ HIS RIGHT TO DUE PROCESS.

129. THE COURT'S FAILURE TO DEFINE THE ESSENTIAL ELEMENT OF THE THREE CONSPIRACY CHARGES OF "ATTEMPT" FOR THE JURY DENIED MR. RODRIGUEZ DUE PROCESS AND HIS RIGHT TO A TRIAL BY JURY AS TO THOSE ESSENTIAL ELEMENTS OF THE CHARGED OFFENSES, UNDER THE FEDERAL AND COLORADO CONSTITUTIONS.

130. THE ERRONEOUS INSTRUCTION ON COMPLICITY DENIED MR. RODRIGUEZ HIS RIGHTS TO DUE PROCESS AND TO A TRIAL BY JURY AND CAUSED THE JURY TO RETURN A DEATH VERDICT.

131. THE COMPLICITY INSTRUCTION GIVEN AT THE GUILT/INNOCENCE TRIAL WAS AN INCORRECT STATEMENT OF THE LAW AND ALLOWED THE JURY TO CONVICT MR. RODRIGUEZ WHEN HE WAS, IN FACT, NOT GUILTY OF THE CHARGED OFFENSES. MR. RODRIGUEZ WAS THEREBY DENIED DUE PROCESS OF LAW, A TRIAL BY JURY, AND HIS RIGHTS UNDER THE CRUEL AND UNUSUAL PUNISHMENT CLAUSES. THE CONVICTIONS AND SENTENCES BASED THEREUPON, INCLUDING THE DEATH SENTENCE, SHOULD THUS BE VACATED.

132. THE CONVICTION FOR FIRST DEGREE SEXUAL ASSAULT VIOLATES THE DUE PROCESS AND TRIAL BY JURY CLAUSES BECAUSE THE JURY WAS NOT REQUIRED TO UNANIMOUSLY DECIDE ON EITHER THE FACTS OR LEGAL THEORY BEHIND THE CHARGE. THE SEXUAL ASSAULT CONVICTION, AND THE MURDER, KIDNAPPING, AND MOTOR VEHICLE THEFT CONVICTIONS, AND THE DEATH PENALTY PRESUMABLY BASED THEREUPON, ARE ALSO INVALID.

133. THE CONVICTION FOR FIRST DEGREE AGGRAVATED MOTOR VEHICLE THEFT VIOLATES THE DUE PROCESS AND TRIAL BY JURY CLAUSES BECAUSE THE JURY WAS NOT REQUIRED TO UNANIMOUSLY DECIDE ON EITHER THE FACTS OR LEGAL THEORY BEHIND THE CHARGE.

134. THE TRIAL COURT'S *SUA SPONTE* SUBMISSION OF THE UNCHARGED ALLEGATION THAT MR. RODRIGUEZ COMMITTED A "CRIME OF VIOLENCE" DURING THE AGGRAVATED MOTOR VEHICLE THEFT, VIOLATED THE DUE PROCESS AND CRUEL AND UNUSUAL PUNISHMENT CLAUSES AND DENIED MR. RODRIGUEZ A FAIR TRIAL BY IMPARTIAL JURY. THE RESULTING VERDICT AND SENTENCE SHOULD BE VACATED, AS SHOULD THE DEATH PENALTY WHICH IS BASED ON THAT "CONVICTION" FOR A SERIOUS CRIMINAL OFFENSE.

135. THERE WAS INSUFFICIENT EVIDENCE TO SUPPORT THE JURY FINDINGS ON THE CRIME OF VIOLENCE ALLEGATIONS, AND THE DEATH SENTENCE AND THE OTHER SENTENCES SHOULD THUS BE VACATED

SINCE THEY VIOLATE THE DUE PROCESS AND CRUEL AND UNUSUAL PUNISHMENT CLAUSES OF THE FEDERAL AND COLORADO CONSTITUTIONS.

136. THE INSTRUCTIONS TO THE JURY THAT THE "CRIME OF VIOLENCE" ALLEGATION WAS A CRIMINAL OFFENSE DENIED MR. RODRIGUEZ HIS RIGHTS UNDER THE CRUEL AND UNUSUAL PUNISHMENT, DUE PROCESS AND TRIAL BY JURY CLAUSES AND COLORADO'S DEATH STATUTE.

137. THE TRIAL COURT'S ACTION IN PROVIDING FIVE VERDICT FORMS ON ONE CRIME OF VIOLENCE ALLEGATION WAS PREJUDICIAL ERROR.

138. THE COURT'S INSTRUCTIONS TO THE JURY OMITTED SEVERAL ESSENTIAL ELEMENTS OF THE "CRIME OF VIOLENCE" ALLEGATIONS, THUS DENYING MR. RODRIGUEZ A TRIAL BY JURY AS TO THOSE ALLEGATIONS AND DUE PROCESS. THE SENTENCES AND DEATH SENTENCE BASED UPON THOSE CONVICTIONS FOR "OFFENSES" VIOLATE THOSE PROVISIONS AND THE CRUEL AND UNUSUAL PUNISHMENT CLAUSES AND SHOULD BE VACATED.

139. THE CRIME OF VIOLENCE ALLEGATION WAS DUPLICITOUS AND VIOLATED THE DUE PROCESS CLAUSES AND THE CONTROLLING STATUTE.

140. MR. RODRIGUEZ WAS DENIED DUE PROCESS OF LAW UNDER THE FEDERAL AND COLORADO CONSTITUTIONS BECAUSE THE INFORMATION PURPORTING TO CHARGE HIM WITH CRIMES WAS DEFECTIVE, FAILED TO CHARGE HIM WITH OFFENSES, AND DID NOT GIVE JURISDICTION TO THE COURT. THE CONVICTIONS AND THE RESULTING DEATH SENTENCE SHOULD BE VACATED.

141. THE EVIDENCE WAS INSUFFICIENT TO SUPPORT THE CONVICTIONS OF AGGRAVATED ROBBERY AND FELONY MURDER, AND THOSE CONVICTIONS AND THE DEATH SENTENCE BASED THEREUPON MUST BE VACATED, SINCE THEY VIOLATE THE DUE PROCESS AND CRUEL AND UNUSUAL PUNISHMENT CLAUSES.

142. THERE WAS INSUFFICIENT EVIDENCE TO SUPPORT THE CONVICTION FOR FIRST DEGREE SEXUAL ASSAULT. THE CONVICTION FOR THAT OFFENSE, AND THE MURDER, KIDNAPPING AND MOTOR VEHICLE THEFT CONVICTIONS BASED ON THAT ALLEGATION SHOULD ALSO BE VACATED. THE DEATH SENTENCE SHOULD ALSO BE VACATED, SINCE IT WAS BASED ON ALL OF THESE UNCONSTITUTIONAL CONVICTIONS.

143. THE UNDERLYING FELONIES MERGED INTO THE FELONY MURDER. THE TRIAL COURT ERRED BY FAILING TO INSTRUCT THE JURY ON THIS CRITICAL FACT, AND BY IMPOSING LIFE SENTENCES FOR THE UNDERLYING FELONIES, AND THE CONVICTIONS AND SENTENCES, AND THE DEATH SENTENCE BASED THEREON, SHOULD BE VACATED SINCE THEY VIOLATE THE DUE PROCESS, DOUBLE JEOPARDY, TRIAL BY JURY AND CRUEL AND UNUSUAL PUNISHMENT CLAUSES OF THE U.S. AND COLORADO CONSTITUTIONS.

144. THE SEXUAL ASSAULT CONVICTION MERGED INTO THE KIDNAPPING CONVICTION. THE TRIAL COURT ERRED BY FAILING TO INSTRUCT THE JURY ON THIS CRITICAL FACT, AND BY IMPOSING A LIFE SENTENCE

FOR THE SEXUAL ASSAULT CONVICTION, AND THE CONVICTION AND SENTENCE, AND THE DEATH SENTENCE BASED THEREON, SHOULD BE VACATED SINCE THEY VIOLATE THE DUE PROCESS, DOUBLE JEOPARDY, TRIAL BY JURY AND CRUEL AND UNUSUAL PUNISHMENT CLAUSES OF THE U.S. AND COLORADO CONSTITUTIONS.

145. THE FIRST DEGREE MURDER CONVICTION MERGED INTO THE CONVICTION FOR FIRST DEGREE AGGRAVATED MOTOR VEHICLE THEFT, SINCE PRESUMABLY THAT FIRST DEGREE MURDER WAS AN ELEMENT OF, AND AN INCLUDED OFFENSE TO, THE FIRST DEGREE AGGRAVATED MOTOR VEHICLE THEFT. THE SEXUAL ASSAULT AND KIDNAPPING CONVICTIONS ALSO MERGE. MR. RODRIGUEZ HAS THUS BEEN DENIED DUE PROCESS OF LAW AND HIS RIGHTS UNDER THE DOUBLE JEOPARDY CLAUSES AND THE MURDER CONVICTION AND DEATH SENTENCE THUS SHOULD BE VACATED.

146. THE COURT'S INSTRUCTION THAT THE POSSIBILITY OF THE DEATH PENALTY SHOULD NOT ENTER INTO THE JURY'S CONSIDERATION OF THE CHARGES AGAINST THE ACCUSED VIOLATED THE PRINCIPLES RECOGNIZED IN *ADAMS V. TEXAS*, 448 U.S. 38, 100 S.Ct. 2521, 65 L.Ed.2d 581 (1980) AND DENIED THE ACCUSED DUE PROCESS AND A FAIR TRIAL BY IMPARTIAL JURY.

147. THE TRIAL COURT'S REFUSAL TO INSTRUCT THE JURY THAT IT SHOULD NOT CONSIDER SYMPATHY FOR THE VICTIM OR PREJUDICE AGAINST THE ACCUSED AT THE TRIAL ON THE NOT GUILTY PLEA WAS ERROR AND DENIED MR. RODRIGUEZ A FAIR TRIAL BY IMPARTIAL JURY, DUE PROCESS OF LAW AND VIOLATED THE PROHIBITIONS OF CRUEL AND UNUSUAL PUNISHMENT UNDER THE FEDERAL AND COLORADO CONSTITUTIONS. THE DEATH SENTENCE AND THE CONVICTIONS SHOULD BE VACATED.

148. THE DISTRICT COURT'S REFUSAL TO PROVIDE MR. RODRIGUEZ WITH THE TRANSCRIPT OF THE OCTOBER 28, 1986, HEARING, IN THE FACE OF ORDERS FROM THIS COURT AND DESIGNATIONS OF RECORD DEMANDS AN INQUIRY FROM THIS COURT AND DENIED MR. RODRIGUEZ HIS FUNDAMENTAL RIGHTS.

149. THE NEWLY DISCOVERED EVIDENCE CLAIM SHOULD HAVE BEEN GRANTED.

150. JUDGE PETERSON'S BIAS AGAINST MR. RODRIGUEZ AND HIS COUNSEL DENIED MR. RODRIGUEZ HIS RIGHT TO DUE PROCESS.

151. MR. RODRIGUEZ WAS NOT COMPETENT TO STAND TRIAL. HE WAS THUS DENIED DUE PROCESS OF LAW, TO EQUAL PROTECTION OF THE LAW, TO THE PROHIBITIONS OF CRUEL AND UNUSUAL PUNISHMENT, AND TO EFFECTIVE ASSISTANCE OF COUNSEL.

Justice SCOTT concurring:

I concur in the reasoning and judgment of the majority. "[A] sentence of death is qualitatively unlike any other punishment and [thus] a corresponding need exists for reliability in the death sentencing procedure." Maj. op. at 253 (citations omitted). Because a sentence of death is uniquely severe and final, Justice Lohr dissenting op. at 323, I write separately to further address the ineffective assistance of counsel argument. In the briefs and at oral argument, Rodriguez posits that a direct correlation exists between the delivery of professional services and race, or defense counsel's ability to represent a

client and defense counsel's racial or ethnic attributes. Without addressing the merits of any such claim, I find the argument, as made today, unacceptable.

Rodriguez contends that the use of a public defender or defense investigator of a race or ethnic background that differs from that of Rodriguez is patently unreasonable. Rodriguez reaches that conclusion by asserting that he would have more likely disclosed mitigating evidence of child abuse had he and those enlisted to serve him been of the same race. Maj. op. at 296. During the 35(c) ineffective assistance of counsel hearing, Rodriguez' initial public defender attempted to substantiate the unreasonableness of the employee selection. When asked whether she had received mitigating evidence from Rodriguez during the course of their meetings, the public defender responded:

I was aware, even at the time that I asked him that, that he was not going to tell me that he had been sexually abused. Our backgrounds were very incredibly different, and although we got along, I don't believe it would have been possible for him to tell me....

... I come from an upper middle-class Anglo background from Southport, Connecticut, where there are no racial problems because there is no one but Anglos....

[Rodriguez'] background was from the west side projects of Denver, a Chicano background. We got along, but there was nothing about the relationship that would have ever let me believe that he would have been able to give me the type of personal information that I realized it was necessary to have.

R., v. 65 at 35–36. Neither Rodriguez' briefs nor his arguments provide a further basis for his claim. Without more, his argument is unpersuasive.

It is insightful, however, to contextualize the circumstances in which the public defend-er asserts Rodriguez' ineffective assistance claim and to evaluate the integrity of the argument within that framework. The claim strains credulity when measured against the racial characteristics of the attorney now presenting the argument or, for that matter, the hiring or contracting practices of the Public Defender.[1] The diversity in the Public Defender's Office is strikingly negligible, especially when, presumably, significant members of the Public Defender's clientele are people of color. This paucity is more clearly highlighted, however, when the public defender contends that a client received ineffective assistance of counsel because an absence of commonality prohibited the delivery of effective legal services, including the collection of mitigating evidence.

I assume the initial public defender and Nora Kelly, Rodriguez' current attorney, both of whom are apparently not of the same race or ethnic background as the defendant, have given Rodriguez' ineffective assistance claim great consideration before (1) asserting the argument, and (2) continuing to represent him, a person of different racial or ethnic background. Because both attorneys appearing on behalf of Rodriguez fail to reflect the very racial or ethnic characteristics Rodriguez posits as necessary to his effective representation, I can only question the integrity of the argument here.

In any event, based on the facts set forth in the record and legal argument offered, I remain unpersuaded that race provides a basis for Rodriguez' claim of ineffective assistance of counsel. While the majority accurately concludes that this issue is without merit, I write separately to raise my concerns and join the judgment of the majority.

Justice KIRSHBAUM concurring in part and dissenting in part.

I concur in the majority's resolution of the issues it addresses. Although it might ini-

---

1. The record does not reflect the racial or ethnic characteristics of the clients represented by the Public Defender or the experience of Rodriguez' current attorney in representing clients of Hispanic descent. However, I do note that out of 51 investigators in the Public Defender's Office 40 are white (78%); 10 are Hispanic (20%); and 1 is African American (2%). Out of 171 Public Defenders 145 are white (85%); 18 are Hispanic (11%); 7 are African American (4%); and 1 is American Indian/Alaskan (.006%). These statistics are taken from the February 12, 1996 State of Colorado Department of Personnel General Support Services: Human Resource Services ADHOC Report: EEO1c.

tially appear that the district court erred in denying Rodriguez' requests for evidentiary hearings on the allegations contained in his Crim.P. 35(c) motion that the jury commissioner acted in violation of the Uniform Jury Selection and Service Act, §§ 13–71–101 to –122, 6 C.R.S. (1973 & 1986 Supp.) (the Act), in selecting prospective jurors (Issue 61) and that Rodriguez was not properly advised of and did not adequately waive his constitutional right to testify at trial (Issue 89), careful examination of the record as a whole supports the majority's conclusion that the district court did not err in its denial of those requests for evidentiary hearings.[1]

On November 25, 1986, Rodriguez filed a motion to quash jury panel with the trial court. The motion contains allegations, supported by an accompanying affidavit, that the jury commissioner improperly excused several classes of potential jurors from the final jury pool, in violation of the Act. However, neither that motion nor Rodriguez' stated argument in his brief filed here contains allegations that the jury pool as ultimately constituted did not represent a random cross-section of the general public. Absent such allegations, evidence establishing the impropriety of the jury commissioner's conduct would not establish a violation of Rodriguez' due process rights.

Similarly, an allegation that a defendant did not knowingly waive the right to testify at trial could in some circumstances require

an evidentiary hearing for resolution of that issue.[2] However, Rodriguez' Crim.P. 35(c) motion contains the following conclusional assertion:

> Mr. Rodriguez was not adequately advised of and did not make adequate waivers of his constitutional right to testify at any of the three parts of the trial in this case.

Rodriguez' motion does not allege any facts in support of those conclusions. In view of this state of the record, the district court did not abuse its discretion in determining this issue solely on the basis of the transcripts of the trial proceedings.

While I concur in the majority's resolution of the issues it addresses, I cannot join the majority's conclusion in part IIA of its opinion that in his appeal to this court Rodriguez has consciously relinquished over eighty of the issues he raised in his Crim.P. 35(c) motion. *See* Maj.op. at 248. I do not speculate whether Rodriguez would or would not prevail on the merits of such issues. I simply do not agree that he has forfeited the procedural right to have the merits of those issues addressed by this court.

The district court dismissed approximately 110 issues contained in Rodriguez' Crim.P. 35(c) motion on the ground that they had been previously litigated. Stating that Rodriguez "specifically asserts" some eighteen of those issues in this appeal, the Majority addresses those eighteen issues. *See* Maj. op.

---

1. Issues 61 and 89 state as follows:

 > 61. MR. RODRIGUEZ ASSERTS ALL OF THE CLAIMS PRESENTED IN HIS MOTION TO QUASH INFORMATION, MOTION TO QUASH JURY PANEL, MOTION TO STAY PROCEEDINGS, MOTION FOR HEARING, FILED NOVEMBER 25, 1986. THE DEATH SENTENCE AND CONVICTIONS SHOULD ALSO BE VACATED DUE TO THE TRIAL COURT'S INEXCUSABLE FAILURES TO ALLOW HEARINGS ON THE ISSUES RAISED THEREIN AND TO GRANT RELIEF AT THE TIME. THE COURT'S REFUSAL TO ALLOW THE ACCUSED AN OPPORTUNITY TO MAKE AN ADEQUATE RECORD OR SHOWING CONCERNING THE MANNER IN WHICH THE JURY PANEL WAS SELECTED AND CHOSEN, INCLUDING THE DECISIONS OF THE JURY COMMISSIONER EXCUSING PROSPECTIVE JURORS, DENIED MR.

 > RODRIGUEZ DUE PROCESS OF LAW AND HIS RIGHT TO A FAIR TRIAL BY IMPARTIAL JURY. THE JURY SUMMONING AND SELECTION PROCESS IN THIS CASE VIOLATED THE DUE PROCESS AND TRIAL BY JURY CLAUSES OF THE FEDERAL AND STATE CONSTITUTIONS, AND THE CONTROLLING STATUTES.
 > 89. MR. RODRIGUEZ WAS NOT ADEQUATELY ADVISED OF AND DID NOT MAKE ADEQUATE WAIVERS OF HIS CONSTITUTIONAL RIGHT TO TESTIFY AT ANY OF THE THREE PARTS OF THE TRIAL IN THIS CASE.

2. Rodriguez also asserts that the trial court's advisements concerning Rodriguez' right to testify were inadequate. However, the record contains transcripts of those advisements and Rodriguez does not assert that evidence in addition to the transcripts is necessary for determination of the adequacy of the advisements.

at 248–49. However, Rodriguez asserts in his very first issue on appeal that the district court erred in dismissing and therefore not addressing all of the 110 issues raised by his Crim.P. 35(c) motion.[3] Rodriguez thus expressly requests this court to review the merits of the district court's ruling that it need not consider those 110 issues.

In his brief filed in this court Rodriguez illustrates the district court's alleged error by way of example and asserts that, contrary to the district court's conclusions, most of those 110 issues had not been previously litigated. Rodriguez then states that there are "many other obvious examples" of issues which had not been previously litigated, that "the merits of the claims presented under the approximately one hundred and nine headings should be considered," and that the district court's "failure to allow hearings and to make findings and conclusions as to all of the claims covered by the ruling at issue here violated Rule 35(c) and Mr. Rodriguez' right to due process under the federal and Colorado Constitutions."

Despite Rodriguez' statement that he seeks this court's review of all of the issues asserted in his Crim.P. 35(c) motion and dismissed by the district court as previously litigated, the majority states that "Rodriguez' failure to specifically reassert on this appeal all of the claims which the district court disposed of as previously litigated on direct appeal constitutes a conscious relinquishment of those claims which he does not reassert." Maj.op. at 249. The majority cites no authority for the apparent rule that specific issues raised in post-conviction proceedings by a defendant's Crim.P. 35(c) motion will be deemed abandoned on appeal if the defendant's appellate brief refers to all such issues instead of restating each such issue. Such a rule would of course require more lengthy briefs.

The language of Rodriguez' brief refutes the majority's conclusion. While silence may in some circumstances constitute a relinquishment of a right, the assertion of a general proposition does not indicate relinquishment of the specific components necessarily included within the general proposition. Rodriguez asserts in Issue 1 that the trial court erroneously dismissed 110 of the issues Rodriguez presented in his Crim.P. 35(c) motion. Resolution of the issue as stated by Rodriguez requires determination of the propriety of the trial court's ruling and hence review of all of the issues affected by that ruling. Rodriguez is entitled to the appellate review he has requested of all aspects of the trial court's ruling dismissing 110 of the issues he raised in his Crim.P. 35(c) motion.

For the foregoing reasons, I respectfully dissent from the majority's conclusion in section IIA of its opinion that Rodriguez has consciously relinquished his right to appellate review of all of the claims contained in his Crim.P. 35(c) motion that the trial court dismissed on the ground that such claims had previously been litigated. I concur in the remainder of the majority opinion.

Justice LOHR dissenting:

In this proceeding for postconviction relief under Crim.P. 35, the majority upholds the death sentence imposed on Frank D. Rodriguez for conviction of first-degree murder stemming from the killing of Lorraine Martelli. I would hold that the proceedings that led up to the jury determination that the death penalty should be imposed were fatally flawed and that the sentence to death must be vacated.[1] I therefore respectfully dissent.

I.

A.

A sentence to death is qualitatively different from any other punishment because of its unique severity and finality. *E.g., Lockett v. Ohio*, 438 U.S. 586, 604, 98 S.Ct. 2954, 2964–65, 57 L.Ed.2d 973 (1978); *Woodson v. North*

---

3. Issue 1, as framed by Rodriguez, contains the following language: "THE DISTRICT COURT'S RULING THAT MR. RODRIGUEZ HAD ALREADY HAD APPELLATE REVIEW OF MANY CLAIMS IN HIS POSTCONVICTION MOTIONS WAS ERRONEOUS."

1. Even if I could accept the contrary conclusion reached by the majority—and I cannot—I would require a remand to the district court for further hearings, findings, and conclusions. *See infra* part II.

*Carolina,* 428 U.S. 280, 303–05, 96 S.Ct. 2978, 2990–92, 49 L.Ed.2d 944 (1976); *People v. Tenneson,* 788 P.2d 786, 791–92 (Colo.1990); *People v. Drake,* 748 P.2d 1237, 1254 (Colo. 1988). For this reason, both the United States Supreme Court, *see, e.g., Mills v. Maryland,* 486 U.S. 367, 383–84, 108 S.Ct. 1860, 1869–70, 100 L.Ed.2d 384 (1988), and this court, *see, e.g., Tenneson,* 788 P.2d at 791–92; *Drake,* 748 P.2d at 1254, have repeatedly emphasized the heightened need for sentencing reliability in capital cases. Yet, after acknowledging that the district court properly vacated certain of the convictions upon which the jury may have relied in arriving at the sentence to death, the majority upholds that sentence. Maj. op. at 283, 285–86. The majority's holding, in my opinion, violates the general, constitutionally-based requirement of sentencing reliability and misapplies relevant United States Supreme Court precedent.

### B.

In post-trial proceedings under Crim.P. 35, the district court vacated Rodriguez's convictions for felony murder of Lorraine Martelli, conspiracy to commit second-degree kidnapping, and conspiracy to commit aggravated motor vehicle theft. The court vacated the felony murder conviction because Rodriguez had also been convicted of first-degree murder of Lorraine Martelli after deliberation, and two murder convictions cannot be imposed for the killing of a single victim. *E.g., People v. Glover,* 893 P.2d 1311, 1314 (Colo. 1995). The conspiracy convictions were vacated because Rodriguez had been convicted on another conspiracy charge relating to the chain of events in question, and, as the majority notes, " 'conspiracy constitutes a single offense, although the agreement upon which the charge is founded contemplates the per-

formance of several criminal acts.' " Maj. op. at 283 (quoting *People v. Bradley,* 169 Colo. 262, 265, 455 P.2d 199, 200 (1969)). In this case, as the majority observes, the conspiracy extended to several criminal acts and therefore could support only a single conviction for conspiracy rather than the three that were imposed. Maj. op. at 283.

### C.

The jury was permitted to consider the felony murder conviction as part of the evidence at the penalty phase of Rodriguez's trial. Specifically, the jury was instructed that the felony murder conviction did not in itself constitute an aggravating factor "[e]xcept as required by the alleged [felony murder] aggravating factor...."[2] R. at v. IV, pp. 774, 777 (this form of reference will be used throughout to cite to the volume and page number of the record in this case). Nevertheless, the majority reasons that Rodriguez's death sentence need not be overturned, even after admitting that the evidence supporting the vacated felony murder conviction "also supports" one of the aggravating factors found by the jury, *i.e.,* "intentionally causing the death of a person in the course of or in furtherance of a felony or in his immediate flight therefrom, § 16–11–103(6)(g)." Maj. op. at 284.[3] The majority supports its conclusion by hypothetically reconstructing the jury's deliberation process and distinguishing *Johnson v. Mississippi,* 486 U.S. 578, 108 S.Ct. 1981, 100 L.Ed.2d 575 (1988). Maj. op. at 284–86. Because it is impossible for an appellate court to reconstruct a jury's deliberation process, and because the majority misreads the *Johnson* precedent in view of the statutory role of jurors in Colorado, I must respectfully dissent from parts IX(F) and XIV of the majori-

---

**2.** The penalty phase instruction defining the felony murder aggravating factor read:

> The Defendant committed a class one, class two, or class three felony and in the course of or in the furtherance of the felony, he intentionally caused the death of a person other than one of the participants.

R. at v. IV, p. 774.

**3.** The majority also admits that the evidence supporting the vacated convictions for conspiracy to

commit second-degree kidnapping and conspiracy to commit first-degree aggravated motor vehicle theft also supports another aggravating factor found in this case, *i.e.,* "intentionally killing a person in furtherance of an agreement to kill, § 16–11–103(6)(e)." Maj. op. at 284. Although I see no need to address this contention in view of my resolution of the implications stemming from the vacated felony murder conviction, the majority's assertion provides additional support for my position today.

ty opinion and its resolution of the corresponding issues 13, 130, and 131.[4]

### 1.

First, the majority notes that "section 16–11–103 does not require a conviction for either felony murder or conspiracy to commit murder before those aggravating factors are found," maj. op. at 284, and "[e]ven after the vacation of the felony murder conviction, Rodriguez meets the requirements of the aggravating factor found in section 16–11–103(6)(g)," maj. op. at 284.[5] However, the majority has no way of knowing what weight the jury gave to the felony murder conviction in determining the existence of that aggravating factor, nor can the majority accurately assess the importance of any potentially invalid aggravating factor in the jury's weighing process. *Cf. Mills*, 486 U.S. at 376–77, 108 S.Ct. at 1866–67 ("[T]he jury's verdict must be set aside if it could be supported on one ground but not on another, and the reviewing court was uncertain which of the two grounds was relied upon by the jury in reaching the verdict. In reviewing death sentences, the Court has demanded even greater certainty that the jury's conclusions rested on proper grounds. Unless we can rule out the substantial possibility that the jury may have rested its verdict on the 'improper' ground, we must remand for resentencing.") (citations omitted).

Second, in *Johnson*, 486 U.S. at 586, 108 S.Ct. at 1986–87, the United States Supreme Court vacated a death penalty that was based on an aggravating factor stemming from a subsequently overturned felony conviction. The majority distinguishes *Johnson* as a case where the evidence relating to the felony conviction was otherwise inadmissible, whereas in Rodriguez's case "the evidence supporting the convictions was properly before the sentencing jury" and was constitutionally obtained. Maj. op. at 285–86. Although the majority does not reference any specific United States Supreme Court cases in distinguishing *Johnson*, *see* maj. op. at 285, its reasoning apparently is based on footnote nine of that opinion:

> In *Zant v. Stephens*, 462 U.S. 862, 103 S.Ct. 2733, 77 L.Ed.2d 235 (1983), we held that on the facts of that case the invalidation of an aggravating circumstance did not, under Georgia's capital sentencing scheme, require vacation of the death sentence. In reaching this holding, we specifically relied on the fact that the evidence adduced in support of the invalid aggravating circumstance was nonetheless properly admissible at the sentencing hearing. *Id.*, at 887, 103 S.Ct. at 2748.

*Johnson*, 486 U.S. at 590 n. 9, 108 S.Ct. at 1989 n. 9.[6] Thus, the majority's dismissal of

---

4. The references to numbered issues in this dissenting opinion are to the issues presented by Rodriguez for appellate review as set forth and numbered in Appendix A to the majority opinion. *See* Appendix A to maj. op. at 303–20. For the sake of uniformity and simplicity, series of three or more numbers will not be spelled out.

5. Section 16–11–103(6)(g), 8A C.R.S. (1986), sets forth the following aggravating factor:

 The defendant committed a class 1, 2, or 3 felony and, in the course of or in furtherance of such or immediate flight therefrom, he intentionally caused the death of a person other than one of the participants; . . .

6. *See also Johnson v. Mississippi*, 486 U.S. 578, 581, 108 S.Ct. 1981, 1984, 100 L.Ed.2d 575 (1988) ("The sole evidence supporting the aggravating circumstance that petitioner had been 'previously convicted of a felony involving the use or threat of violence to the person of another' consisted of an authenticated copy of petitioner's commitment to Elmira Reception Center in 1963 following his conviction in Monroe County, New

York, for the crime of second-degree assault with intent to commit first-degree rape," a conviction that had been reversed on appeal.); *Zant v. Stephens*, 462 U.S. 862, 873, 103 S.Ct. 2733, 2740–41, 77 L.Ed.2d 235 (1983) (describing how "[t]he [Georgia Supreme Court] noted that a different result might be reached if the failed circumstance had been supported by evidence not otherwise admissible"); *id.* at 886, 103 S.Ct. at 2747 ("The underlying evidence is nevertheless fully admissible [despite invalidation of the aggravating circumstance] at the sentencing phase."); *id.* at 886, 103 S.Ct. at 2747 ("This case involves a statutory aggravating circumstance, invalidated by the State Supreme Court on grounds of vagueness, whose terms plausibly described aspects of the defendant's background that were properly before the jury and whose accuracy was unchallenged."); *id.* at 887 n. 24, 103 S.Ct. at 2748 n. 24 ("Petitioner acknowledges that, if an invalid statutory aggravating circumstance were supported by material evidence not properly before the jury, a different case would be presented. We need not decide in this case whether the death sentence would be impaired in other cir-

the *Johnson* precedent, maj. op. at 285, finds support in that opinion's reference, *Johnson,* 486 U.S. at 590 n. 9, 108 S.Ct. at 1989 n. 9, to the holding of *Zant v. Stephens,* 462 U.S. 862, 887, 103 S.Ct. 2733, 2748, 77 L.Ed.2d 235 (1983), which affirmed a death penalty conviction despite invalidation of an aggravating circumstance where the underlying evidence supporting the questionable aggravating circumstance was otherwise admissible and another aggravating circumstance remained undisturbed.

However, the distinction between *Johnson* and *Zant* does not support an application of the *Zant* precedent to Rodriguez's case. It is true that in *Zant* the United States Supreme Court held that although "the fact that the [invalid aggravating circumstance] instruction gave added weight to [otherwise admissible prior felony convictions] no doubt played some role in the deliberations of some jurors," *Zant,* 462 U.S. at 904, 103 S.Ct. at 2757 (Rehnquist, J., concurring), invalidation of an aggravating circumstance that was based on otherwise admissible evidence would not result in vacation of the death penalty under Georgia's death penalty statutory scheme where other aggravating circumstances remained intact, *id.* at 889, 103 S.Ct. at 2749 (majority opinion). However, the Court began its assessment by noting that "[t]he answer *depends* on the function of the jury's finding of an aggravating circumstance under Georgia's capital sentencing statute...." *Id.* at 864, 103 S.Ct. at 2736 (emphasis added).[7] The Court then described the jury's function in finding aggravating circumstances under Georgia law as limited:

> In Georgia, unlike some other States, the jury is not instructed to give any special weight to any aggravating circumstance, to consider multiple aggravating circumstances any more significant than a single such circumstance, or to balance aggravating against mitigating circumstances pursuant to any special standard....
>
> ....
>
> ... Instead, as the Georgia Supreme Court has unambiguously advised us, the aggravating circumstance merely performs the function of narrowing the category of persons convicted of murder who are eligible for the death penalty.

*Id.* at 873–75, 103 S.Ct. at 2740–42 (footnotes omitted); *see also id.* at 871–72, 103 S.Ct. at 2739–40. Indeed, as noted in Justice Marshall's dissent in *Zant,* "[t]he very premise of the 'threshold' theory adopted today is that statutory aggravating circumstances are *not* relied upon by the jury in reaching its ultimate sentencing decision, but are considered *only* in deciding whether the defendant is eligible to receive the death penalty." *Id.* at 914, 103 S.Ct. at 2762 (Marshall, J., dissenting) (emphasis in original).

In other words, under the Georgia death penalty statutory scheme under review in *Zant,* the only purpose of a jury's finding of an aggravating circumstance was to make the defendant death eligible. *Id.* at 871–72, 873–75, 914, 103 S.Ct. at 2739–40, 2740–42, 2762. Therefore, where an aggravating circumstance was invalidated or questioned, but the underlying evidence was otherwise admissible, and where the jury made independent findings of other valid aggravating factors, *see id.* at 868, 103 S.Ct. at 2738, there was no reason to invalidate the death penalty; the jury made the requisite finding of one aggravating factor notwithstanding the invalidation of another aggravating factor, and the jury never considered any evidence in voting for the death penalty that they otherwise would not have considered. The

cumstances, for example, if the jury's finding of an aggravating circumstance relied on materially inaccurate or misleading information.") (citations omitted).

**7.** On the first review by the United States Supreme Court, the Court remanded the case to the Georgia Supreme Court for an explanation of the "premises" and "rationale" for a rule that invalidation of one aggravating circumstance would not render a death sentence constitutionally in-

firm. *Zant v. Stephens,* 456 U.S. 410, 414–15, 416–17, 102 S.Ct. 1856, 1857–58, 1858–59, 72 L.Ed.2d 222 (1982). The Court reasoned:

> It may be that implicit in the rule is a determination that multiple findings of statutory aggravating circumstances are superfluous, or a determination that the reviewing court may assume the role of the jury when the sentencing jury recommended the death penalty under legally erroneous instructions.

*Id.* at 415, 102 S.Ct. at 1858.

majority's reasoning in this case mirrors the result in *Zant*. *See* maj. op. at 285–86.

However, because the Court's rationale in *Zant* was based fundamentally on Georgia's death penalty statutory framework, the Court took pains to limit its holding to cases where a jury's finding of aggravating factors simply served the death eligibility function, and questioned any applicability to cases where a jury was further instructed to weigh aggravating factors against mitigating factors:

> Finally, we note that in deciding this case we do not express any opinion concerning the possible significance of a holding that a particular aggravating circumstance is 'invalid' under a statutory scheme in which the judge or jury is specifically instructed to weigh statutory aggravating and mitigating circumstances in exercising its discretion whether to impose the death penalty.... Under Georgia's sentencing scheme, and under the trial judge's instructions in this case, no suggestion is made that the presence of more than one aggravating circumstance should be given special weight.

*Id.* at 890–91, 103 S.Ct. at 2750. Indeed, the Court compared the Georgia death penalty statutory scheme to the approaches of other states, *see id.* at 873 n. 12, 103 S.Ct. at 2741 n. 12, and distinguished those other statutory schemes:

> In each of these cases, the State Supreme Court set aside a death sentence based on both valid and invalid aggravating circumstances. Respondent advances these cases in support of his contention that a similar result is required here. However, examination of the relevant state statutes shows that in each of these States, not only must the jury find at least one aggravating circumstance in order to have the power to impose the death sentence;

in addition, the law requires the jury to weigh the aggravating circumstances against the mitigating circumstances when it decides whether or not the death penalty should be imposed.

*Id.* at 873 n. 12, 103 S.Ct. at 2741 n. 12. Unlike the death penalty statutory scheme under examination in *Zant*, Colorado *does* require jurors to determine "[w]hether sufficient mitigating factors exist which outweigh any aggravating factor or factors found to exist." § 16–11–103(2)(a)(II), 8A C.R.S. (1986).[8]

The United States Supreme Court reviewed the question reserved in *Zant*, 462 U.S. at 890–91, 103 S.Ct. at 2749–50, in *Clemons v. Mississippi*, 494 U.S. 738, 110 S.Ct. 1441, 108 L.Ed.2d 725 (1990), and left no doubt that the majority's resolution of issue thirteen is incorrect.[9] In *Clemons*, the Mississippi Supreme Court upheld a death penalty despite questions surrounding one of several aggravating circumstances. 494 U.S. at 743–44, 110 S.Ct. at 1445–46. On review, the United States Supreme Court noted the question reserved in *Zant*, 462 U.S. at 890, 103 S.Ct. at 2749–50, and prefaced its discussion by distinguishing Mississippi's statutory death penalty scheme:

> In Mississippi, unlike the Georgia scheme considered in *Zant*, the finding of aggravating factors is part of the jury's sentencing determination, and the jury is required to weigh any mitigating factors against the aggravating circumstances.

*Clemons*, 494 U.S. at 745, 110 S.Ct. at 1446 (footnote omitted). The Court then explicitly rejected the rationale upon which the majority resolves issue thirteen in this case, *see* maj. op. at 284, 285–86, and held that where an aggravating factor is invalidated but another aggravating factor remains, "[a]n automatic rule of affirmance in a weighing State would be invalid under *Lockett v. Ohio*, 438

---

**8.** This analysis is not necessarily applicable to the amendments to Colorado's death penalty statute. *See* § 16–11–103, 8A C.R.S. (1995 Supp.).

**9.** Issue thirteen reads:

THE ILLEGALITY OF THE FIRST DEGREE MURDER AND TWO CONSPIRACY CONVIC-

TIONS REQUIRES THAT THE DEATH SENTENCE BASED UPON THEM BE VACATED. THE MOTOR VEHICLE THEFT AND "CRIMES OF VIOLENCE" CONVICTIONS, AND THE DEATH SENTENCE BASED ON THEM, ARE ALSO ILLEGAL SINCE THEY ARE BASED ON THE MURDER CONVICTION.

Appendix A to maj. op. at 305.

U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978), and *Eddings v. Oklahoma,* 455 U.S. 104, 102 S.Ct. 869, 71 L.Ed.2d 1 (1982), for it would not give defendants the individualized treatment that would result from actual reweighing of the mix of mitigating factors and aggravating circumstances." *Clemons,* 494 U.S. at 752, 110 S.Ct. at 1450. Although the Court approved the constitutionality of harmless error analysis or actual reweighing of aggravating and mitigating circumstances by appellate courts reviewing death sentences, *id.* at 748–50, 110 S.Ct. at 1448–49, the Court vacated the death penalty judgment and remanded the case for a proper reweighing, if appropriate under Mississippi law, by the Mississippi Supreme Court, *id.* at 752, 110 S.Ct. at 1450. The Court took care to note that the permissibility of an appellate court's reweighing of aggravating and mitigating circumstances was for state supreme courts to decide, and recognized that such courts might conclude that reweighing or harmless error analysis was "extremely speculative or impossible." *Id.* at 754, 110 S.Ct. at 1451.

In a concurrence and dissent, four members of the Court took issue with the majority's approval of the reweighing of aggravating and mitigating circumstances by appellate courts. *Id.* at 756–74, 110 S.Ct. at 1452–62 (Blackmun, J., dissenting). Justice Blackmun cogently wrote:

> If a jury's verdict rests in part upon a constitutionally impermissible aggravating factor, and the State's appellate court upholds the death sentence based upon its own reweighing of legitimate aggravating and mitigating circumstances, the appellate court, in any real sense, has not approved or affirmed the verdict of the jury. Rather, the reviewing court in that situation has assumed for itself the role of sentencer. The logical implication of the majority's approach is that no trial-level sentencing procedure need be conducted at

all. Instead, the record of a capital trial (including a sentencing hearing conducted before a court reporter) might as well be shipped to the appellate court, which then would determine the appropriate sentence in the first instance.

*Id.* at 762–63, 110 S.Ct. at 1455–56. Justice Blackmun then pointed out the fundamental flaw in allowing appellate courts to reweigh aggravating and mitigating factors, emphasizing that "both this Court and the Supreme Court of Mississippi repeatedly have emphasized that appellate courts are institutionally incapable of fulfilling the distinct functions performed by trial judges and juries," *id.* at 765, 110 S.Ct. at 1457 (footnote omitted), and concluding that the majority's approval of appellate reweighing of aggravating and mitigating circumstances "flies in the face of this Court's prior warnings concerning the institutional limitations of appellate courts," *id.* at 773, 110 S.Ct. at 1461 (footnote omitted).[10]

The Mississippi Supreme Court apparently found Justice Blackmun's concurrence and dissent convincing in view of Mississippi's statutory death penalty scheme. On remand for a better articulation of the Mississippi Supreme Court's reweighing of the aggravating and mitigating circumstances or other rationale, that court began by delineating a threshold question:

> [P]reliminary to any attempt we make on remand to clarify our analysis in upholding the death sentence, we must decide, as a matter of state law, our authority to reweigh aggravating and mitigating circumstances in order to uphold a death sentence which is based in part upon an improperly defined aggravating circumstance.

*Clemons v. State,* 593 So.2d 1004, 1005 (Miss. 1992). After citing the statutory requirement that a jury impose the death penalty and reviewing other elements of the Mississippi statutory death penalty scheme, the

---

**10.** Although this court acknowledged *Clemons v. Mississippi,* 494 U.S. 738, 110 S.Ct. 1441, 108 L.Ed.2d 725 (1990), in *People v. Davis,* 794 P.2d 159, 178–79 (Colo.1990), *cert. denied,* 498 U.S. 1018, 111 S.Ct. 662, 112 L.Ed.2d 656 (1991), we refrained from engaging in appellate reweighing, *Davis,* 794 P.2d at 179. At this point, with the benefit of both the remand in *Clemons,* 593

So.2d 1004 (Miss.1992), and our own statutory death penalty requirement that jurors engage in the weighing of aggravating and mitigating circumstances, § 16–11–103(2)(a)(II), 8A C.R.S. (1986), we should explicitly reject the notion that appellate courts are equipped to engage in a weighing process that is the statutory province of the jury.

court found the Supreme Court's invitation to reweigh aggravating and mitigating circumstances precluded and held:

> [T]wo things are clear: only the jury, by unanimous decision, can impose the death penalty; as to aggravating circumstances, this Court only has the authority to determine whether the evidence supports the jury's or judge's finding of a statutory aggravating circumstance. There is no authority for this Court to reweigh remaining aggravating circumstances when it finds one or more to be invalid or improperly defined, nor is there authority for this Court to find evidence to support a proper definition of an aggravating circumstance in order to uphold a death sentence by reweighing. Finding aggravating and mitigating circumstances, weighing them, and ultimately imposing a death sentence are, by statute, left to a properly instructed jury.

593 So.2d at 1006; *accord, e.g., State v. Moore,* 614 S.W.2d 348, 352 (Tenn.) ("While proof of these convictions was admissible for purposes other than mere reflection upon credibility, these crimes were not properly shown to qualify as aggravating circumstances under T.C.A. § 39–2404(i)(2). Yet they were offered for that very purpose and the jury was instructed that one of them did qualify. The Court has no way of knowing whether the jury would have imposed the death penalty had they not been permitted to so consider this evidence in their weighing process."), *cert. denied,* 454 U.S. 970, 102 S.Ct. 517, 70 L.Ed.2d 388 (1981). In my opinion, the Colorado statutory death penalty scheme merits the same conclusion as that reached in *Clemons,* 593 So.2d at 1006.

### 2.

On another occasion, this court described Colorado's death penalty statutory scheme as a multi-step process, where the jury must determine first "if at least one of the statutory aggravating factors exists," *Tenneson,* 788 P.2d at 789 (citing § 16–11–103(2)(a)(I), –103(6), 8A C.R.S. (1986)), so as to narrow the group of persons who may be subjected to the death sentence, *id.* at 791. However, unlike the statutory scheme under scrutiny in *Zant,* 462 U.S. at 871–72, 874–75, 914, 103

S.Ct. at 2739–40, 2741–42, 2762, Colorado's death penalty statute aims not just to narrow the class of death-eligible prisoners, but requires the additional step that the jury then weigh aggravating against mitigating factors, *see, e.g., Tenneson,* 788 P.2d at 789, 791, and precludes a jury verdict of death unless "[t]here are insufficient mitigating factors to outweigh the aggravating factor or factors that were proved," § 16–11–103(2)(b)(II)(B), 8A C.R.S. (1986). In the final analysis, the Colorado death penalty statutory scheme is like that of Mississippi, *see Clemons,* 593 So.2d at 1006, in that after weighing aggravating and mitigating factors "the jury makes the ultimate individualized decision on whether death is the appropriate penalty." *People v. Rodriguez (Rodriguez IV),* 794 P.2d 965, 973 (Colo.1990), *cert. denied,* 498 U.S. 1055, 111 S.Ct. 770, 112 L.Ed.2d 789 (1991); *see also Tenneson,* 788 P.2d at 795 ("All of the foregoing considerations and authorities contribute to support the conclusion that Colorado's death penalty statute must be construed to require that the jury must be convinced beyond a reasonable doubt that any mitigating factors do not outweigh the proven statutory aggravating factors before a sentence to death can be imposed.") (footnote omitted). Under the death penalty process applicable to Rodriguez, the weighing process and decision to implement a death sentence are firmly within the jurors' hands, § 16–11–103(2)(a)(II), –103(2)(b)(II)(B), 8A C.R.S. (1986), and a judge that considers the jury's verdict to be clearly erroneous only has the authority to sentence the defendant to life imprisonment, § 16–11–103(2)(c), 8A C.R.S. (1986).

The jury in Rodriguez's case found six aggravating factors. Maj. op. at 284. In *Rodriguez IV,* this court invalidated the aggravating factor that the commission of the crime was "'especially heinous, cruel or depraved.'" 794 P.2d at 965, 982–83 (quoting § 16–11–103(6)(j), 8A C.R.S. (1986)). Nevertheless, this court concluded that inclusion of the invalid aggravating factor was harmless error, after emphasizing that the evidence was otherwise admissible and noting that the jury had found five other aggravating factors. *Id.* at 983–84; *see also* maj. op. at 246–

47 n. 4. I continue to adhere to my dissent in *Rodriguez IV* that the majority's harmless error analysis amounted to "no more than a guess as to what the jury might have decided had it been properly instructed." *Id.* at 1000 (Lohr, J., dissenting) (internal quotation marks and citations omitted); *see also Zant,* 462 U.S. at 916, 103 S.Ct. at 2763 (Marshall, J., dissenting) ("There is simply no way for this Court to know whether the jury would have sentenced respondent to death if the unconstitutional statutory aggravating circumstance had not been included in the judge's charge. If it is important for the State to authorize and for the prosecution to request the submission of a particular statutory aggravating circumstance to the jury, 'we must assume that in some cases [that circumstance] will be decisive in the [jury's] choice between a life sentence and a death sentence.' ") (quoting *Gardner v. Florida,* 430 U.S. 349, 359, 97 S.Ct. 1197, 1205, 51 L.Ed.2d 393 (1977) (Stevens, J.)).

Regardless, the majority mistakenly insists that only benign implications stem from the trial court's vacation of Rodriguez' duplicative convictions and the majority's affirmance of that vacation. Maj. op. at 284–85. The majority characterizes the vacation of Rodriguez' duplicative convictions as an innocuous technicality, in that all of the underlying evidence supporting the vacated convictions was otherwise admissible. Maj. op. at 285–86. As I have indicated however, *supra* part I(C)(1), the majority's analysis ignores the responsibility of jurors in capital cases in Colorado to weigh aggravating factors against mitigating factors. The existence of a conviction can in itself result in a jury concluding that an aggravating factor exists, regardless of the general admissibility of the underlying evidence. For example, the jury in this case was instructed specifically that convictions did not in themselves constitute aggravating circumstances, "*except as required*" by the alleged felony murder aggravating factor. (Emphasis added). The jury may have interpreted this instruction alone to require that they find the existence of a felony murder aggravating factor based solely on Rodriguez's subsequently vacated felony murder conviction. Although the jurors may have reached their aggravating factor conclusions independently, we will never know whether they arrived at their felony murder aggravating factor conclusion based on full analysis and discussion or whether they simply found the automatic existence of that aggravating factor based on the aforementioned jury instruction. Even assuming that the jury did not read the relevant instruction to require an automatic finding of the existence of a felony murder aggravating factor, the convictions themselves may have been considered by the jury during their decisions to lend certain aggravating factors greater importance in the weighing process. For these reasons, the majority errs in focusing on the admissibility of the underlying evidence and disregarding the potency of the actual convictions.

In short, (1) this court's existing invalidation of one of the aggravating factors in this case, *Rodriguez IV,* 794 P.2d at 982–83, (2) the admitted questions surrounding two other aggravating factors and their potential invalidity, maj. op. at 284, and (3) the United States Supreme Court's suggestion in *Zant, Johnson,* and *Clemons, see* discussion in *supra* part I(C)(1), that a potentially erroneous aggravating circumstance finding, even when based on otherwise admissible evidence, renders a death sentence infirm when the jurors' statutory role is to weigh aggravating circumstances against mitigating circumstances, together preclude the continued disregard of the fundamental errors of law in this case under the banner of "harmless error," *Rodriguez IV,* 794 P.2d at 983–84.[11] After all, the jury instruction in this case directed that " '[i]f one or more jurors finds sufficient mitigating factor or factors exist that outweigh a specified aggravating factor or factors, then the result is a sentence of life imprisonment.' " *Rodriguez IV,* 794 P.2d at 981–82 (quoting Jury Instruction No. 15). In Rodriguez's case, with one aggravating factor invalidated and the validity of another two aggravating factors preserved only by hy-

---

11. The majority seems to reason that the errors were harmless, although it does not use that term. *See* maj. op. at 284–86.

pothesizing the jury's deliberation process, only three aggravating factors remain and it is unreasonable for this court to reweigh aggravating and mitigating factors or continue to dismiss this impact as harmless error considering the jurors' mandate to weigh aggravating factors against mitigating factors before they impose a sentence of death.[12]

Even if the evidence was otherwise admissible, it is the jurors' role to weigh aggravating factors, and an appellate court has no way of discerning what use the jury made of improper convictions in finding the existence of certain aggravating factors. This fundamental problem is particularly acute in the context of a capital case, which requires a heightened degree of sentencing reliability. In view of the applicable United States Supreme Court precedent, the questions surrounding several aggravating factors in this case, the invalidation of the "especially heinous, cruel, or depraved" aggravating factor relied upon by the jurors, and this state's statutory death penalty requirement that jurors exclusively must weigh aggravating factors against mitigating factors before they

reach a death sentence verdict, I would vacate Rodriguez's death penalty and remand for the imposition of a sentence to life imprisonment.

## II.

The General Assembly mandated that jurors in capital cases weigh aggravating factors against mitigating factors before rendering a death sentence. § 16–11–103(2)(a)(II), 8A C.R.S. (1986). Where jurors are obligated to weigh aggravating and mitigating factors before imposing a death sentence, the balance can be tipped when an aggravating factor is invalidated or questioned, even if another valid aggravating factor remains and the underlying evidence is otherwise admissible. In such circumstances, there are qualitatively different implications in comparison to a statutory scheme that simply requires jurors to determine whether one aggravating circumstance exists in order for a criminal to become death eligible.

Although this distinction does not attract the support of a majority of this court's

---

**12.** In addition to the above-described infirmities in the jury's findings of certain aggravating factors, the reliability of the jury's aggravating factors determinations is weakened further by the trial court's invalid complicity instruction. The majority agrees with Rodriguez that the trial court erred in instructing the jury on "complicity" that "[t]he defendant must have had knowledge that the other person intended to commit all *or part* of the crime." Maj. op. at 276, 277 (emphasis added). Rodriguez points out that because of this erroneous instruction "the jury could convict Rodriguez of the first-degree murder of Lorraine Martelli even if he only agreed to her assault," maj. op. at 276, but the majority dismisses the instructional mistake as harmless error, maj. op. at 276 n. 47, 277.

In support of its harmless error conclusion, the majority argues that the first-degree murder conviction is supported by the record but points to (1) the testimony of Patricia Thomas, which was contested, and (2) blood evidence, which casts no light on whether Rodriguez had *knowledge* regarding the extent of an alleged co-participant's murderous intentions. Maj. op. at 276–277. The majority's dismissal of the complicity mistake as harmless error is surprising considering the prosecution's reliance on that instruction during closing arguments:

[L]ook at Instruction Number 12. It's a very important instruction. It has to do with the

legal concept of complicity, because even if you somehow believe David Martinez, not [Rodriguez], deliberately stabbed Lorraine Martelli to death, [Rodriguez] is still guilty of first degree murder after deliberation. He is guilty as an accomplice and Instruction Number 12 makes that clear to you.

R. at v. XXXI, p. 24. In my opinion, this reliance alone casts in doubt the majority's disposition of issues 130 and 131.

The majority finds further support by reasoning that "in returning a guilty verdict on the charge of conspiracy to commit first-degree murder after deliberation, the jury necessarily found that Rodriguez specifically intended to promote or facilitate the first-degree murder of Lorraine Martelli." Maj. op. at 277. However, the majority's reasoning in this regard is circular. If the jury was allowed to convict Rodriguez of first-degree murder based on a complicity instruction that hypothetically allowed the conviction to be founded on Rodriguez's mere knowledge of an alleged co-perpetrator's assaultive, but not murderous, intentions, the conspiracy to commit murder conviction could have been based on the potentially improper first-degree murder conviction and a reviewing court has no way of assuming that the jury necessarily found specific murderous intent on Rodriguez's part rather than simple knowledge of "part" of an alleged co-conspirator's intentions. *See* R. at v. III, pp. 572–73, 581 (applicable jury instructions).

members, it is not the only issue of concern in this case. Absent the requested relief of vacation of the death penalty, this case should be remanded to the district court for evidentiary hearings and the resolution of several issues. Crim.P. 35(c)(3) requires that "[u]nless the motion and the files and record of the case show to the satisfaction of the court that the prisoner is not entitled to relief, the court shall cause a copy of said motion to be served on the prosecuting attorney, *grant a prompt hearing thereon, and take whatever evidence is necessary for the disposition of the motion.*" (Emphasis added). I recognize that efficiency is a concern, but the penalty of death is irrevocable and must not be imposed in absence of adherence to those procedures presented by our rules to assure full and fair consideration of a defendant's contentions of error. In my opinion, the following issues warrant more thorough discussions on the merits or a remand for evidentiary hearings pursuant to Crim.P. 35(c)(3).

## A.

The majority considers as a group 110 of the postconviction claims raised by Rodriguez and rejected by the district court on the basis that they had been previously raised and resolved on direct appeal. Maj. op. at 248. It disposes of ninety-two of those claims by concluding that Rodriguez decided not to reassert them on this appeal and therefore consciously relinquished them. Maj. op. at 248–49. This overlooks the basis of Rodriguez's assertion of error, which is simply that the district court erred in concluding, without a hearing on the merits of the claim, that the claims had been previously raised and resolved on direct appeal.[13] It is not the merit of the claims that is at issue here; it is the correctness of the district court's ruling that the claims were previously raised and resolved on direct appeal that is now before us. This issue has been properly raised by Rodriguez in the present appeal, and I dissent to the majority's refusal to address it.

13. Specifically, Rodriguez's issue one reads:
THE DISTRICT COURT'S RULING THAT MR. RODRIGUEZ HAD ALREADY HAD APPELLATE REVIEW OF MANY CLAIMS IN

In relying on its reassertion rule, the majority avoids addressing several claims that were dismissed by the district court as raised and resolved on direct appeal even though they were not addressed by this court on such appeal. For example, in ruling on the postconviction motion, the district court rejected as raised and resolved on direct appeal Rodriguez's contentions that:

THE TRIAL COURT VIOLATED THE DEATH STATUTE AND DENIED MR. RODRIGUEZ DUE PROCESS OF LAW BY GRANTING THE STATE REBUTTAL CLOSING ARGUMENT AND BY REFUSING TO ALLOW MR. RODRIGUEZ SURREBUTTAL ARGUMENT ARGUMENT [sic].

(R. at v. I, p. 157).

MR. RODRIGUEZ WAS DENIED HIS RIGHTS UNDER THE DUE PROCESS, TRIAL BY JURY, CRUEL AND UNUSUAL PUNISHMENT CLAUSES AND THE DEATH STATUTE BECAUSE THE COURT SUBMITTED THE "KILLING A WITNESS" AGGRAVATING FACTOR TO THE JURY, SINCE THAT FACTOR WAS NEITHER FACTUALLY NOR LEGALLY APPLICABLE TO THIS CASE, AND SINCE THE INSTRUCTIONS TO THE JURY ON THAT FACTOR WERE MANIFESTLY INCORRECT.

(R. at v. I, p. 163).

THE SUBMISSION OF THE "UNDER SENTENCE OF IMPRISONMENT" AGGRAVATING FACTOR WAS IMPROPER, SINCE IT DOES NOT APPLY LEGALLY OR FACTUALLY TO THIS CASE, AND IF IT IS SO INTERPRETED AS TO ARGUABLY APPLY IN THIS CASE, IT VIOLATES THE DUE PROCESS AND CRUEL AND UNUSUAL PUNISHMENT CLAUSES OF THE FEDERAL AND COLORADO CONSTITUTIONS.

(R. at v. I, p. 163).

HIS POSTCONVICTION MOTIONS WAS ERRONEOUS.
Appendix A to maj. op. at 303.

THE REFUSAL OF THE COURT TO CHANGE VENUE IN THIS CASE DENIED MR. RODRIGUEZ A FAIR TRIAL BY IMPARTIAL JURY AND DUE PROCESS OF LAW.

(R. at v. I, p. 171).

The district court dismissed the first of these listed claims by ruling that this court generally "resolved closing argument claims." R. at v. I, p. 155. The district court rejected the second and third of these listed claims by holding that this court "resolved against the defendant all his other claims regarding the jury instructions." R. at v. I, p. 159. Similarly, the district court dismissed the last listed claim, a venue assertion, by declaring broadly and without further explanation:

The [Supreme] Court also found that [Rodriguez's] sentence was appropriate. It found that the evidence against him was overwhelming, that it amply supported the jury's aggravating factors, and that the mitigating factors did not outweigh the aggravating factors. The court also found that the murder was particularly brutal and pitiless, that the defendant demonstrated no remorse, that the defendant had a serious criminal record, and that the jury did not impose the sentence under the influence of passion, prejudice, or any other arbitrary factor. As a result, this court concludes that the following claims are not available to the defendant in a Crim.P. 35(c) motion.

R. at v. I, p. 169. None of the aforementioned examples was in fact raised and resolved by this court on direct appeal in *People v. Rodriguez*, 794 P.2d 964, 964–65 (Colo. 1990) (*Rodriguez III*), or *Rodriguez IV*, 794 P.2d at 965–91, the only cases referenced by the district court in dismissing Rodriguez's 110 claims as raised and resolved, R. at v. I, p. 155.

These examples illustrate the need for more specific findings detailing the holdings of this court that are relied upon to establish whether each of the 110 claims has been raised and resolved. A hearing should be permitted to assist the district court in determining whether particular claims have been raised and resolved. Crim.P. 35 contemplates just such a procedure:

Unless the motion and the files and record of the case show to the satisfaction of the court that the prisoner is not entitled to relief, the court shall cause a copy of said motion to be served on the prosecuting attorney, grant a prompt hearing thereon, and take whatever evidence is necessary for the disposition of the motion. In all cases, the court shall determine the issues and make findings of fact and conclusions of law with respect thereto.

Crim.P. 35(c)(3) (quoted in relevant parts). For these reasons, I would remand issue one for a more detailed and accurate analysis or address the remaining ninety-two issues contained within issue one on the merits after dismissing those that were indeed raised and resolved on direct appeal. As a result, I respectfully dissent from part II(A) of the majority opinion and its disposition of Rodriguez's issue one.

### B.

In section II(D) of its opinion, the majority dismisses issue three as an attack on the constitutionality of the death penalty statute,[14] an issue previously resolved by this court. Maj. op. at 249–50. However, although the majority correctly dismisses issues 6, 7, 8, and 87 as attacks on the constitutionality of the death penalty statute, maj. op. at ——, the majority incorrectly assumes that the district court properly characterized the questions contained within issue three as redundant attacks on the constitutionality of the death penalty statute. The district court again swept away discrete issues by generalizing broadly:

The Colorado Supreme Court has previously construed C.R.S. 16–11–103, 8A (1986 Repl.Vol.), applicable here and as it existed prior to the July 1, 1988 amendments, consistent with the United States and Colorado constitutions. *People v. Ten-*

---

**14.** Rodriguez's issue three reads:

THE DISTRICT COURT'S RULING THAT THIS COURT DECIDED SEVERAL OF MR. RODRIGUEZ' CLAIMS AGAINST HIM IN

*PEOPLE V. TENNESON,* 788 P.2d 786 (Colo. 1990), AND *PEOPLE V. DAVIS,* 794 P.2d 159 (Colo.1990), IS INCORRECT.

Appendix A to maj. op. at 304.

*neson,* 788 P.2d 786 (Colo.1990); *People v. Davis,* 794 P.2d 159 (Colo.1990), *cert. denied,* 498 U.S. 1018 [111 S.Ct. 662, 112 L.Ed.2d 656] (1991). As a result, the defendant's attacks on the constitutionality of the statute are denied, as the Court has previously resolved them against the defendant's position. . . .

R. at v. I, p. 209. The district court then detailed the specific claims asserted by Rodriguez in his Crim.P. 35(c) motion that the court determined to have been previously resolved. In doing so, the court included assertions by Rodriguez that were not addressed in either *Tenneson,* 788 P.2d at 786–800, or *People v. Davis,* 794 P.2d 159, 159–213 (Colo.1990), *cert. denied,* 498 U.S. 1018, 111 S.Ct. 662, 112 L.Ed.2d 656 (1991), including case-specific attacks on motion denials. For example, Rodriguez unsuccessfully argued that, "[t]he court erred by refusing to grant the motion to death qualify the judge." R. at v. I, p. 209. The correctness of the district court's characterization of the questions contained within issue three as attacks on the constitutionality of the death penalty statute is precisely the issue that Rodriguez is concerned with, and this court should have reviewed that characterization for accuracy, rejecting those claims settled in *Tenneson* and *Davis* and addressing the remainder on the merits or remanding for such consideration, rather than accepting the district court's characterization at face value and rejecting issue three as an attack on the constitutionality of the death penalty statute. As a result, I respectfully dissent from the majority's disposition of Rodriguez's issue three in part II(D) of the majority opinion.

### C.

In part III of its opinion, the majority rejects issues 41, 42, 43, 44, 45, and 88 as inadequately raised. Maj. op. at 252. The majority describes its reasoning in dismissing claims forty-four and eighty-eight:

> Because the district court can summarily dismiss claims inadequately presented to it, our consideration of such issues on appeal of the district court's order would effectively grant Rodriguez a successive 35(c) motion without also burdening him

with the harsher standard of review appropriate to a successive motion. We decline to grant Rodriguez this deference and, instead, uphold the district court's dismissal of these claims, regardless of the adequacy of their presentation upon this appeal. We refuse to review the following issues [including forty-four and eighty-eight] because of Rodriguez' failure to adequately specify the errors and legal grounds for relief at the district court level. . . .

Maj. op. at 251 (citations omitted). The majority inexplicably never mentions issues 42, 43, or 45 in its litany of claims that the district court allegedly dismissed as inadequately raised and yet nevertheless concludes:

> In issue 41, Rodriguez alleges error in the district court's dismissal of postconviction claims which he now reasserts in Issues 42, 43, 44, 45, and 88. Because we hold these underlying issues to be inadequately presented, we reject Issue 41.

Maj. op. at 252. Notwithstanding the failure to include issues 42, 43, and 45 in the discussion of those claims that the district court allegedly dismissed as inadequately raised, the majority affirms the district court's alleged dismissal of issues 42, 43, 44, 45, and 88 as inadequately raised. Maj. op. at 251–52.

However, the district court did not dismiss issues 42, 43, 44, 45, and 88 as inadequately raised. Instead, the district court dismissed these claims on other grounds, (1) dismissing issues *forty-four* and *eighty-eight* as evidentiary issues that were "forfeited" for failing to raise the issues on direct appeal, R. at v. I, pp. 191, 190, and then (2) apparently in the alternative, rejecting both of these claims as well as issues 42, 43, and 45 as nonconstitutional issues, R. at v. I, 212–13. The majority mistakenly dismisses issues 42, 43, 44, 45 and 88 as inadequately raised, unless the majority's characterization is an independent conclusion in which case at least a modicum of analysis or explanation is warranted. *See* maj. op. at 250–51. Since the majority explicitly rejects the district court's waiver rule, maj. op. at 253–54 & n. 20, issues forty-four and eighty-eight should be remanded for consideration in view of the majority's waiver

pronouncements or this court should review issue forty-one on the merits [15] and determine whether issues 42, 43, 44, 45, and 88 were properly dismissed in the alternative as nonconstitutional issues. For these reasons, I respectfully dissent from the majority's disposition of issues 41, 42, 43, 44, 45, and 88, as set forth in part III of the majority opinion.

### D.

The majority acknowledges that failure to raise an issue on direct appeal will not result in waiver absent an abuse of process, and that abuse of process is an affirmative defense to be pleaded and proved by the state. Maj. op. at 253 & n. 20. However, the majority does not require the state to meet this burden and instead creates an analytical framework whereby a defendant's failure to reassert claims in this court, even where the defendant correctly challenges the claims as incorrectly dismissed at the district court level based on faulty waiver principles, constitutes a "conscious relinquishment" by the defendant. Maj. op. at 254. The majority's "conscious relinquishment" rule, maj. op. at 254, is particularly surprising considering the majority's admission that "we have had little occasion to address [the waiver standard]," and indeed "have addressed the [waiver] standard only obliquely, through dicta and dismissals of claims." Maj. op. at 252. Considering that "[t]he case law and dicta which do address the [waiver] standard are not easily synthesized," maj. op. at 252, it cannot reasonably be maintained that Rodriguez's understanding of the standard was such that he could consciously decide to relinquish certain claims in failing to reassert them now. In my opinion, the better course would be to clarify the waiver standard and remand the case to allow the state to meet the "abuse of process" burden, or to determine whether the state satisfied the abuse of process burden based on already submitted materials.

As a result, I respectfully dissent from the majority's rejection of Rodriguez's issues 2, 57, 65, 80, 99(A), 99(D), 99(E), 107, 133, 146, and 147, contained within part IV of the majority opinion.[16]

### E.

The majority correctly asserts that the burden is on the defendant to preserve a record for appeal. Maj. op. at 260. However, the majority glosses over two possible qualifications to this rule in the context of lost jury questionnaires or other record material, and instead scolds the defendant for not attempting to prepare a statement based on his recollections of the questionnaires. Maj. op. at 260. Pointing to C.A.R. 10(c), the majority concludes that Rodriguez "has not prepared such a statement nor provided this court with specific assertions of fact or error," and therefore holds that "the record before us is sufficient to permit our resolution of the jury selection issues which are properly before us." Maj. op. at 260.

First, the burden to preserve portions of the record should not be placed on the defendant where the judiciary itself is responsible for destroying or losing those parts of the record in question. The majority's demand that Rodriguez " 'prepare a statement of the evidence or proceedings from the best available means, including his recollection,' " maj. op. at 260 (quoting C.A.R. 10(c)), is completely unrealistic in the context of hundreds of lost jury questionnaires. In addition, the majority transforms a discretionary option under Colorado's appellate rules, see C.A.R. 10(c) ("the appellant *may* prepare a statement of the evidence or proceedings from the best available means, including his recollection") (emphasis added), into a mandatory obligation.

Second, section 13–71–115, 6A C.R.S. (1995 Supp.), adopted after conclusion of the trial in this case, requires courts to retain all

---

**15.** Rodriguez's issue forty-one reads:

> THE COURT'S RULING THAT SEVERAL CLAIMS CONCERNED ONLY "INADEQUATE FOUNDATION FOR EXHIBITS" AND THUS THAT THEY WERE NOT "AVAILABLE" WAS ERROR.

Appendix A to maj. op. at 307.

**16.** I agree with the majority that issues 120, 121, 122, 125, 126, 127, and 128 are rendered moot by this court's affirmance of the trial court's vacation of the predicate offenses. Maj. op. at 254–55.

completed questionnaires of prospective jurors. Although the majority recognizes this, maj. op. at 259 n. 30, it makes no effort to examine the legislative history for any indications as to whether the statutory revision simply codified existing practice or legislative expectations.

In addition, the majority errs in dismissing Rodriguez's ineffective assistance of counsel claim with regard to lost portions of the record. In *Perry v. Leeke*, the United States Supreme Court determined that if governmental action actually or constructively denies the assistance of counsel altogether, a showing of prejudice is not necessary to establish a violation of a defendant's constitutional right to effective assistance of counsel. *Perry v. Leeke*, 488 U.S. 272, 279–80, 109 S.Ct. 594, 599–600, 102 L.Ed.2d 624 (1989); *see* maj. op. at 302. As that case makes clear, denial of the assistance of counsel altogether is to be evaluated with respect to individual issues or times during the course of the judicial proceedings. *Id.* For instance, such denial resulted when a court forbade a defendant from consulting with his attorney during an overnight recess at the conclusion of the defendant's direct examination. *See Geders v. United States*, 425 U.S. 80, 96 S.Ct. 1330, 47 L.Ed.2d 592 (1976).

In the case before us, I do not agree with the majority's conclusion that the judiciary's loss of portions of the record, including lost jury questionnaires, cannot support a claim for ineffective assistance of counsel with regard to those claims that were dependent upon the lost portions of the record. The majority states:

> In the present case, the state of the record did not altogether prevent Rodriguez' counsel from assisting Rodriguez in the preparation of his appeal. On direct appeal, Rodriguez' counsel filed a 138–page brief and an appendix listing 102 additional issues. Accordingly, we conclude that the incompleteness of the record did ·not amount to an actual or constructive denial of counsel for which prejudice would be presumed.

Maj. op. at 303. In my opinion, the number of pages and listed issues in Rodriguez's brief and appendix are of no help in deter-

mining whether the judiciary's loss of portions of the record deprived Rodriguez of effective assistance of counsel with respect to claims that are dependent on the missing portions of the record. I would hold that Rodriguez has a legitimate claim that the judiciary's loss of jury questionnaires prevented him from receiving effective assistance of counsel with regard to those claims that could not be evaluated or substantiated in absence of the lost record material.

I would qualify a defendant's burden to preserve the record for appeal where the judiciary is responsible for lost portions of the record, and remand the question of lost portions of the record to the district court for a hearing on the issue of whether the defendant has suffered prejudice as a result of the missing records. In addition, this court should consider on the merits Rodriguez's claim that he has not received effective assistance of counsel with regard to any claims that were dependent upon the lost record material, without requiring that Rodriguez establish prejudice, rather than dismissing that claim in part because Rodriguez did receive effective assistance of counsel on certain unrelated claims. For these reasons, I respectfully dissent from parts VI(A), VI(C), and XVIII of the majority's opinion, including its disposition of issues 53, 54, 58, 65, and 81.

### F.

Addressing Rodriguez's issue sixty-one, the majority concedes that his allegations, if true, would establish a violation of the Uniform Jury Selection and Service Act, §§ 13–71–101 to –122, 6A C.R.S. (1987), but dismisses the need for a hearing by framing the claims as nonconstitutional issues. Maj. op. at 262–63. Because fundamental errors in the jury selection process can implicate constitutional norms such as due process concerns or the right to a jury trial, a hearing is necessary to determine whether the alleged errors indeed occurred. *See* Crim.P. 35(c)(3). I would remand issue sixty-one to the district court for a hearing on the merits of Rodriguez's Uniform Jury Selection and Service Act claim. For this reason, I respectfully dissent from the majority's disposi-

tion of issue sixty-one, contained within part IV(D) of the majority's opinion.

### G.

The majority engages in a cursory analysis of issue thirty-eight, without any specific references to the record or elaboration. Maj. op. at 267. The majority characterizes issue thirty-eight as a due process claim. Maj. op. at 267. However, Rodriguez's issue thirty-eight extended beyond due process questions:

> THE RESTRICTIONS ON DEFENSE COUNSEL'S CROSS-EXAMINATION AND IMPEACHMENT OF PATRICIA THOMAS VIOLATED THE CONFRONTATION, CRUEL AND UNUSUAL PUNISHMENT AND DUE PROCESS CLAUSES OF THE FEDERAL AND COLORADO CONSTITUTIONS.

Appendix A to maj. op. at 307. Within issue thirty-eight, Rodriguez raised several discrete contentions, including that:

> The trial court demonstrated a complete misunderstanding of the "collateral impeachment" rule. The court repeatedly refused to allow defense counsel to ask questions which went directly to the bias of the witness, [and] to her interests and motives in testifying as she did....
>
> ....
>
> ... The numerous discovery violations by the state went totally unsanctioned by the court, to the enormous prejudice to Mr. Rodriguez' fundamental rights. The court's refusal to grant a continuance at any time, or even to delay the cross examination of Ms. Thomas after the latest of these many intentional attempts by the state to subvert the truth-seeking function of the trial [through alleged discovery violations], or even to grant Mr. Rodriguez any relief or to sanction the state when its misconduct and lies became evident during the examination of Ms. Thomas, fully protected the state's efforts....

Appellant/Cross-Appellee's Opening Brief at 145–46, *People v. Rodriguez* (No. 91SA112) (March 9, 1995). Rather than engage in any discussion of Rodriguez's claims, the majority simply notes the principle that a trial court has discretion to determine the scope and limits of cross-examination and summarily concludes that its review of the record discloses no abuse of trial discretion. Maj. op. at 267. Because issue thirty-eight requires a substantive discussion on the merits of the claim, I respectfully dissent from issue thirty-eight in part VII(A)(2) of the majority opinion.

### H.

In issue thirty-one, Rodriguez contends that the district court erred in refusing to grant a continuance so that the defense could secure the testimony of Sam Cruz. Cruz allegedly would have testified that the knife admitted into evidence was given by him to Patricia Thomas as a birthday present. *See* maj. op. at 268. One of Rodriguez's main lines of defense was that David Martinez, the boyfriend of Patricia Thomas, was the actual killer of Lorraine Martelli. Evidence that Thomas owned the murder weapon could have cast significant doubt on Thomas's credibility and the jury's determination regarding who wielded the knife during the murder. Furthermore, in view of the multiple stab wounds and vicious nature of this killing, the jury's finding that Rodriguez was the killer could in turn have been highly prejudicial during the sentencing phase of this case.

The majority reasons that there was no abuse of discretion because Mary Compos had already testified that she saw Thomas in possession of a knife that Thomas received as a birthday present, that Compos' testimony indicated that the birthday knife had the same brand or model marking as the murder knife, and that Cruz' testimony would therefore have been cumulative. Maj. op. at 268–69. However, there is a substantial difference between testimony that Thomas possessed a knife with the same general brand or model marking and testimony that Thomas possessed the knife that was used in the murder. Here, the murder weapon was uniquely characterized by a defective locking mechanism. *See* r. at v.31, pp. 48–51. Although Compos testified that the birthday knife and the murder knife had the same brand or model markings, only Cruz could potentially have testified that the knife given

to Thomas for her birthday had the same defective locking mechanism, thereby providing strong evidence that Thomas's knife was the murder weapon. Cruz's potential testimony cannot be considered cumulative evidence, especially in view of the crucial nature of Thomas' testimony for the prosecution, and the majority is disingenuous in arguing that Rodriguez has not shown that the continuance denial "prevented him from effectively impeaching Thomas." Maj. op. at 268.[17] Because Cruz's testimony may not have been cumulative, I would remand issue thirty-one for an evidentiary hearing regarding the potential testimony and the district court's decision to deny the motion for continuance. For this reason, I respectfully dissent from the majority's disposition of issue thirty-one, contained within part VII(C) of the majority opinion.

### III.

This dissent does not address the majority's opinion comprehensively. I have singled out issues that appear to be most salient and have concluded that the death penalty imposed on Frank D. Rodriguez should be vacated and the case remanded for imposition of a sentence to life imprisonment for reasons explained in part I of this opinion. At a minimum, the majority's rejection of this conclusion should still require remand to the district court for resolution of the issues discussed in part II of this opinion. For these reasons, I respectfully dissent.

---

**17.** In contrast, I agree with the majority's analysis and disposition of the second part of issue thirty-one, the hearsay question. *See* maj. op. at 268–69.